IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JACKSON INVESTMENT GROUP, LLC,<br><br>              Plaintiff,<br>   v.<br><br>JOHNNY THOMAS AND JOHN C. FRANCIS,<br><br>             Defendants. | Case No. _____<br><br>COMPLAINT<br><br>JURY DEMANDED |

Plaintiff, Jackson Investment Group, LLC ("Jackson"), alleges the following based upon the investigation undertaken by its counsel, which included a review of publicly available news articles and reports; Blue Earth, Inc.'s filings with the Securities and Exchange Commission; electronic communications from Defendants Johnny Thomas and John Francis and others; and private investigations and discussions.

## I.    NATURE OF THE ACTION

1.      This is a securities suit against two former senior executives of Blue Earth, Inc., Johnny Thomas and John Francis.

2.      Blue Earth was a clean-energy startup formed in 2010.  It needed capital in order to fill Thomas's and Francis's ambitious plans for the company.

To attract investors, Blue Earth, Thomas, and Francis made misrepresentations—both to Jackson specifically and to investors generally—that Blue Earth had tens of millions of dollars in tangible "Property and Equipment" or "Net Fixed Assets." That fiction allowed Thomas and Francis to paint Blue Earth as a company that could generate substantial profits for investors and also as a safe investment with hard assets that creditors could foreclose upon if Blue Earth experienced financial difficulties.  In reality, and unbeknownst to Jackson, the supposed "Property and Equipment" or "Net Fixed Assets"—which at times approached *half* of Blue Earth's total assets on Blue Earth's balance sheet—were mere intangible, non-binding term sheets relating to building seven "cogeneration" (sometimes referred to as "combined head and power" or "CHP") power plants, that were by their own terms "intended to serve only as a framework to identify certain issues and matters that would have to be addressed in further discussions and definitive written agreements."   Those non-binding term sheets had no value at all, much less the at least $44 million value Blue Earth, Thomas, and Francis ascribed to them.

3.     Jackson invested approximately $34 million in Blue Earth in reliance on Blue Earth's, Thomas's, and Francis's misrepresentations that Blue Earth had tens of millions of dollars' worth of safe, tangible assets that could generate profits and protect Jackson's investment.  Jackson also made several investments in Blue

Earth debt securities in reliance on Blue Earth's, Thomas's, and Francis's false representation in February 2015 that they had lined up "take-out" financing to repay Jackson's debt investments.

4.     Blue Earth eventually entered bankruptcy.  Blue Earth did not in fact have the hard assets to protect Jackson's investment.  As a result, Jackson lost the great bulk of its investment.  In the bankruptcy, all pre-bankruptcy equity interests were cancelled, including Jackson's Blue Earth common stock.  Under the bankruptcy plan, Jackson received no compensation for its pre-bankruptcy Blue Earth equity investments.  Moreover, in the bankruptcy Jackson received compensation for only a fraction of its pre-bankruptcy debt investments in Blue Earth.  After the bankruptcy, Jackson had an approximately $20 million deficiency with respect to its debt investments in Blue Earth.

## II.     <u>PARTIES</u>

5.     Plaintiff, Jackson Investment Group, is a Georgia limited liability corporation.  Its principal office is 2655 Northwinds Parkway, Alpharetta, Georgia, 30009.

6.     Defendant Johnny Thomas ("Thomas") joined Blue Earth as its Chief Executive Officer and President on September 1, 2010 and served in that position until September 1, 2015, when he resigned so that he could devote his full time to

serving as CEO of a Blue Earth subsidiary.  He also served as president until May 16, 2013.  He was appointed to the Blue Earth Board of Directors in February 2011, a position in which he served until September 1, 2015.

7.     Defendant John Francis ("Francis") joined Blue Earth as its Executive Vice President of Corporate Development and Investor Relations on September 1, 2010.  He served in that position until on or about September 1, 2015.   According to a proxy statement Blue Earth filed on June 13, 2014, he was an "Executive" at Blue Earth.

### III.   <u>JURISDICTION AND VENUE</u>

8.     Jurisdiction exists pursuant to § 27 of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.  Some of the claims asserted arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated by the Securities and Exchange Commission thereunder.

9.     This Court may exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts giving rise to the violations complained of occurred in this District.  As set forth more fully below:

(a)     The Defendants both met with Jackson in this District in order to solicit Jackson's investment and made material misrepresentations and omissions there that Jackson relied upon in purchasing Blue Earth securities;

(b)     The Defendants sent emails and made calls to Jackson in this District and made material misrepresentations and omissions that Jackson relied upon in purchasing Blue Earth securities;

(c)     Jackson purchased all of the securities at issue while operating in this District;

(d)     Jackson signed all documents related to the purchase of notes described herein in this District.

(e)     The notes and certificates for the securities described below were delivered to Jackson in this District.

11.     In connection with the acts and conduct alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and/or electronic communications, in making misrepresentations and omissions to Jackson.

### IV.   <u>STATEMENT OF FACTS</u>

12.   In October 2010 a Delaware company called Genesis Fluid Solutions Holdings, Inc., reincorporated in Nevada and merged with a newly created Nevada corporation, Blue Earth.  Blue Earth's  business focuses on clean technology for use in the energy industry.

13.   The newly-formed Blue Earth was effectively a startup with few assets.  According to Blue Earth's Form 10-K for 2010, the company had less than $4 million in total assets.

14.   Blue Earth needed capital to execute its business strategy.  In Blue Earth's Form 10-K for 2013, for example, Blue Earth stated that its "ultimate success depends upon [its] ability to raise additional capital.  We are pursuing sources of additional capital through various means, including joint venture projects and debt or equity financing.  However, we expect to fund much of our growth through project financing by using a combination of debt and equity financing[.]"

15.   Hence, Blue Earth, Thomas, and Francis thereafter endeavored to raise capital from investors like Jackson.

**June 20, 2014, Investment**

16.     In June 2014, an investment-management consultant approached Jackson about investing in Blue Earth.  The consultant assembled presentation materials on Blue Earth's business plans and finances.  The presentation included information from Blue Earth's consolidated balance sheet in Blue Earth's Form 10-Q for the first quarter of 2014, which Blue Earth had filed on May 16, 2014. Based on the Form 10-Q's balance sheet, the presentation stated that Blue Earth had a total of $88,192,692 in assets.  Also based on the 10-Q's balance sheet, the presentation stated that  $33,745,418 of those assets—or 38% of all assets—were "Property and Equipment, net."  And also like the 10-Q's balance sheet, the presentation stated that another $12,581,570 of the assets—or 14% of all assets— were "Construction in progress."

17.     Mr. Thomas signed the 10-Q that contained the balance sheet that the presentation incorporated.  He also signed Sarbanes Oxley certifications, representing, among other things, that he had reviewed the 10-Q; that the report did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made not misleading; that the 10-Q fairly presented the financial condition of Blue Earth; that he had designed disclosure controls to ensure that material information related to Blue Earth was made known to him; that he had designed internal controls over financial reporting to provide

reasonable assurances regarding the reliability of financial reporting and preparation of financial statements for external purposes in accordance with generally accepted accounting principles; that he had evaluated the effectiveness of Blue Earth's disclosure controls and procedures; that he had disclosed any fraud involving management or employees with a significant role in Blue Earth's internal control over financial reporting; and that the 10-Q represented the financial conditions and result of operations of Blue Earth.

18.     The balance sheet in Blue Earth's Form 10-Q, which was reproduced in the June 2014 presentation Jackson received, and Mr. Thomas's certifications about the accuracy and reliability of the 10-Q's balance sheet, were false.  The 10-Q's balance sheet indicated that Blue Earth had over $33.7 million in tangible, physical assets by labeling that asset "Property and Equipment." That is a label that the Financial Accounting Standards Board's Standards Codification applies to "long-lived tangible assets used to create and distribute an entity's products and services" including land and land improvements; buildings; machinery and equipment; and furniture and fixtures.  FASB ASC 360-10-05-2.  Likewise, the 10-Q's balance sheet indicated that Blue Earth was then constructing additional property and equipment, which would be another tangible asset, and which

construction Blue Earth valued at $12.5 million.  In reality, and unbeknownst to Jackson:

(a)     At least $44,035,000 of the $46.2 million labeled as "Property and Equipment" and "Construction in Progress" represented (by Blue Earth's admission in internal documents) mere intangible assets, i.e., seven non-binding term sheets to discuss the possibility of entering a definitive agreement to construct "cogeneration" power plants for a food-processing company—assets that lacked a "physical substance." FASB ASC 85-10-20 (defining "Intangible Assets").  It is clear that Blue Earth knew as much, because an internal accounting document Blue Earth produced in bankruptcy labels the seven potential cogeneration plants as representing a total of $44,035,502 in "*intangible* value" (emphasis added).

(b)     At that time, Blue Earth had not completed a single plant. Indeed, only on August 22, 2014, would Blue Earth first sign an apparently binding agreement to build a single cogeneration plant. Construction on that plant remains uncompleted today.  Thereafter, on December 1, 2014, Blue Earth would sign one more apparently binding agreement to construct a cogeneration plant.  Blue Earth

would energize that plant on March 30, 2015.  Blue Earth never

signed binding contracts or commenced construction on any other

cogeneration plant.

(c)     The at least $44,035,500 value that Blue Earth and Thomas

ascribed to the non-binding term sheets was the market value of stock

Blue Earth had purportedly issued to the shareholders of IPS Power

Engineering, Inc., and Global Renewable Energy Group, Inc., in order

to acquire those companies and their primary asset, which in fact was

no asset at all.  That supposed  asset was the non-binding term sheets

to discuss the possibility of entering a definitive agreement to build

the seven cogeneration power plants—term sheets that in fact did not

even exist at the time of the acquisition.  According to an internal

accounting document Blue Earth produced in a bankruptcy

proceeding, Blue Earth treated that $44,035,500 figure as "intangible

value" and distributed that value evenly across the seven potential

cogeneration projects, with each receiving a baseline intangible value

of $6,290,786.  Such was the case even as late as December 31, 2015,

according to the document.

(d)     Under Generally Accepted Accounting Principles, Blue Earth should have recognized no value at all for the non-binding term sheets, much less $44,035,000.  When one company acquires another, GAAP allows the acquirer to recognize a separate value for only those acquired assets that are "identifiable" separately from goodwill. FASB ASC 805-20-25-1, 805-20-25-10, 805-30-30-1.  An asset is separately "identifiable" only if it (i) is "separable, that is, capable of being separated or divided from the entity and sold, transferred, licensed, rented or exchanged" or (ii) "raises from contractual or other legal rights[.]"  FASB ASC 805-10-20.   Here, the term sheets satisfied neither criteria.  The term sheets were completely non-binding.  And the term sheets were dated *after* the acquisition of the companies that had supposedly held them, so the term sheets did not even exist at the time of the acquisition.  Instead of assigning the $44,035,000 in value to the non-binding term sheets, Blue Earth should have classified virtually that entire sum (less the value of the acquirees' meager tangible assets) to mere goodwill on Blue Earth's balance sheet.  *See* FASB ASC 804-30-30-1, 805-20-25-10.

19.     In short, in the balance sheet in the Form 10-Q—and in the other misrepresentations described below—Blue Earth labeled the supposed $44,035,500 purchase price it purported to have paid for non-binding term sheets as hard assets that could be used to generate revenues and secure debts.  In fact, this amount represented at best the grossly overstated value of intangible assets that would attain any real value only if multiple other contingencies occurred and at worst nothing more than an accounting entry with no real value.

20.     These misrepresentations, which Thomas made[1] on Blue Earth's behalf and in the scope of his employment,[2] about the nature and value of Blue Earth's assets, and about the accuracy and reliability of  the balance sheet in Blue Earth's Form 10-Q, were material.  To a reasonable investor, these misrepresentations significantly altered the mix of information available about Blue Earth.  If the Form 10-Q's balance sheet had (1) accurately represented that *almost half*, and maybe more, of Blue Earth's assets were mere intangible, non-binding term sheets, rather than tangible property and equipment or construction of tangible property actually in progress, or (2) accurately represented that the value

---

[1] Although Francis did not sign such SEC filings, he likewise authored the misrepresentations in those filings about the nature and value of the non-binding terms sheets.  As explained below, he and Thomas both participated directly in the decision about how to classify those term sheets on the balance sheet.

[2] Unless otherwise stated, Thomas and Francis acted on behalf of Blue Earth and within the scope of their employment with Blue Earth at all times described herein.

Blue Earth placed on the assets was merely the value of Blue Earth stock supposedly transferred to acquire the non-binding term sheets, and was grossly inflated, then the Form 10-Q's balance sheet would have presented a substantially different risk profile to investors.  For example, investors would have known that Blue Earth had much less property and equipment with which to "create and distribute [Blue Earth's] products and services"—and that Blue Earth was thus substantially less able to generate revenue than Blue Earth represented that it had been.  FASB ASC 360-10-05-2.   Likewise, investors would have known that few assets would be available to distribute to investors and creditors if Blue Earth were to enter bankruptcy (which it eventually did).

21.     Blue Earth and Thomas knew, or with severe recklessness disregarded, the falsity of these statements about the nature and value of Blue Earth's assets and the accuracy and reliability of Blue Earth's financial statement. Blue Earth and Thomas made these misrepresentations knowingly, or with severe recklessness, for the purpose and effect of inducing investors like Jackson to invest in Blue Earth.

22.     On June 20, 2016, Jackson bought 1,000,000 shares of Blue Earth stock at $2.50 per share and received Class B Warrants to purchase an equal number of shares at $6.00 per share and rights to 1 million Class C warrants at

$12.00 per share.   Jackson did so in reasonable reliance on Blue Earth's and

Thomas's representations that Blue Earth's assets included $33.7 million in

tangible, physical property and equipment, and over $12.5 million worth of

construction in progress, which would lead to still more tangible, physical

property.   Jackson also relied on Thomas's certifications, such as that the Form

10-Q's balance sheet accurately represented the value and nature of Blue Earth's

assets.  If the Form 10-Q's balance sheet had accurately stated the nature of the

assets and their true value (or that the 10-Q was inaccurate and unreliable), Jackson

would not have invested in Blue Earth.

### Stock Purchases in September through November 2014

23.    In early September 2014, Jackson communicated by email with

Thomas and Francis, both of whom acted as Blue Earth representatives, about

acquiring additional Blue Earth stock.   Although the statements in the prior 10-Q's

balance sheet and Thomas's certifications had been false, neither Thomas nor

Francis (who acted on Blue Earth's behalf) made any disclosure to Jackson to

correct those statements.  During these discussions, Francis and Thomas sent

emails to Jackson in Alpharetta, Georgia.

24.    Those omissions created a misleading impression about the nature and

value of Blue Earth's assets.  They let stand the misrepresentations from the prior

Form 10-Q's balance sheet that Blue Earth had tens of millions of dollars in tangible "Property and Equipment" and "Construction in progress." In reality, and unbeknownst to Jackson:

> **(a)**     At least $44,035,000 of the sum labeled as "Property and Equipment" and "Construction in progress" represented (by Blue Earth's admission in its internal documents) intangible assets, i.e., non-binding term sheets to discuss the possibility of entering a definitive agreement to construct "cogeneration" power plants for a food-processing company and (by the time of the email communications) perhaps one apparently binding agreement to do so. It is clear that Blue Earth knew as much, because an internal accounting document Blue Earth produced in bankruptcy labels the seven potential cogeneration plants as representing a total of $44,035,502 in "*intangible* value" (emphasis added).
>
> **(b)**     As of September 2014, Blue Earth had not completed a single plant. The plant for which Blue Earth had signed an apparently binding agreement on August 22, 2014, was not complete and indeed remains uncompleted today. Thereafter, on December 1, 2014, Blue Earth would sign one more apparently binding agreement to construct

a cogeneration plant.  Blue Earth would energize that plant on March 30, 2015.  Blue Earth never signed binding contracts or commenced construction on any other cogeneration plant.

(c)     The at least $44,035,500 value Blue Earth and Thomas ascribed to the non-binding term sheets, and perhaps one apparently binding contract, consisted of the market value of stock Blue Earth had purportedly issued to the shareholders of IPS Power Engineering, Inc., and Global Renewable Energy Group, Inc., in order to acquire those companies and their non-binding term sheets to discuss the possibility of entering a definitive agreement to build the seven cogeneration power plants—term sheets that did not even exist at the time of the acquisition. According to an internal accounting document Blue Earth produced in a bankruptcy proceeding, Blue Earth treated that $44,035,500 figure as "intangible value" and distributed that value evenly across the seven potential cogeneration projects, with each receiving a baseline intangible value of $6,290,786.  Such was the case even at late as December 31, 2015, according to the document

(d)     As explained above, the term sheets in fact had no value at all under GAAP, much less $44,035,500.

25.    Blue Earth, Thomas, and Francis made omissions that were material when they failed to disclose to Jackson the true nature and value of the "Property and Equipment" and "Construction and progress" in these communications.  To a reasonable investor, these omissions significantly altered the mix of information available about Blue Earth. If a reasonable investor had known (1) that almost half, and maybe more, of Blue Earth's assets were mere intangible, non-binding term sheets, and perhaps one apparently binding agreement, rather than tangible property and equipment or construction in progress, or (2) that the value ascribed to those assets was merely the value of Blue Earth stock transferred to acquire the non-binding term sheets, which grossly inflated the term sheets' value, then the investor would have seen a substantially different risk profile.  For example, the investor would have known that Blue Earth had very little property and equipment with which to "create and distribute [Blue Earth's] products and services"—and that Blue Earth was substantially less able to generate revenue than Blue Earth represented itself to be.  FASB ASC 360-10-05-2.  Likewise, investors would have known that few assets would be available to distribute to investors and creditors if Blue Earth were to enter bankruptcy (which it eventually did).

26.    Blue Earth, Thomas, and Francis knew, or with severe recklessness disregarded, that these omissions, coupled with the misrepresentations in the Form

10-Q's balance sheet, created a misleading impression about the nature and value of Blue Earth's assets and the accuracy and reliability of Blue Earth's financial statements.  Blue Earth, Thomas, and Francis made these omissions knowingly, or with severe recklessness, for the purpose and effect of inducing Jackson to invest in Blue Earth.

27.     On September 5, 2014, Jackson purchased 677,500 Blue Earth shares at $3.00 per share, or $2,032,500, and received Class B warrants to buy 677,500 shares at $6.00 per share and rights to 677,500 Class C warrants at $12.00 per share.  From October 23 through November 14, 2014 Jackson acquired an additional 1,428,276 shares of Blue Earth stock in open-market purchases for a total purchase price of $1,984,595.

28.     Jackson made these investments in reasonable reliance on (1) Blue Earth's and Thomas's misrepresentations in the balance sheet from the Blue Earth 10-Q (incorporated in the June 2014 presentation) about the nature and value of Blue Earth's assets and the accuracy and reliability of that Form 10-Q's balance sheet; and (2) Blue Earth's, Thomas's, and Francis's failure to correct those misrepresentations in the email communications with Jackson directly.  Jackson would not have made these investments if Jackson had known the true nature and

value of the assets labeled "Property and Equipment" and  "Construction in progress" and the inaccuracy and unreliability of Blue Earth's 10-Q balance sheet.

### $10 million Investment on November 25, 2014

29.     On November 14, 2014, Blue Earth filed another Form 10-Q, which Thomas again signed.  In that 10-Q's balance sheet, Blue Earth and Thomas stated that Blue Earth now had "Property and Equipment" worth $52,248,308 and total assets of $89,199,176.

30.     Thomas again signed certifications about the accuracy and reliability of the Form 10-Q, certifications which were identical or substantially identical to the prior one.

31.     Blue Earth's and Thomas's representations about the nature and value of Blue Earth's assets and the accuracy and reliability of the November 2014 10-Q were false.  The Form 10-Q represented that Blue Earth had $52,248,308 worth of "long-lived tangible assets used to create and distribute an entity's products and services" including land and land improvements; buildings; machinery and equipment; and furniture and fixtures.  FASB ASC 360-10-05-2.   In reality, and unbeknownst to Jackson:

> (a)     At least $44,035,000 of the $52,248,308 labeled as "Property and Equipment" represented (by Blue Earth's admission in its internal

documents) intangible assets, i.e., non-binding term sheets to discuss the possibility of entering a definitive agreement to construct "cogeneration" power plants for a food-processing company and perhaps one apparently binding agreement to do so.  It is clear that Blue Earth knew as much, because an internal accounting document Blue Earth produced in bankruptcy labels the seven potential cogeneration plants as representing a total of $44,035,502 in "*intangible* value" (emphasis added).

(b)     At the time of that November 2014, 10-Q, Blue Earth had not completed a single one of the seven plants.  Although Blue Earth signed an apparently binding agreement on August 22, 2014, to build a plant, that plant was not completed and indeed still is not complete today.  Thereafter, on December 1, 2014, Blue Earth would sign one more apparently binding agreement to construct a cogeneration plant. Blue Earth would energize that plant on March 30, 2015. Blue Earth never signed binding contracts or commenced construction on any of the other five cogeneration plants.

(c)     The $44,035,000 value ascribed to the non-binding term sheets to discuss the possibility of entering a definitive agreement to build

co-generation plants, and perhaps one apparently binding agreement, consisted of the market value of stock Blue Earth had purportedly issued to the shareholders of IPS Power Engineering, Inc., and Global Renewable Energy Group, Inc., in order to acquire those companies and their supposed primary asset.  That supposed asset was in fact no asset at all but was instead  non-binding term sheets to discuss the possibility of entering a definitive agreement to build the seven cogeneration power plants—term sheets that did not even exist at the time of the acquisition. According to an internal accounting document Blue Earth produced in a bankruptcy proceeding, Blue Earth treated that $44,035,500 figure as "intangible value" and distributed that value evenly across the seven potential cogeneration projects, with each receiving a baseline intangible value of $6,290,786.  Such was the case even at late as December 31, 2015, according to the document.

(d)     As explained above, the term sheets in fact had no value at all under GAAP, much less $44,035,500.

32.     These misrepresentations were material.  To a reasonable investor, these misrepresentations significantly altered the mix of information available

about Blue Earth. If investors had known (1) that almost half, and perhaps more, of Blue Earth's assets were mere intangible, non-binding term sheets and perhaps one apparently binding agreement, rather than tangible property and equipment, or (2) that the value ascribed to that asset was merely the value of Blue Earth stock supposedly transferred to acquire the non-binding term sheets, which grossly inflated the term sheets' value, then investors would have seen a substantially different risk profile.  For example, investors would have known that Blue Earth had much less property and equipment with which to "create and distribute [Blue Earth's] products and services"—and that Blue Earth was thus substantially less able to generate revenue than Blue Earth represented that it had been.  FASB ASC 360-10-05-2.   Likewise, investors would have known that few assets would be available to distribute to investors and creditors if Blue Earth were to enter bankruptcy (which it eventually did).

33.    Blue Earth and Thomas knowingly, or with severe recklessness disregarded, that these representations about the nature and value of Blue Earth's assets and the accuracy and reliability of Blue Earth's financial statements were false.  Blue Earth and Thomas made these misrepresentations knowingly, or with severe recklessness, for the purpose and effect of inducing investors like Jackson to invest in Blue Earth.

34.    On November 20, 2014, Thomas and Francis met with senior Jackson representatives responsible for helping Jackson make investment decisions in Alpharetta, Georgia, to solicit a further investment from Jackson.   Although Thomas and Francis discussed the cogeneration-plant project, and although the Form 10-Qs' balance sheets had misrepresented the nature and value of Blue Earth's assets, Thomas and Francis did not divulge that the Blue Earth's Form 10-Qs' balance sheets were applying the "Property and Equipment" label to the non-binding term sheets and perhaps one apparently binding agreement to build an uncompleted plant. Nor did they divulge  how Blue Earth had calculated the at least $44,035,000 in value, and perhaps more, Blue Earth was ascribing to that asset.   To the contrary, in their joint presentation to Jackson, Thomas and Francis stated that Blue Earth had real, tangible assets.

35.    Coupled with the misrepresentations in the Form 10-Qs' balance sheets, those omissions gave Jackson a misleading impression about the nature and value of Blue Earth's assets—especially when combined with the misrepresentations at the meeting about Blue Earth having real, tangible assets. The prior Form 10-Qs' balance sheets, left uncorrected because of the omissions, suggested that Blue Earth's "Property and Equipment"—i.e., "long-lived tangible assets used to create and distribute an entity's products and services," including

land and land improvements; buildings; machinery and equipment; and furniture and fixtures—had grown to $52,248,308.  FASB ASC 360-10-05-2.  In reality, and unbeknownst to Jackson:

(a)     At least $44,035,000 of the $52,248,308 labeled as "Property and Equipment" represented (by Blue Earth's admission in its internal documents) intangible assets, i.e., non-binding term sheets to discuss the possibility of entering a definitive agreement to construct "cogeneration" power plants for a food-processing company and perhaps one apparently binding agreement to do so.  It is clear that Blue Earth knew as much, because an internal accounting document Blue Earth produced in bankruptcy labels the seven potential cogeneration plants as representing a total of $44,035,502 in "*intangible* value" (emphasis added).

(b)     As of the November 2014 meeting, Blue Earth had not completed a single plant.  The plant for which Blue Earth had signed an apparently binding agreement on August 22, 2014, was not complete and indeed remains uncompleted today.  Thereafter, on December 1, 2014, Blue Earth would sign one more apparently binding agreement to construct a cogeneration plant.  Blue Earth

would energize that plant on March 30, 2015.  Blue Earth never

signed binding contracts or commenced construction on any other

cogeneration plant.

(c)     The at least $44,035,500 value Blue Earth and Thomas ascribed

to the non-binding term sheets, and perhaps one apparently binding

agreement, consisted of the market value of stock Blue Earth had

purportedly issued to the shareholders of IPS Power Engineering, Inc.,

and Global Renewable Energy Group, Inc., in order to acquire those

companies and their non-binding term sheets to discuss the possibility

of entering a definitive agreement to build the seven cogeneration

power plants—term sheets that did not even exist at the time of the

acquisition. According to an internal accounting document Blue Earth

produced in a bankruptcy proceeding, Blue Earth treated that

$44,035,500 figure as "intangible value" and distributed that value

evenly across the seven potential cogeneration projects, with each

receiving a baseline intangible value of $6,290,786.  Such was the

case even at late as December 31, 2015, according to the document.

(d)     As explained above, the term sheets in fact had no value at all

under GAAP, much less $44,035,500.

36.    Blue Earth, Thomas, and Francis made misrepresentations and omissions that were material when they failed to disclose to Jackson the true nature and value of the "Property and Equipment" during this meeting and instead represented that Blue Earth had real, tangible assets.  To a reasonable investor, these misrepresentations and omissions significantly altered the mix of information available about Blue Earth.  If investors had known (1) that almost half, and maybe more, of Blue Earth's assets were mere intangible, non-binding term sheets and perhaps one apparently binding agreement, rather than tangible property and equipment, or (2) that the value ascribed to that asset was merely the value of Blue Earth stock transferred to acquire the companies that supposedly held the non-binding term sheets, which grossly inflated the term sheets' value, then investors would have seen a substantially different risk profile.  For example, investors would have known that Blue Earth had much less property and equipment with which to "create and distribute [Blue Earth's] products and services"—and that Blue Earth was thus substantially less able to generate revenue than Blue Earth represented that it had been.  FASB ASC 360-10-05-2.  Likewise, investors would have known that few assets would be available to distribute to investors and creditors if Blue Earth were to enter bankruptcy (which it eventually did).

37.     Blue Earth, Thomas, and Francis knowingly, or with severe recklessness disregarded, that these misrepresentations and omissions, coupled with the misrepresentations in the 10-Qs' balance sheets, created a misleading impression of the nature and value of Blue Earth's assets and the accuracy and reliability of Blue Earth's financial statements.  Blue Earth, Thomas, and Francis made these misrepresentations and omissions knowingly, or with severe recklessness, for the purpose and effect of inducing Jackson to invest in Blue Earth.

38.     On November 25, 2014, Jackson bought 10,000,000 shares of Blue Earth stock at $1.00 per share, or $10 million.  Jackson purchased the stock through a Common Stock Purchase Agreement—which Thomas signed on Blue Earth's behalf—stating that Blue Earth's November 14, 2014, 10-Q "fairly present[ed] in all material respects the consolidated financial position of [Blue Earth] and [Blue Earth's] Subsidiaries as of the date thereof[.]"  The Agreement also stated specifically that all of the forms, reports, certifications, and other documents Blue Earth had filed with the Securities and Exchange Commission (including the audited and unaudited consolidated financial statements) complied with the Securities Act of 1933, the Securities Exchange Act of 1934, and the SEC's rules and regulations and that "[n]one of the SEC Reports, at the time filed,

contained any untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading." Further, the Agreement stated that neither it nor other documents related to the Agreement "contain[ed] any untrue statement of a material fact, and [that none of those documents] omit[ted] to state a material fact required to be stated therein or necessary in order to make such representations, warranties or statements not misleading in light of the circumstances under which they were made."  As explained above, those statements were materially false and Blue Earth and Thomas knew, or with severe recklessness disregarded, the statements' falsity and also knowingly, or with severe recklessness, made those misrepresentations with the purpose of inducing Jackson to invest in Blue Earth.

39.    Jackson bought the 10,000,000 Blue Earth shares in reasonable reliance on Blue Earth's, Thomas's, and Francis's misrepresentations and omissions, including  (1) Blue Earth's and Thomas's misrepresentations in Blue Earth's 10-Qs' balance sheets about the nature and value of Blue Earth's assets and the accuracy and reliability of those Form 10-Qs' balance sheets; (2) Blue Earth's, Thomas's, and Francis's misrepresentations and failure to correct the earlier misrepresentations in the November 2014 meeting with senior Jackson personnel

responsible for helping to make investment decisions and in the September 2014 communications; and (3) the representations in the Common Stock Purchase Agreement about the accuracy and reliability of the documents Blue Earth had filed with the SEC.  Indeed, the Common Stock Purchase Agreement stated that Blue Earth "acknowledge[d] that [Jackson was] relying on the representations, acknowledgements and agreements made by" Blue Earth in the Agreement "in making decisions concerning the Shares."  If Blue Earth, Thomas, and Francis had accurately stated the nature of the assets and their true value, or if Jackson had known that Blue Earth's filings with the SEC were inaccurate and unreliable, Jackson would not have invested in Blue Earth.

### $10 million Investment on March 10, 2015

40.    On February 20, 2015, Thomas and Francis held calls with senior Jackson personnel responsible for helping Jackson to make investment decisions, who were in Alpharetta, Ga., to request a further investment in Blue Earth to help complete one of the cogeneration plants.  On February 21, 2015, Thomas and Francis sent the senior Jackson personnel in Alpharetta, Georgia, a memorandum detailing Blue Earth's need for additional capital and explaining how the investment would help complete construction on a cogeneration plant.  On February 23, 2015, Thomas and Francis met in Alpharetta Georgia with senior

Jackson personnel (who were responsible for making investment decisions) to discuss Jackson's proposed investment. Thereafter, Francis and Thomas sent emails to the Jackson personnel, who were in Alpharetta, Ga., about the need for Jackson's investment and explaining the importance of that investment towards completing a cogeneration plant.

41.    In these February 2015 communications and meeting, Blue Earth, Thomas, and Francis made clear that they sought an "investment" from Jackson. For example, in one memorandum from Thomas on behalf of Blue Earth, copying Francis, Thomas stated that Blue Earth was looking for an "investor" to make a "proposed investment" in an "investment opportunity"; that Blue Earth was asking Jackson to replace another "Investor" that had fallen through; and that a cogeneration plant Blue Earth was building would serve as collateral for Jackson's "investment."

42.    In one communication on February 24, 2015, Thomas emailed Jackson, copying Francis, and attached Blue Earth's budgets for 2015-2017. The document included a balance sheet that listed Blue Earth's assets as of January 31, 2015 (a month earlier). In that January 2015 balance sheet, Blue Earth and Thomas represented that Blue Earth had over $56 million in "Net Fixed Assets,"— another term that describes tangible assets such as land, buildings, and equipment,

-30-

that are used to generate revenues—out of over $98 million total assets. Likewise

on February 27, 2015, Thomas, copying Francis, emailed Jackson a spreadsheet

that included another balance sheet for Blue Earth. Again, the balance sheet listed

Blue Earth's assets as of January 31, 2015.  That January 2015 balance sheet

likewise stated that Blue Earth had over $56 million in "Net Fixed Assets," out of a

total of $98,812,477 total assets.  These January 2015 balance sheets were yet

more representations that Blue Earth had tens of millions of dollars in tangible

assets.  In reality, and unbeknownst to Jackson:

> (a)    At least $44,035,000 of the over $56 million labeled as "Net
>
> Fixed Assets" represented (by Blue Earth's admission in its internal
>
> documents) intangible assets, i.e., non-binding term sheets to discuss
>
> the possibility of entering a definitive agreement to construct
>
> "cogeneration" power plants for a food-processing company and
>
> perhaps one or two apparently binding agreements to do so.  It is clear
>
> that Blue Earth knew as much, because an internal accounting
>
> document Blue Earth produced in bankruptcy labels the seven
>
> potential cogeneration plants as representing a total of $44,035,502 in
>
> "*intangible* value" (emphasis added).

(b)      As of the February 2015 communications and meeting, Blue

Earth had not completed a single plant.[3]  The plant for which Blue

Earth had signed an apparently binding agreement on August 22,

2014, was not complete and indeed remains uncompleted today.

Thereafter, on December 1, 2014, Blue Earth had signed another

apparently binding agreement to construct a cogeneration plant.  Blue

Earth would energize that plant on March 30, 2015.  Blue Earth never

signed binding contracts or commenced construction on any other

cogeneration plant.

(c)      The at least $44,035,500 value Blue Earth, Thomas, and Francis

ascribed to the non-binding term sheets, and perhaps one or two

apparently binding agreements, consisted of the market value of stock

Blue Earth had purportedly issued to the shareholders of IPS Power

Engineering, Inc., and Global Renewable Energy Group, Inc., in order

to acquire those companies and their supposed primary asset.  That

supposed primary asset was in fact no asset at all but was instead the

---

[3] At some point, Jackson did learn that Blue Earth had not completed its
cogeneration plants. But only in early 2016 did Jackson learn that the supposed
"Net Fixed Assets" or "Property and Equipment" were in fact primarily the non-
binding term sheets to discuss the possibility of building seven cogeneration plants,
only two of which ever actually began construction.

non-binding term sheets to discuss the possibility of entering a definitive agreement to build the seven cogeneration power plants— term sheets that did not even exist at the time of the acquisition. According to an internal accounting document Blue Earth produced in a bankruptcy proceeding, Blue Earth treated that $44,035,500 figure as "intangible value" and distributed that value evenly across the seven potential cogeneration projects, with each receiving a baseline intangible value of $6,290,786.  Such was the case even as late as December 31, 2015, according to the document.

(d)     As explained above, the term sheets in fact had no value at all under GAAP, much less $44,035,500.

43.     Blue Earth, Thomas's, and Francis's misrepresentations about the nature and value of its "Net Fixed Assets" was material.  To a reasonable investor, the misrepresentation significantly altered the mix of information available about Blue Earth. If investors had known (1) that almost half, and maybe more, of Blue Earth's assets were mere intangible, non-binding term sheets and perhaps two apparently binding agreements, rather than tangible fixed assets, or (2) that the value ascribed to that asset was merely the value of Blue Earth stock transferred to acquire the non-binding term sheets, which grossly inflated the term sheets' value,

then investors would have seen a substantially different risk profile.  For example, investors would have known that Blue Earth had much fewer tangible fixed assets than Blue Earth had represented and thus also had much fewer assets that could be used to create and distribute products and services.  Likewise, investors would have known that few assets would be available to distribute to investors and creditors if Blue Earth were to enter bankruptcy (which it eventually did).

44.    Blue Earth, Thomas, and Francis knew, or with severe recklessness disregarded, the falsity of this statement.  Blue Earth, Thomas, and Francis made this misrepresentation and omission knowingly, or with severe recklessness, for the purpose and effect of inducing Jackson to invest in Blue Earth.

45.    Despite this misrepresentation about Blue Earth's fixed assets; and although Thomas and Francis discussed the cogeneration-plant project throughout these February 2015 communications and in-person meeting in Alpharetta, Georgia; and despite the misrepresentations and omissions described above, such as in the prior 10-Qs' balance sheets; during these February 2015 communications and meeting, Thomas and Francis omitted to state:

(a)    That Blue Earth's January 2015 balance sheet and the Form 10-Qs' balance sheets were applying the "Net Fixed Assets" and "Property and Equipment" label to what were at most intangible

assets—i.e., non-binding term sheets and perhaps apparently binding contracts to build one or two uncompleted cogeneration plants;

(b)     That Blue Earth's Form 10-Qs' balance sheets and January 2015 balance sheets had ascribed at least $44,035,000 in value, and perhaps more, to the non-binding term sheets to discuss the possibility of entering a definitive agreement to build cogenerations plants; or

(c)     That the $44,035,000 figure represented the market value of stock Blue Earth had supposedly issued to acquire the companies that supposedly held the non-binding term sheets, which in fact did not exist at the time of the acquisition and which in fact had no value of their own under GAAP.

46.     Coupled with the misrepresentations in the January 2015 balance sheet and the prior 10-Qs' balance sheets and other misrepresentations and omissions above, these omissions were misleading.  Because of those prior misrepresentations and omissions, Blue Earth's, Thomas's, and Francis's omissions left Jackson with the incorrect understanding that Blue Earth had tens of millions of dollars in "long-lived tangible assets used to create and distribute an entity's products and services" including land and land improvements; buildings; machinery and equipment; and furniture and fixtures.  FASB ASC 360-10-05-2.

47.     These misleading omissions were material.  To a reasonable investor,
these omissions significantly altered the mix of information available about Blue
Earth.  If Blue Earth, Thomas, and Francis had (1) accurately represented that
almost half, and maybe more, of Blue Earth's assets were mere  intangible, non-
binding term sheets and at most two apparently binding contracts to build
cogeneration plants, rather than tangible property, or (2) accurately represented
that the value Blue Earth placed on the assets was merely the value of Blue Earth
stock transferred to acquire the non-binding term sheets, which grossly inflated the
term sheets' value, then investors would have faced a substantially different risk
profile.  For example, investors would have known that Blue Earth had much less
property and equipment with which to "create and distribute [Blue Earth's]
products and services"—and that Blue Earth was thus substantially less able to
generate revenue than Blue Earth represented than it had been.  FASB ASC 360-
10-05-2.   Likewise, investors would have known that few assets would be
available to distribute to creditors and investors if Blue Earth were to enter
bankruptcy (which it eventually did).

48.     Blue Earth, Thomas, and Francis knew, or with severe recklessness
disregarded, that these omissions created a misleading impression of the nature and
value of Blue Earth's assets and the accuracy and reliability of Blue Earth's

financial statements.  Blue Earth, Thomas, and Francis made these omissions knowingly, or with severe recklessness, for the purpose and effect of inducing Jackson to invest in Blue Earth.

49.     Also during the February 2015 communications with Jackson, Thomas and Francis, on behalf of Blue Earth, represented to Jackson that they had take-out financing lined up from other sources to repay a debt investment from Jackson.   That statement was false; Blue Earth had no such financing lined up. And that misrepresentation was material.  To a reasonable investor, this misrepresentation significantly altered the mix of information available about Blue Earth.  Whereas the misrepresentation made a debt investment look like a safe one, the truth was that take-out financing was not in fact available to ensure a return on the investment.  Thomas, Francis, and Blue Earth made this misrepresentation knowingly, or with severe recklessness, with the purpose and effect of inducing Jackson to invest in Blue Earth.

50.     On March 10, 2015, Jackson and Blue Earth signed a Note and Warrant Purchase Agreement, which Thomas signed on behalf of Blue Earth. Under the Agreement, Jackson paid Blue Earth $10 million for a 12% senior secured convertible note from Blue Earth, principal and interest from which were convertible to Blue Earth common stock at $1.00 per share; a warrant to purchase

2,000,000 shares of Blue Earth common stock at $1.00 per share; and the option to

purchase up to 10,000,000 shares of Blue Earth common stock at $1.00 per share.

(The conversion price and warrant and option exercise prices were later changed to

$1.02 per share.)  Additionally, under the agreement Blue Earth issued 200,000

shares of Blue Earth stock to Jackson as a "closing commitment fee."  The note

had a maturity of just six months due to Thomas's and Francis's respresentation

that take-out financing was lined up.

  51. The Note and Warrant Purchase Agreement incorporated by reference

several Blue Earth SEC filings, including the November 2014 10-Q for the period

ending September 30, 2014.  Further, in the Note and Warrant Purchase

Agreement, Blue Earth and Thomas represented that the "consolidated unaudited

financial statements of [Blue Earth] and its subsidiaries dated September 30, 2014

for the nine-month period then ended, were prepared in accordance with GAAP,

consistently applied, during the period[] involved" and "fairly present[ed] in all

material respects the consolidated financial position of [Blue Earth] and its

consolidated subsidiaries as of the date[] thereof[.]"  Further, in the Note and

Warrant Purchase Agreement, Blue Earth and Thomas represented that "all

disclosure provided" to Jackson by Blue Earth, including "SEC Documents" such

as the November 2014 10-Q, were "true and correct in all material respects" and

did not contain "any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, taken as a whole and in the light of the circumstances under which they were made, not materially misleading."  The Note and Warrant Purchase Agreement further stated that certain "SEC Documents," including the November 2014 10-Q, "complied in all material respects with the requirements of the 193[4] Act and the rules and regulations of the SEC applicable to such SEC documents." As explained above, those statements were materially false and Blue Earth and Thomas knew, or with severe recklessness disregarded, the statements' falsity and knowingly, or with severe recklessness, made those misrepresentations with the purpose of inducing Jackson to invest in Blue Earth.

52.     According to a Pledge and Security Agreement that Blue Earth and Jackson entered contemporaneously, this transaction was one in which Jackson was "making a $10,000,000 investment in Blue Earth."  The Note and Warrant Purchase Agreement specified that Blue Earth would use most of the money Jackson was investing to help build a cogeneration plant in Alberta, Canada.

53.     In a March 12, 2015, Press Release that Blue Earth attached to a Form 8-K filed on March 13, 2015, Blue Earth announced Jackson's $10 million investment.  In the release, Blue Earth said that proceeds "from the agreement will

be used for funding the continuing construction of the Company's Brooks, Alberta, Canada combined heat and power . . . energy plant and for working capital purposes."  The release quoted Jackson's principal as saying, "We are pleased with the progress that Blue Earth is making on their business model and excited about the progress on current energy power plants and the pipeline of projects."   The release also quoted Thomas as saying, "We are extremely pleased that our largest shareholder has made an additional investment in the Company . . . ."

54.    To secure Jackson's $10 million investment in Blue Earth, Blue Earth and its affiliates granted Jackson a first priority lien on all of Blue Earth's and its affiliate's assets, except for those belonging to two Blue Earth subsidiaries.

55.    In making this $10 million investment, Jackson reasonably and justifiably relied on the misrepresentations and omissions above, including (1) Blue Earth's, Thomas's, and Francis's misrepresentations in the January 2015 balance sheet and the Form 10-Qs' balance sheets about the nature and value of the assets labeled as "Net Fixed Assets" and "Property and Equipment" (and previously, in part, "Construction in progress") and about the reliability and accuracy of the Form 10-Qs' balance sheets; (2) Blue Earth's, Thomas's, and Francis's misrepresentations and omissions to state the true nature and value of those assets during the email communications, phone calls, and in-person

meetings; (3) the misrepresentations in the Note and Warrant Purchase Agreement as well as the earlier Common Stock Purchase Agreement; (4) Thomas's, Francis's, and Blue Earth's misrepresentation that take-out financing was lined up to ensure a return on Jackson's investment.  Jackson made this $10 million investment because Jackson believed that its investment was secured by collateral in the form of substantial tangible assets, including at least $52,248,308 in property and equipment, and because Jackson believed that take-out financing was available to ensure a return on Jackson's investment.  If Jackson had known (i) that most of the "Property and Equipment" or "Net Fixed Assets" supposedly securing Jackson's investment were in fact the excess of the purchase price for the IPS and Global Renewable Energy Group, Inc., entities over the value of their tangible assets—which is not an asset a secured party can liquidate or monetize upon a default or bankruptcy, or (ii) how the value of that asset had been calculated, or (iii) that take-out financing was not lined up, Jackson would not have invested in the note.

### September 10, 2015 Investment

56.     On March 16, 2015, Blue Earth filed a Form 10-K for the year ended December 31, 2014, which Thomas signed.  In the 10-K, Thomas and Blue Earth

represented that Blue Earth had $56,982,778 in "Property and Equipment," out of $102,739,361 total assets.

57.    Thomas signed certifications about the 10-K's accuracy and reliability.  For example, he certified that he had reviewed the 10-K; that the 10-K did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances in which such statements were made, not misleading with respect to the period covered by the report; that the financial statements and financial information in the report fairly presented in all material respects the financial condition, results of operations and cash flows of Blue Earth; that Thomas had designed disclosure controls and procedures, or caused such disclosures controls and procedure to be designed under his supervision, to ensure that material information relating to Blue Earth was made known to Blue Earth's officers including Thomas; that Thomas had designed internal control over financial reporting, or caused such internal control over financial reporting to be designed under his supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; that he had evaluated the effectiveness of Blue Earth's disclosures controls and procedures; that Thomas had disclosed to Blue Earth's

auditors all significant deficiencies and material weaknesses in the design or operation of Blue Earth's financial reporting which were reasonably likely to adversely affect Blue Earth's ability to record, process, summarize, and report financial information; and that he had reported any fraud that involved management or other employees with a significant role in Blue Earth's internal control over financial reporting.

58.     Blue Earth's and Thomas's statement about Blue Earth's "Property and Equipment" in the balance sheet for the 10-K for the year ended December 31, 2014, and about the 10-K's accuracy and reliability, were false.  The statement suggested that Blue Earth had $56,982,778 worth of "long-lived tangible assets used to create and distribute an entity's products and services" including land and land improvements, buildings, machinery and equipment, and furniture and fixtures.  FASB ASC 360-10-05-2.   In reality, and unbeknownst to Jackson:

> **(a)**     At least $44,035,000 of the $56,982,778 labeled as "Property
> and Equipment" represented (by Blue Earth's admission in its internal
> documents) intangible assets, i.e., non-binding term sheets to discuss
> the possibility of entering a definitive agreement to construct
> "cogeneration" power plants for a food-processing company and
> perhaps two apparently binding agreements to do so. It is clear that

Blue Earth knew as much, because an internal accounting document Blue Earth produced in bankruptcy labels the seven potential cogeneration plants as representing a total of $44,035,502 in "*intangible* value" (emphasis added).

(b)      At that time of that March 16, 2015, 10-K, Blue Earth had not completed a single one of the seven plants.  Although Blue Earth signed an apparently binding agreement on August 22, 2014, to build a plant, that plant was not completed  as of that time and indeed still is not complete today.  As of today, Blue Earth has completed only one plant, which was energized on March 30, 2015.  Blue Earth never signed binding contracts or commenced construction on any of the other five cogeneration plants.

(c)      The $44,035,000 value ascribed to the non-binding term sheets to discuss the possibility of entering a definitive agreement to build co-generation plants, and perhaps two apparently binding agreements, consisted of the market value of stock Blue Earth had purportedly issued to the shareholders of IPS Power Engineering, Inc., and Global Renewable Energy Group, Inc., in order to acquire those companies and their supposed primary asset.  That supposed asset was in fact no

asset at all, but rather the non-binding term sheets to discuss the possibility of entering a definitive agreement to build the seven cogeneration power plants—term sheets that did not even exist at the time of the acquisition. According to an internal accounting document Blue Earth produced in a bankruptcy proceeding, Blue Earth treated that $44,035,500 figure as "intangible value" and distributed that value evenly across the seven potential cogeneration projects, with each receiving a baseline intangible value of $6,290,786. Such was the case even at late as December 31, 2015, according to the document.

(d)   As explained above, the term sheets in fact had no value at all under GAAP, much less $44,035,500.

59.   These misrepresentations about the nature and value of Blue Earth's assets, and about the accuracy and reliability of the balance sheet in Blue Earth's Form 10-K, were material. To a reasonable investor, these misrepresentations significantly altered the mix of information available about Blue Earth. If the Form 10-K's balance sheet had (1) accurately represented that almost half, and maybe more, of Blue Earth's assets were mere intangible, non-binding term sheets and perhaps two apparently binding contracts, rather than tangible property and

equipment, and (2) accurately represented that the value Blue Earth placed on the assets was merely the value of Blue Earth stock transferred to acquire the companies that supposedly held the non-binding term sheets, which grossly inflated the term sheets' value, then the Form 10-K's balance sheet would have presented a substantially different risk profile to investors.  For example, investors would have known that Blue Earth had much less property and equipment with which to "create and distribute [Blue Earth's] products and services"—and that Blue Earth was thus substantially less able to generate revenue than Blue Earth represented that it had been.  FASB ASC 360-10-05-2.  Likewise, investors would have known that few assets would be available to distribute to creditors and investors if Blue Earth were to enter bankruptcy (which it eventually did).

60.    Blue Earth and Thomas knew, or with severe recklessness disregarded, the falsity of these statements about the nature and value of Blue Earth's assets and the accuracy and reliability of Blue Earth's financial statements. Blue Earth and Thomas made these misrepresentations knowingly, or with severe recklessness, for the purpose and effect of inducing investors like Jackson to invest in Blue Earth.

61.    On May 19 and August 13, 2015, Thomas and Francis again met in Alpharetta, Georgia, with senior Jackson personnel responsible for making

investment decisions. Despite the above misrepresentations about the nature and value of Blue Earth's assets, Thomas and Francis omitted to state:

(a)     That Blue Earth's January 2015 balance sheet, Form 10-Qs' balance sheets, and Form 10-K's balance sheet were applying the "Net Fixed Assets" and "Property and Equipment" label to non-binding term sheets and also perhaps binding contracts to build one or two uncompleted cogeneration plants;

(b)     That Blue Earth's Form 10-K balance sheet, Form 10-Qs' balance sheets, and January 2015 balance sheets had ascribed at least $44,035,000 in value, and perhaps more, to the non-binding term sheets to discuss the possibility of entering a definitive agreement to build cogenerations plants; or

(c)     That the $44,035,000 figure represented the market value of stock Blue Earth had supposedly issued to acquire the companies that supposedly held the non-binding term sheets, which did not even exist at the time of the acquisition and which in fact had no value of their own under GAAP.

62.     Coupled with the misrepresentations in the January 2015 balance sheet and the prior 10-K's and 10-Qs' balance sheets and other misrepresentations

and omissions above, these omissions were misleading.  Because of those prior misrepresentations and omissions, Blue Earth's, Thomas's, and Francis's omissions left Jackson with the incorrect understanding that Blue Earth had tens of millions of dollars in "long-lived tangible assets used to create and distribute an entity's products and services" including land and land improvements; buildings; machinery and equipment; and furniture and fixtures.  FASB ASC 360-10-05-2.

63.     These misleading omissions were material.  To a reasonable investor, these omissions significantly altered the mix of information available about Blue Earth.  If Blue Earth, Thomas, and Francis had (1) accurately represented that almost half, and maybe more, of Blue Earth's assets were mere intangible, non-binding term sheets and at most two apparently binding contracts to build cogeneration plants, rather than tangible property, or (2) accurately represented that the value Blue Earth placed on the assets was merely the value of Blue Earth stock transferred to acquire the companies that supposedly held non-binding term sheets (which were in fact dated after the acquisition), which grossly inflated the term sheets' value, then investors would have faced a substantially different risk profile.  For example, investors would have known that Blue Earth had much less property and equipment with which to "create and distribute [Blue Earth's] products and services"—and that Blue Earth was thus substantially less able to

generate revenue than Blue Earth represented that it had been.  FASB ASC 360-10-05-2.   Likewise, investors would have known that few assets would be available to distribute to creditors and investors if Blue Earth were to enter bankruptcy (which it eventually did).

64.     Blue Earth, Thomas, and Francis knew, or with severe recklessness disregarded, that these omissions created a misleading impression of the nature and value of Blue Earth's assets and the accuracy and reliability of Blue Earth's financial statements.  Blue Earth, Thomas, and Francis made these omissions knowingly, or with severe recklessness, for the purpose and effect of inducing Jackson to invest in Blue Earth.

65.     On August 17, 2015, Blue Earth filed a Form 10-Q for the period ending June 30, 2015.  Thomas signed the 10-Q.  In that 10-Q, Blue Earth and Thomas represented that Blue Earth had $65,654,593 in "Property and Equipment."

66.     Thomas again signed certifications about the accuracy and reliability of the Form 10-Q, certifications which were identical or substantially identical to the prior ones.

67.     Blue Earth's and Thomas's statement about Blue Earth's "Property and Equipment" in the August 2015 10-Q, and about the 10-Q's accuracy and

reliability, were false.  The statement suggested that Blue Earth had $65,654,593 worth of "long-lived tangible assets used to create and distribute an entity's products and services" including land and land improvements; buildings; machinery and equipment; and furniture and fixtures.  FASB ASC 360-10-05-2. In reality, and unbeknownst to Jackson:

(a)     At least $44,035,000 of the $65,654,593 labeled as "Property and Equipment" represented (by Blue Earth's admission in its internal documents) intangible assets, i.e., non-binding term sheets to discuss the possibility of entering a definitive agreement to construct "cogeneration" power plants for a food-processing company and perhaps two apparently binding agreements to do so. It is clear that Blue Earth knew as much, because an internal accounting document Blue Earth produced in bankruptcy labels the seven potential cogeneration plants as representing a total of $44,035,502 in "*intangible* value" (emphasis added).

(b)     At the time of that August 2015 10-Q, Blue Earth had completed a single plant of the seven projected.  Although Blue Earth signed an apparently binding agreement on August 22, 2014, to build another plant, that plant was not completed as of that time and indeed

still is not complete today.  Blue Earth never signed binding contracts or commenced construction on any of the other five cogeneration plants.

(c)      The $44,035,000 value ascribed to the non-binding term sheets to discuss the possibility of entering a definitive agreement to build co-generation plants, and perhaps two apparently binding agreements, consisted of the market value of stock Blue Earth had purportedly issued to the shareholders of IPS Power Engineering, Inc., and Global Renewable Energy Group, Inc., in order to acquire those companies and their supposed primary asset.  That supposed asset was no asset at all and was instead  the non-binding term sheets to discuss the possibility of entering a definitive agreement to build the seven cogeneration power plants—term sheets that did not even exist at the time of the acquisition. According to an internal accounting document Blue Earth produced in a bankruptcy proceeding, Blue Earth treated that $44,035,500 figure as "intangible value" and distributed that value evenly across the seven potential cogeneration projects, with each receiving a baseline intangible value of $6,290,786.  Such was

the case even at late as December 31, 2015, according to the document.

(d)    As explained above, the term sheets in fact had no value at all under GAAP, much less $44,035,500.

68.    These misrepresentations about the nature and value of Blue Earth's assets, and about the accuracy and reliability of the balance sheet in Blue Earth's Form 10-Q, were material.  To a reasonable investor, these misrepresentations significantly altered the mix of information available about Blue Earth.  If the Form 10-Q's balance sheet had (1) accurately represented that almost half, and maybe more, of Blue Earth's assets were mere intangible, non-binding term sheets and perhaps two apparently binding contracts, rather than tangible property and equipment, or (2) accurately represented that the value Blue Earth placed on the assets was merely the value of Blue Earth stock transferred to acquire the non-binding term sheets, which grossly inflated the term sheets' value, then the Form 10-Q's balance sheet would have presented a substantially different risk profile to investors.  For example, investors would have known that Blue Earth had much less property and equipment with which to "create and distribute [Blue Earth's] products and services"—and that Blue Earth was thus substantially less able to generate revenue than Blue Earth represented that it had been.  FASB ASC 360-

10-05-2.  Likewise, investors would have known that few assets would be available to distribute to investors and creditors if Blue Earth were to enter bankruptcy (which it eventually did).

69.     Blue Earth and Thomas knew, or with severe recklessness disregarded, the falsity of these statements about the nature and value of Blue Earth's assets and the accuracy and reliability of Blue Earth's financial statements. Blue Earth and Thomas made these misrepresentations knowingly, or with severe recklessness, for the purpose and effect of inducing investors like Jackson to invest in Blue Earth.

70.     On September 10, 2015, Jackson and Blue Earth signed a Note Purchase Agreement in which Jackson acquired a 15% senior secured note in the amount of $10,600,000 from Blue Earth to repay and refinance the principal and accrued interest on the 12% senior note Blue Earth had issued on March 10, 2015. Like the earlier note, the September 10, 2015, transaction  granted Jackson a security interest in substantially all of Blue Earth's and its subsidiaries' assets.

71.     The Note Purchase Agreement stated that Jackson had been provided with Blue Earth's Form 10-K for December 31, 2014, as amended, and Form 10-Q for the quarter ended June 30, 2015.  In that Agreement, Blue Earth represented and warranted that the consolidated audited financial statement dated December

31, 2014, and the consolidated unaudited financial statement of Blue Earth dated June 30, 2015 "were prepared in accordance with GAAP, consistently applied, during the period involved . . . and fairly presented in all material respects the consolidated financial position of [Blue Earth] and its consolidated subsidiaries as of the date thereof[.]"   Blue Earth further represented that the "SEC Documents" including the 2014 10-K and the 10-Q for the period ending June 30, 2015 were "true and correct in all material respects" and did not "contain any untrue statement of a material fact or omit to state any material fact necessary in order make the statements made therein, taken as a whole and in the light of the circumstances under which they were made, not materially misleading."   According to the agreement, those SEC Documents  "complied in all material respects with the requirements of the 193[4] Act and the rules and regulations of the SEC applicable to such SEC Documents." As explained above, those statements were materially false and Blue Earth knew, or with severe recklessness disregarded, the statements' falsity and knowingly, or with severe recklessness, made those misrepresentations with the purpose of inducing Jackson to invest in Blue Earth.

72.    The Note Purchase Agreement also reiterated that the purpose of the Note was to help finance the cogeneration project in Alberta, Canada.

73.     Jackson acquired the 15% senior secured note in the amount of
$10,600,000 in reliance on Blue Earth's, Thomas's, and Francis's
misrepresentations and omissions, including (1) the misrepresentations in Blue
Earth's January 2015 balance sheet and the balance sheet in its 10-K and 10-Qs
about the nature and value of its assets and Thomas's certification about the
accuracy and reliability of those filings; (2) Blue Earth's, Thomas's, and Francis's
misrepresentations and omissions to state the true nature of those assets in the
email conversations, meetings, and phone calls described above;  (3)  the
misrepresentations in the agreements described above; and (4) Thomas's,
Francis's, and Blue Earth's misrepresentation that take-out financing was lined up
to ensure a return on Jackson's investment.  If Jackson had known (i) that most of
the "Property and Equipment" securing Jackson's investment was in fact merely
intangible non-binding term sheets to discuss the possibility of entering a definitive
agreement to build cogeneration plants, and perhaps binding agreements to build
two plants—which is not an asset a secured party can liquidate or monetize upon a
default or bankruptcy, or (ii) how the value of that asset had been calculated, or
that the value was grossly inflated, or (iii) that take-out financing was not lined up,
Jackson would not have invested in the note.

74.     On October 5, 2015, Blue Earth announced that it had "determined that there [was] a material weakness relating to financial reporting and disclosure controls."

75.     On October 13, 2015, Thomas emailed Jackson, copying Francis, and attached a copy of Blue Earth's proforma consolidated balance sheet as of July 31, 2015.  The October 2015 balance sheet stated that Blue Earth had over $65 million worth of "Property and Equipment, net."  That representation falsely indicated that Blue Earth had over $65 million worth of "long-lived tangible assets used to create and distribute an entity's products and services" including land and land improvements; buildings; machinery and equipment; and furniture and fixtures. FASB ASC 360-10-05-2.   In reality, and unbeknownst to Jackson:

(a)     At least $44,035,000 of the over $65 million labeled as "Property and Equipment" represented (by Blue Earth's admission in its internal documents) intangible assets, i.e., non-binding term sheets to discuss the possibility of entering a definitive agreement to construct "cogeneration" power plants for a food-processing company and perhaps two apparently binding agreements to do so. It is clear that Blue Earth knew as much, because an internal accounting document Blue Earth produced in bankruptcy labels the seven

potential cogeneration plants as representing a total of $44,035,502 in "*intangible* value" (emphasis added).

(**b**)     At that time of that October 2015 email, Blue Earth had completed a single plant of the seven projected.  Although Blue Earth signed an apparently binding agreement on August 22, 2014, to build another plant, that plant was not completed as of that time and indeed still is not complete today.  Blue Earth never signed binding contracts or commenced construction on any of the other five cogeneration plants.

(**c**)     The $44,035,000 value ascribed to the non-binding term sheets to discuss the possibility of entering a definitive agreement to build co-generation plants, and perhaps two apparently binding agreements, consisted of the market value of stock Blue Earth had purportedly issued to the shareholders of IPS Power Engineering, Inc., and Global Renewable Energy Group, Inc., in order to acquire those companies and their supposed primary asset.  That supposed asset was no asset at all and was instead  the non-binding term sheets to discuss the possibility of entering a definitive agreement to build the seven cogeneration power plants—term sheets that did not even exist at the

time of the acquisition. According to an internal accounting document Blue Earth produced in a bankruptcy proceeding, Blue Earth treated that $44,035,500 figure as "intangible value" and distributed that value evenly across the seven potential cogeneration projects, with each receiving a baseline intangible value of $6,290,786. Such was the case even at late as December 31, 2015, according to the document.

(**d**)     As explained above, the term sheets in fact had no value at all under GAAP, much less $44,035,500.

76.     This misrepresentation about the nature and value of Blue Earth's assets in the October 2015 balance sheet was material. To a reasonable investor, the misrepresentation significantly altered the mix of information available about Blue Earth. If the October 2015 balance sheet had (1) accurately represented that almost half, and maybe more, of Blue Earth's assets were mere intangible, non-binding term sheets and perhaps two apparently binding contracts, rather than tangible property and equipment, or (2) accurately represented that the value Blue Earth placed on the assets was merely the value of Blue Earth stock transferred to acquire the non-binding term sheets, which grossly inflated the term sheets' value, then the balance sheet would have presented a substantially different risk profile to

investors.  For example, investors would have known that Blue Earth had much less property and equipment with which to "create and distribute [Blue Earth's] products and services"—and that Blue Earth was thus substantially less able to generate revenue than Blue Earth represented that it had been.  FASB ASC 360-10-05-2.  Likewise, investors would have known that few assets would be available to distribute to investors and creditors if Blue Earth were to enter bankruptcy (which it eventually did).

77.    Thomas and Francis knew, or with severe recklessness disregarded, the falsity of these statements about the nature and value of Blue Earth's assets and the accuracy and reliability of Blue Earth's financial statements.  Thomas and Francis made these misrepresentations knowingly, or with severe recklessness, for the purpose and effect of inducing investors like Jackson to invest in Blue Earth.

### October 23, 2015, Investment

78.    On October 23, 2015, Jackson invested another $4,940,000 in Blue Earth in return for a 9% senior secured note in the principal amount of $5,154,507.77.  That note was likewise secured by substantially all of Blue Earth's assets.

79.    To complete that transaction, Jackson and Blue Earth signed an Omnibus Amendment and Reaffirmation Agreement (which Thomas signed on

behalf of Ensite Power, Inc.).  The Agreement stated that the October note was "being issued pursuant [to the] Note Purchase Agreement, dated as of September 10, 2015," meaning that the Omnibus Amendment and Reaffirmation Agreement incorporated all of the material misrepresentations above from that Note Purchase Agreement. Blue Earth and Thomas knew, or with severe recklessness disregarded, the statements' falsity and knowingly, or with severe recklessness, made those misrepresentations with the purpose of inducing Jackson to invest in Blue Earth.

80.     In making this $4,940,000 investment, Jackson reasonably and justifiably relied on Blue Earth's, Thomas's, and Francis's misrepresentations and omissions about the true nature and value of Blue Earth's assets and the accuracy and reliability of Blue Earth's financial statements, including (1) the misrepresentations in Blue Earth's 10-K's and 10-Qs' balance sheets and January 2015 and October 2015 balance sheets about the nature and value of its assets and Thomas's certification about the accuracy and reliability of the SEC filings; (2) Blue Earth's, Thomas's, and Francis's misrepresentations and omissions to state the true nature of those assets in the email conversations, meetings, and phone calls described above;  (3) the misrepresentations in the various agreements described above; (4) Thomas's, Francis's, and Blue Earth's misrepresentation that take-out financing was lined up to ensure a return on Jackson's debt investment.  If Jackson

had known (i) that most of the "Property and Equipment" securing Jackson's investment was in fact merely intangible non-binding term sheets to discuss the possibility of entering a definitive agreement to build cogeneration plants, and perhaps binding agreements to build two plants—which is not an asset a secured party can liquidate or monetize upon a default or bankruptcy, or (ii) how the value of that asset had been calculated, or that the asset's value was grossly inflated, or (iii) that take-out financing was not lined up, Jackson would not have invested in the note.

### December 11, 2015, Investment

81.     On December 11, 2015, Jackson again invested in Blue Earth. Jackson acquired from Blue Earth a $7,154,639 9% senior secured note.  In part, Blue Earth issued that note to Jackson in return for a $2,000,000 investment from Jackson, which Blue Earth would use for working capital.  Additionally, the note covered the outstanding balance on the October 2015 note and a 3% closing transaction fee.   In connection with the note, Jackson also received a warrant to purchase 2,861,856 shares of Blue Earth stock for $0.50 per share.  And Blue Earth agreed to issue Jackson 704,842 shares of Blue Earth common stock valued at $0.50 per share in consideration for certain interest, fees and expenses that Blue Earth owed Jackson for this and earlier transactions.

82.     Like the earlier investments in Blue Earth notes, the note was secured by substantially all of Blue Earth's and its subsidiaries' assets.

83.     According to an 8-K Blue Earth filed regarding the note, the note was "comprised of (i) the principal balance of the promissory note in the amount of $5,154,507.77 issued by the Company to [Jackson] on October 23, 2015, which was consolidated into the December Note in order to extend the maturity date from December 23, 2015 to February 29, 2016; (ii) $2,000,000 for the Company's general working capital; and (iii) a three percent (3%) closing transaction fee."

84.    To complete that transaction, Jackson and Blue Earth signed a Fourth Omnibus Amendment and Reaffirmation Agreement, which Thomas signed on behalf of Ensite Power Inc. That Agreement stated that Blue Earth was issuing the note "pursuant to [the] Note Purchase Agreement dated as of September 10, 2015" as amended.  More specifically, the Fourth Omnibus Amendment and Reaffirmation Agreement also included representations and warranties from Blue Earth that all the representations and warranties in the September Purchase Agreement and other related documents were true at least in material respects and at least as of the time of the original representation and warranty.   Thus, the Fourth Omnibus Amendment and Reaffirmation Agreement incorporated the material misrepresentations from the September agreement described above, including misrepresentations about the December 31, 2014 audited financial statements and unaudited financial statements for the period ending June 30, 2015. Blue Earth and Thomas knew, or with severe recklessness disregarded, the statements' falsity and knowingly, or with severe recklessness, made those misrepresentations with the purpose of inducing Jackson to invest in Blue Earth.

85.    In making the December 2015 investment, Jackson reasonably and justifiably relied on Blue Earth's, Thomas's, and Francis's misrepresentations and omissions about the nature and value of Blue Earth's assets and the accuracy and

reliability of Blue Earth's financial statements, including, (1) the misrepresentations in Blue Earth's 10-K's and 10-Qs' balance sheets and January 2015 and October 2015 balance sheets about the nature and value of its assets and Thomas's certification about the accuracy and reliability of Blue Earth's SEC filings; (2) Blue Earth's, Thomas's, and Francis's misrepresentations and omissions to state the true nature of those assets in the email conversations, meetings, and phone calls described above;  (3)  the misrepresentations in the various agreements described above; (4) Thomas's, Francis's, and Blue Earth's misrepresentation that take-out financing was lined up to ensure a return on Jackson's investment.  If Jackson had known that most of the "Property and Equipment" securing Jackson's investment was in fact merely intangible non-binding term sheets to discuss the possibility of entering a definitive agreement to build cogeneration plants, and perhaps binding agreements to build two plants— which is not an asset a secured party can liquidate or monetize upon a default or bankruptcy, or (ii) how the value of that asset had been calculated, or that the assets'  value was grossly inflated, or (iii) that take-out financing was not lined up, Jackson would not have invested in the note.

**Blue Earth and its Auditor Concede Deficiencies in Controls Related to Financial Reporting**

86.     On January 14, 2016, Blue Earth announced that its "financial statements for the year ended December 31, 2014 and the quarters ended March 31, June 30, and September 30, in 2014 and 2015 included in the Company's Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q for such periods and together with all three-, six- and nine- month financial information contained therein . . . can no longer be relied upon." Blue Earth said that "all earnings press releases and similar prior communications issued by the Company as well as other prior statements made by or on behalf of the Company relating to those period should not be relied upon."

87.     On February 10, 2016, Blue Earth filed an amended Form 10-K. That Form 10-K included revelations from Blue Earth's auditor about deficiencies in Blue Earth's internal controls related to financial reporting, including:

> (a)     "Management has subsequently determined that a deficiency in internal control over financial reporting exists related to the presentation and disclosure controls, and has further concluded that such deficiency represented a material weakness as of December 31, 2014.  As a result, management has revised its assessment, as presented in the accompanying Management's Annual Report on

Internal Control Over Financial Reporting, to conclude that the

Company's internal controls over financial reporting were not

effective as of December 31, 2014."

**(b)**      "Blue Earth, Inc. has not maintained effective internal control

over financial reporting as of December 31, 2014, based on criteria

established in *Internal Control - Integrated Framework* issued by the

Committee of Sponsoring Organizations of the Treadway

Commission in 1992."

### Blue Earth's Bankruptcy

88.     In total, Blue Earth repaid only $530,0000 of accrued interest on the

notes and none of the principal.  When Blue Earth failed to make a scheduled

interest payment, Jackson delivered a notice of default to Blue Earth on March 1,

2016.

89.     On March 17, 2016, Blue Earth's common stock was suspended from

trading on Nasdaq and the securities were delisted from Nasdaq.

90.     On March 21, 2016, Blue Earth filed a voluntary petition for

reorganization under Chapter 11 of the United States Bankruptcy Code in the

Bankruptcy Court for the Northern District of California.

91.     Around that time in early 2016, Jackson, which had a secured interest in almost all of Blue Earth's and Blue Earth subsidiaries' assets, learned for the first time that Blue Earth, Thomas, and Francis had misrepresented and omitted to state the true nature and value of Blue Earth's assets.  Blue Earth learned that a large portion of the assets listed on Blue Earth's balance sheet as tangible "Property and Equipment" or "Net Fixed Assets" were in fact intangible, nonbinding term sheets to discuss the possibility of entering a definitive agreement to build cogeneration plants.  Jackson also learned that the supposed "Property and Equipment" or "Net Fixed Assets" had been grossly overvalued.  Blue Earth and Thomas had ascribed at least $44,035,000 to those intangible term sheets.  That was not the true value of those term sheets, which had no value of their own under GAAP, but was instead the market value of stock Blue Earth had supposedly issued to the shareholders of two companies that had supposedly held the term sheets.

92.     In the bankruptcy, all pre-bankruptcy equity interests were cancelled, including Jackson's Blue Earth common stock.  Under the bankruptcy plan, Jackson received no compensation for its pre-bankruptcy Blue Earth equity investments.

93.     In the bankruptcy Jackson received compensation for only a fraction of its pre-bankruptcy debt investments in Blue Earth.  After the bankruptcy, Jackson had an approximately $20 million deficiency with respect to its debt investments in Blue Earth.

## THE NOTES WERE SECURITIES

94.     The Blue Earth notes described above in which Jackson invested were securities.

95.     Blue Earth sold the notes in order to fund its operations and make investments in the cogeneration project.  Indeed, the Note Purchase Agreement for the March 2015 investment specified that Blue Earth would use the note's proceeds to continue work on a cogeneration plant in Alberta, Canada.  The September 2015 Note Purchase Agreement likewise made clear that that the note's purchase was to refinance the March note and thus to fund construction on the Alberta plant and to provide "working capital."  The October 2015 note provided funds to facilitate a repurchase of securities by Blue Earth from other investors.  In part, the December note provided Blue Earth "general working capital."

96.     Jackson's reason for purchasing the notes was to profit from interest on the notes.

97.     The parties understood the notes to be an investment.  The February 2015 communications and meeting that led to the series of note purchases made that clear. For example, in one memorandum from Thomas on behalf of Blue Earth, copying Francis, Thomas stated that Blue Earth was looking for an "investor" to make a "proposed investment" in an "investment opportunity"; that Blue Earth was asking Jackson to replace another "Investor" that had fallen through; and that a cogeneration plant Blue Earth was building would serve as collateral for Jackson's "investment." And in a March 12, 2015, Press Release that Blue Earth attached to a Form 8-K filed on March 13, 2015, Blue Earth announced the first note in the series.  The release quoted Thomas as saying, "We are extremely pleased that our largest shareholder has made an additional investment in the Company . . . ."  Moreover, each of the notes referred to "Investment Representations" made to Jackson in connection with the note.  And in connection with the March and December notes, Jackson received additional Blue Earth stock, stock options, and/or warrants.

98.     The investing public would view the notes as an investment, especially given that Blue Earth and Thomas themselves characterized the notes as such.

99.    No regulatory regime exists to reduce the risk associated with the notes.

100.   The March 2015 note was "convertible into shares of Common Stock at the option of the Holder."

101.   The notes were not high quality instruments.  Quite the contrary, they were highly speculative investments, as evidenced by the high interest rates they carried.

## SCIENTER ALLEGATIONS

102.   A number of facts show that Blue Earth, Thomas, and Francis knew, or with severe recklessness disregarded, the falsity of their statements, and omissions to correct statements, including (i) that Blue Earth had over $44 million in tangible "Property and Equipment" or "Net Fixed Assets"; (ii) that the balance sheets in Form 10-Qs, and 10-K mentioned above were reliable and accurate; and (iii) that take-out financing was available to ensure that Jackson would recoup the debt investments.  Likewise, a number of facts show that Blue Earth, Thomas, and Francis made those misstatements and omission knowingly, or with severe recklessness, with the purpose of inducing Jackson to invest in Blue Earth.

### Thomas and Francis Are Sophisticated Businessmen

103.    Thomas is well versed in the responsibilities of a corporate executive and in corporate finance.  From January 2007 until April 2010, Thomas served as Chairman of the Board, Chief Executive Officer, and President of Consolidation Services, Inc.  From January 2000 to September 2010, Thomas was self-employed as an investor in securities, real estate, and limited custom home development. From January 2000 to 2008, Thomas also served as a managing member of Falcon Financial Group, LLC, a company that provided assistance and advice to private companies on capital formation, corporate governance, and corporate communications.  From September 1993 to February 1999, Thomas was Chairman of the Board and CEO of AgriBioTech, Inc.

104.    Francis is likewise well versed in the responsibilities of a corporate executive and in corporate finance.  For several public and private companies, he is an investor, founder, director, or executive officer.  From January 2007 until April 2, 2010, he served as Vice President, Chief Financial Officer, and a director of Consolidation Services, Inc.   From 2000 to 2008, Francis was a co-founder and managing member of Falcon Financial Group, LLC, a company that provided assistance and advice to private companies on capital formation, corporate governance, and corporate communications.  He served as a founder, director, president, and CEO of Huanpu, Inc.  He founded and served as an officer and

director of FiberChem, Inc.  From April 1994 to January 1999, he served

AgriBiotech, for part of that time as the company's Chief Financial Officer and for

the rest as vice president, secretary, and director.

### The SEC Focused Blue Earth's and Thomas's Attention on Accounting for the Cogeneration Plants

105.   In correspondence, the Securities and Exchange Commission focused

Thomas's, Francis's, and Blue Earth's attention on the way Blue Earth accounted

for its cogeneration-plant projects on the balance sheet and repeatedly pressed Blue

Earth and Thomas to account for those assets with precision.  (Jackson was

unaware of that correspondence before making any of the investments.)

106.   The SEC sent Blue Earth and Thomas a letter on April 2, 2014, i.e.,

before Blue Earth filed the Form 10-Q that provided the balance sheet on which

Jackson relied in making the first investment.  In that letter, the SEC asked Thomas

and Blue Earth to clarify whether the "designs for co-generation projects" listed

under "construction in progress" on Blue Earth's Form 10-K for 2013—the very

asset that Blue Earth would thereafter classify as "Property and Equipment"—

"represent[ed] physical assets in construction or an intangible asset related to

contract rights."  The SEC asked Thomas and Blue Earth to "tell [the SEC] in

sufficient detail about the nature of the underlying assets."  The SEC asked for

additional information about "the estimated costs to complete the seven co-

generation projects, the expected source of funds for the projects, the current status of each project, and the estimated timing of beginning and ending each project."

107.   Also on April 2, 2014, the SEC sent Blue Earth and Thomas another letter about a Blue Earth registration statement.  There, the SEC warned that Blue Earth had "present[ed] a picture of [its] business that is anticipatory in nature and that appears to emphasize aspects of [its] business or this offering that reflect[s] future expectations while deemphasizing the current facts."

108.   On April 11, 2014, Thomas responded to the first letter on Blue Earth's behalf.  Thomas and Blue Earth acknowledged that the "asset" Blue Earth had designated as "Construction in Progress," and would soon reclassify as "Property and Equipment," were mere "designs and plans" for cogeneration plants. Thomas also wrote that, "There were no contract rights existing beyond the right to build the plants at the time of the purchase of IPS/GREG."

109.   In the same letter Thomas wrote that, "All of the projects have begun preconstruction work including siting and permitting as of this date. Equipment has been ordered and is being built for the first 5 projects."  This false and misleading answer would lead the SEC to believe that the approximately $44 million in "Construction in Progress" entry was a reasonable accounting entry.  A truthful answer would have caused the SEC to force Blue Earth to change the classification

to "Goodwill" and other intangible assets.  Thomas also mischaracterized the IPS

acquisition (through which Blue Earth acquired the non-binding term sheets) as an

"asset purchase," rather than a stock acquisition.

110.   On April 14, 2014, Blue Earth's counsel responded on Blue Earth's

behalf to the second SEC letter and copied Thomas.   In response to the SEC's

concern that Blue Earth had presented a picture of its business "that is anticipatory

in nature," Blue Earth stated that the first of its cogeneration plants was not

scheduled to be "turned on" until "August 2014."

111.   On April 23, 2014, the SEC again wrote to Mr. Thomas, in his

capacity as Blue Earth's CEO, about the disclosures in the 2013 Form 10-K.

Regarding the cogeneration plants, the SEC instructed Thomas and Blue Earth:

> **Given the significance of these assets, please amend to
> disclose the nature of the assets** similar to your
> response to prior comment 8. Further, with a view
> towards disclosure, please summarize the significant
> terms of the agreements you acquired. Based on your
> response, it appears that you acquired contracts to
> construct seven gas-to-steam generator facilities at
> certain meat processing plants in the U.S. and Canada.
> Also, revise your discussion of liquidity and capital
> resources in MD&A to provide disclosure similar to your
> response with respect to the estimated costs to complete
> the seven co-generation projects, the expected source of
> funds for the projects, the current status of each project,
> and the estimated timing of beginning and ending each
> project.

(Emphasis added)

112.   On May 9, 2014, the SEC again wrote to Thomas as CEO of Blue

Earth regarding a Blue Earth's registration statement.  The SEC instructed Thomas

and Blue Earth to disclose more about "the letter of intent to design, build and

operate seven plants and explain the reasons for the delays in finalizing an

agreement since you signed the letter of intent."

113.   Despite the SEC's attempts to focus Blue Earth's, Thomas's, and

Francis's attention on how they characterized the term sheets to discuss the

possibility of entering a definitive agreement to build cogeneration plants, Blue

Earth, Thomas, and Francis would still mischaracterize them as "Property and

Equipment" or "Net Fixed Assets."

**Blue Earth, Thomas, and Francis Had Ready Access to the True Facts**

114.   Thomas was a key officer of Blue Earth who played an integral role in

Blue Earth's day-to-day affairs.  Blue Earth's Form 10-K for year-end 2013 said

that the company "rel[ied] heavily" on his "expertise, experience and continued

services."   In that report, Blue Earth added that "loss of" his "services" could

"materially adversely affect" the company.  Likewise in Blue Earth's Form 10-K

for year-end 2014, Blue Earth again said that it "rel[ied] heavily" on his "expertise,

experience and continued service."  The 10-K again added that "loss" of his "services" could "materially adversely affect" the company.

115.   Francis was likewise a key officer who played an integral role in Blue Earth's day-to-day affairs. As Blue Earth stated in a proxy statement the company filed with the SEC on June 13, 2014, Francis "was a critical manager in the development and implementation of the business model, the acquisitions, investor relations and capital formation.  The Company raised over $20 million in equity in 2013, which would not have been possible without the efforts of Mr. Francis, the Chairman and Dr. Thomas."

116.   Blue Earth was a small company during the relevant period.  Blue Earth stated in its amended Form 10-K filed May 13, 2014, that it was a "small company with six (6) full time employees, including four (4) executive officers, at the parent level and 78 full-time employees on a Company-wide basis."  According to the same amended 10-K, Blue Earth's cogeneration division had "6 full-time employees and 1 part-time employee."  And in Blue Earth's 10-K for the year-end 2014, Blue Earth stated that it was a "small company with 10 full-time employees, including four (4) executives officers, at the parent level and 97 full-time employees on a Company-wide basis."  That 10-K added that Blue Earth's cogeneration division had "12 full-time employees and 1 part-time employee."

117.   Blue Earth's cogeneration project was one of its core operations. According to an amended Form 10-K Blue Earth filed on May 13, 2014, the cogeneration project was one of the company's areas of "primary focus." According to Blue Earth's Form 10-K for year-end 2014, filed March 16, 2015, Blue Earth's cogeneration division was part of Blue Earth's "core energy services business as an independent energy producer."

118.   The seven non-binding term sheets, and later up to two binding contracts, to build seven cogeneration plants for a food-processing company represented the large majority, if not the entirety, of Blue Earth's cogeneration work.

119.   Blue Earth expected the cogeneration project to be a significant source of revenue.  In one presentation, for example, Blue Earth projected that Blue Earth would build 35 plants, which would generate $305 million per year in revenue for 20 years.  And in a November 2014 meeting between Thomas, Francis, and senior Jackson personnel responsible for helping to make Jackson's investment decisions, Thomas and Francis projected that seven cogeneration plants would generate $1.2 billion in revenue over 10 years (and cost only $110 million total to build).  In that same meeting, Thomas and Francis projected that Blue Earth's cogeneration program would generate $100 million in revenue in 2015.

120.   Thomas and Francis were both personally involved in Blue Earth's cogeneration project.  In February 2015, for example, both Thomas and Francis contacted Jackson, and met with senior Jackson personnel in Alpharetta, Georgia, to solicit an investment that would enable Blue Earth to continue construction on a cogeneration plant.  And Thomas signed the merger agreement with the entities that originally (supposedly) held the term sheets to discuss the possibility of entering a definitive agreement to build the 7 cogeneration plants.

121.   According to a senior Blue Earth executive, who spoke with the undersigned based on his personal knowledge, the classification of the term sheets on Blue Earth's balance sheet was a topic of extensive discussion within Blue Earth.  Thomas and Francis were both directly involved in the decision how to classify the term sheets.

122.   Thomas and Francis were also both personally involved in obtaining financing for the cogeneration project, as evidenced by their extensive courting of Jackson for investments.

123.   Because of Thomas's and Francis's key roles in Blue Earth's day-to-day affairs, Blue Earth's small size, the significance of the cogeneration project to Blue Earth's business, and Thomas's and Francis's personal roles in the cogeneration project, and the discussion over how to classify those projects on the

balance sheet and financing for the cogeneration projects, Thomas and Francis knew the true nature and value of the assets Blue Earth labeled "Property and Equipment" or "Net Fixed Assets" worth over $44 million and also the true facts about the unavailability of take-out financing.

### The Defendants Had Motives to Mislead

124.   Thomas, Francis, and Blue Earth each had economic incentives to mislead investors and Jackson into believing that Blue Earth had substantial tangible assets in the form of Property and Equipment and that the tangible assets had actual value over $44 million.

125.   Thomas, Francis, and Blue Earth each had incentives to make those representations in order to make Blue Earth appear to be a more valuable company, which would increase Blue Earth's stock price and also make it easier for Blue Earth to attract investors and much-needed capital.

126.   According to a senior Blue Earth executive who spoke to the undersigned based on his personal knowledge, around the time that Blue Earth acquired the companies that supposedly held the term sheets, Blue Earth desperately needed capital.  Blue Earth owed money to many vendors.  Without sizeable capital infusions, Blue Earth was at risk of insolvency.

127.   Moreover, on May 20, 2014, Blue Earth filed a registration statement that allowed certain holders of restricted Blue Earth securities to freely sell their shares.  Those holders included the JRT Trust, a trust for which Thomas had the power to vote and dispose of the trust's shares; Thomas's wife; the Manzano Limited Partnership, which Thomas's son managed and which distributed securities to Thomas's family members; the Dave Living Trust, which Thomas's son managed; and several other selling shareholders named Thomas.   These people and entities beneficially owned  2,696,080 shares of common stock directly or upon exercise of warrants or conversion of preferred shares, which common shares on May 20, 2014 were worth a total of $7,845,692.

128.   That May 20, 2014, registration statement likewise authorized restricted-security holders affiliated with Francis to sell shares.  Those holders included the CKC LLC and the Lady Bug Trust, for which Francis's wife had the sole power to vote and dispose of the trust's shares.  The holders also included the Cricket Trust, for which Francis's adult daughter had the power to vote and dispose of the shares held by the trust.   These entities beneficially owned 2,140,000 shares of common stock directly or upon exercise of warrants or conversion of preferred shares, which common shares on May 20, 2014 were worth a total of $6,227,400.

129.   Additionally, the value of Blue Earth stock was important to Blue Earth, Thomas, and Francis, because they relied on Blue Earth securities to serve as currency to complete transactions such as acquisition of businesses, entering into licensing and strategic arrangements, attracting board and management talent, and paying consulting fees.  The higher the stock's value, the better its use as a currency for all these transactions.  For example:

(a)    Blue Earth stock was part of Thomas's and Francis's compensation.  When they joined the company, each was granted warrants to purchase an aggregate of one million shares of Common Stock, exercisable for ten years at $1.00 per share.  On March 1, 2011, the Blue Earth Board amended Thomas's and Francis's employment agreements and awarded them five-year performance warrants to purchase one million shares at an exercise price of $1.25 per share. In November 2012, their warrant exercise price was reduced to $0.01 per share, "the term of the warrants was extended to ten years and the vesting criteria was amended to remove [] milestone criteria."   On August 5, 2013, the Blue Earth board extended Thomas's employment agreement.  The Board "approved the grant of ten (10)-year warrant to purchase 1,000,000 shares at an exercise price of $0.01 per share."

(b)     In December 2010 a Blue Earth subsidiary entered an agreement to acquire the assets of Humitech of Northern California, LLC, and its related company Castrovilla, Inc.; part of the purchase prices was $450,000 of Blue Earth common stock.

(c)     In February 2011 the Blue Earth Board awarded Laird Cagan 100,000 restricted shares of Blue Earth common stock for a two-year term on the Board. The Board also granted Cagan five year warrants to purchase 500,000 shares of Blue Earth common stock at $1.24 per share in consideration for a consulting agreement.

(d)     In May 2011 Blue Earth obtained a license and manufacturing rights to a patented lighting controls technology from SwitchGenie LLC.  The purchase price included 150,000 shares of Blue Earth common stock. Blue Earth also entered consulting agreements with SwitchGenie principals that granted those principals warrants to purchase Blue Earth common stock.

(e)     In September 2011, Blue Earth acquired Xenergy Inc., through a plan of merger in which Blue Earth issued 4.5 million shares of Blue Earth common stock to Xenergy stockholders.  Certain Xenergy employees received shares of Blue Earth common stock.  In March

2012, Xenergy officers Jason Davis and Joseph Patalano were granted a "warrant bonus," with Davis receiving 716,400 warrants and Patalano receiving 183,600 warrants, exercisable at $1.16 per share.

**(f)**    In December 2011, Blue Earth entered a Finance Agreement with US Energy Affiliates, Inc.  Under the agreement, US Energy received 125,000 shares of Blue Earth common stock.

**(g)**    According to a summary in a Blue Earth Annual Report, in 2011 Blue Earth issued 5,779,762 shares of Blue Earth common stock to acquire subsidiaries; issued 150,000 shares for technology license rights; and issued 743,903 shares for consulting services.

**(h)**    On January 1, 2012, Blue Earth hired Philip Kranenberg as Chief Financial Officer.  His compensation included an option to purchase 1 million shares of Blue Earth common stock.  In lieu of cash compensation for the month of January 2012, he received 9,125 shares of Blue Earth common stock.

**(i)**    According to a summary in a Blue Earth Annual Report, in 2012 Blue Earth issued 366,529 shares of Blue Earth common stock for certain solar project rights and 370,741 shares for consulting services.

(j)    In April 2013 Blue Earth awarded a ten-year warrant to Laird Caigan to purchase 1,000,000 shares of Blue Earth common stock at $0.01 per share.

(k)    In May 2013, Blue Earth granted Broadway Family Group LLC and Green Planet Consultants, LLC, ten-year warrants to purchase 1.2 million shares of Blue Earth common stock.

(l)    In July 2013, Blue Earth entered an Agreement and Plan of Merger with IPS Power Engineering Inc., and Global Renewable Energy Group, Inc.  Blue Earth purported to issue 15,550,000 shares of its common stock to the former stockholders of those entities.

(m)    Also in July 2013, Blue Earth entered an Agreement and Plan of Merger with Intelligent Power Inc.  An aggregate of 1,383,400 shares of Blue Earth's common stock was issued to the former stockholders of Intelligent Power.

(n)    On August 23, 2013, Blue Earth entered into an Agreement and Plan of Merger with Millennium Power Solutions, LLC.  An aggregate of 3,694,811 shares of Blue Earth common stock were issued to the former members of Millennium Power Solutions. The principals of Millennium Power Solutions were also entitled to a per-

year earnout of 10% of the profits of that entity as a separate wholly-owned subsidiary of Blue Earth, payable in Blue Earth common stock.

(o)     On August 30, 2013, Blue Earth entered a Strategic Partnership Agreement with Talesun Solar USA and New General Power LLC. At the time, Blue Earth planned to invest $6.5 million in solar projects through a combination of $1 million in cash and $5.5 million through the issuance of 1,833,333 shares of Blue Earth common stock.  That $6.5 million investment was a loan to New General Power.

(p)     In October 2013, Blue Earth appointed three new board members.  Each would be compensated with 100,000 shares of Blue Earth common stock.

(q)     In January 2014, Blue Earth appointed a new Chief Executive Officer of one of Blue Earth's subsidiaries.  His compensation included 1.3 million stock options for Blue Earth common stock. Additionally, Blue Earth gave the same individual 1,725,000 shares of Blue Earth common stock to purchase his goodwill in another company Blue Earth acquired, as well as options to purchase 200,000 shares of Blue Earth stock.

(r)     Also in January 2014, Blue Earth granted Donald Kendall incentive stock options to purchase 100,000 shares of Blue Earth common stock and non-qualified stock options to purchase 1,400,000 shares of common stock.  Additionally, Blue Earth granted Ruben Fontes options to purchase 150,000 shares of common stock.

(s)     Effective January 1, 2014, Bill Richardson, James Kelly, and Michael Allman, and Robert Potts were elected independent directors of Blue Earth. Allman, Kelly, and Richardson were each granted 100,000 restricted shares upon their election to the Board.

(t)     In February 2014, Blue Earth awarded Joseph Patalano 35,000 shares of common stock as a consultant fee.

(u)     As of March 25, 2014, Blue Earth granted Ruben Fontes options to purchase 150,000 shares of common stock at $3.00 per share.

(v)     Effective August 25, 2014, Alan Krusi was elected to the Blue Earth Board.  He was granted 100,000 restricted shares upon his election.

(w)     According to Blue Earth's Form 10-Q for the period ending September 30, 2015, "On October 30, 2014, [Blue Earth] closed on an

agreement to acquire shares of PowerGenix common stock for $10

million payable through a combination of cash ($2 million) and [Blue

Earth] restricted common shares (3,729,604) valued at $2.145 per

share."

(x)     On December 22, 2014, Blue Earth granted 150,000 restricted

shares of Blue Earth common stock to each of Messrs. Allman, Kelly,

Richardson, and Cagan.

(y)     Blue Earth adopted an equity incentive plan.  According to Blue

Earth's amended 10-K for 2014, 2,564,118 securities had been

approved by shareholders for issuance upon exercise of outstanding

options, warrants, and rights.   According to that 10-K, 1,298,128

securities remained available for future issuance under equity

compensation plans.

(z)     According to Blue Earth's Form 10-Q for the period ending

September 30, 2015:

(i)     "On July 10, 2015, the Company issued 10,000 shares to

Larry Eggleston, for services rendered.  On July 13, 2015, the

Company issued 13,158 shares to Hobbs & Towne for services

rendered.  On July 28, 2015, the Company issued 12,500 shares

to Alan Krusi, as independent director, for services rendered. On September 17, 2015, the Company issued 369,318 shares to DOE Hawaii Solar 2014, LLC in settlement of litigation.  On September 21, 2015, the Company issued 92,425 shares to Donald R. Kendall, Jr., an officer of the Company, as payment of expenses pursuant to the terms of his employment agreement.  On September 22, 2015, the Company issued 99,883 shares to Edward L. Davis for consulting services rendered.  On September 22, 2015, the Company issued 50,000 shares to G. Robert Powell, the Company's Chief Executive Officer, for $37,835 cash."

(ii)    "On October 23, 2015, the Company granted 149,673 Stock options to employees at $1.10 per share. . . .   On October 27, 2015, the Company granted 15,813 Stock Options to employees at $1.03 per share. . . . On October 27, 2015, the Company granted 12,500 Stock Options to employees at $0.82 per share. . . .   On October 27, 2015, the Company granted 15,000 Stock Options to employees at $0.83 per share."

**(iii)**     "On October 30, 2015, the Company issued 12,500 shares to Alan Krusi, as independent director, for services rendered."

**(iv)**     "During the nine months ended September 30, 2015, the Company issued 605,770 common shares for services valued at $560,990. The Company also issued 200,000 common shares for debt issuance costs valued at $226,000. . . . The Company issued a stock subscription of $2,000,000 for 1,666,667 shares of its common stock and for warrants to purchase an additional 833,334 shares of common stock for $1.60 per share, subsequently reduced to $0.20 per share. . . . The Company issued a stock subscription of $37,785 for 50,000 shares of its common stock for $0.75 per share to its CEO."

130.   Moreover, the circumstances that led to Jackson's March 2015 investment, and subsequent debt investments, show that Blue Earth, Thomas, and Francis had an especially strong motive to mislead Jackson into making that particular investment and the following debt investments.

131.   Specifically, on or about February 18, 2015, a key potential investor in Blue Earth suddenly changed the terms on which the investor would make the

investment.  The new terms were "very unacceptable," according to a memorandum Thomas sent Jackson, copying Francis.  Thomas wrote that the sudden breakdown of that potential investment placed Blue Earth in a "vulnerable" and "precarious" position.  As Thomas stated in the memorandum, Blue Earth "urgent[ly]" needed money to pay key vendors in order to continue construction on a cogeneration plant.   Thomas added that the "timelines required to meet the urgent needs" "clearly limit[ed] [Blue Earth's] options" in finding an alternative investment.  Thomas also said that finding "an investor or investment group that can/will step into the place of the" prior potential investor was "[c]learly . . . in the best interest of" Blue Earth.  Under those urgent circumstances, Blue Earth, Thomas, and Francis asked Jackson for an investment.

132.   The urgent need for Jackson's investment in February and March 2015 gave Blue Earth, Thomas, and Francis a motive to mislead Jackson into thinking that Blue Earth had tens of millions of dollars' worth of tangible assets that would secure Jackson's investment.   That urgent need for Jackson's investment also gave Blue Earth, Thomas, and Francis a motive to mislead Jackson into thinking that Blue Earth had lined up take-out financing that would ensure a return on Jackson's debt investments.

133.   As for the later notes:  Blue Earth issued the September note because Blue Earth could not repay the March note on time.  Blue Earth issued the October note to allow Blue Earth to effect a recapitalization transaction that it considered critical.  Blue Earth issued the December note because Blue Earth could not pay the October note on time.

**Defendants' Misrepresentations Were Part of Larger Course of Deceptive Conduct**

134.   Blue Earth's, Thomas's and Francis's misrepresentations about the nature and value of the assets it labeled "Property and Equipment" were part of a larger pattern of conduct in which they knowingly, or with severe recklessness, misled investors about Blue Earth's cogeneration plants.

135.   For example, Blue Earth and Thomas represented to investors that Blue Earth had binding contracts to build the seven cogeneration plants, rather than mere non-binding term sheets.  On October 7, 2013, Blue Earth filed a Form 8-K, signed by Thomas. The 8-K attached a Notice of Redemption letter that itself attached a presentation about Blue Earth. On a slide titled "Renewable Energy Divisions: Revenue Sources," the Blue Earth presentation identified "BE CHP" (the cogeneration division) as a "Recurring Revenue Source."  The slide explained that "BE CHP" referred to "Construct[ing] and own[ing] power plants on

customers sites." The slide further stated, **"Currently 7 projects contracted with one customer."** (Emphasis added). A true copy of the slide is depicted below:



136. On another slide in the same presentation, titled "CHP: Combined Heat & Power Cogeneration," Blue Earth's presentation again stated, **"Contracts to build seven CHP plants."** (Emphasis added.) A true copy of the slide is depicted below:



137.   On another slide in the same presentation, titled "CHP: Projected Construction Schedule and Recurring Revenue," Blue Earth stated, **"The first 7 agreements are signed and the remainder are being engineered and negotiated."** (Emphasis added.) A true copy of the slide is depicted below:



138.   Likewise, Thomas and Blue Earth misrepresented the speed with which Blue Earth would complete the seven cogeneration plants.

139.   On September 11, 2014, Blue Earth filed another Form 8-K, which Thomas signed, disclosing "information including certain forecasts to be discussed during meetings with certain investors on September 11, 2014."  Among those forecasts was that "Blue Earth expects to turn on the first 3-4 power plants for JBS [the food-processing company] in 2014 and an additional 4-10 power plants in 2015."  The 8-K attached a presentation that likewise stated that "Blue Earth

"expects to turn on the first 3-4 power plants for JBS in 2014 and an additional 4-10 power plants in 2015."

140.   Blue Earth and Thomas could not have believed that Blue Earth would construct up to 4 plants by the end of 2014.  At that time, Blue Earth had one, or at most two, plants under construction.   And in the August 28, 2014, press release announcing that Blue Earth and the food-processing company had "signed an energy purchase agreement and land lease agreement . . . to design, build, finance, own and operate" Blue Earth's first cogeneration plant, Thomas said: "We anticipate the Alberta co-generation facility [i.e., the first one] to commence operations in [the first half] of 2015."

141.   Additionally, in February 2015 Thomas, copying Francis, emailed senior Jackson personnel forecasts for Blue Earth's financial performance.  One projected that Blue Earth's revenue would be $59,757,887 in 2015, $123,093,098 in 2016, and $195,659,354 in 2017—numbers driven in large part by Blue Earth's projections for its supposed cogeneration projects.  Another, which Thomas said were the "worst case forecasts" projected $32,305,139 in 2015, $70,822,299 in 2016, and $153,334,753 in 2017.   Given the undeveloped state of Blue Earth's cogeneration projects, these projections were so implausible that Francis and Thomas knew they were false and misleading.

### The GAAP Violations Were Egregious

142.   Blue Earth, Thomas's and Francis's misrepresentations and omissions about the value and nature of Blue Earth assets were egregious, undebatable GAAP violations.

143.   For example, Blue Earth, Thomas, and Francis repeatedly characterized the non-binding term sheets as "Property and Equipment" (or omitted to correct that characterization).  That label was a clear violation of GAAP.  Under GAAP, "Property and Equipment" is a label for "long-lived tangible assets used to create and distribute an entity's products and services" including land and land improvements; buildings; machinery and equipment; and furniture and fixtures.  FASB ASC 360-10-05-2.  The non-binding term sheets were not tangible assets.  They were instead intangible assets, which are assets that "lack physical substance."  FASB ASC 805-10-20.  Anyone with any familiarity at all with financial statements—and especially a CEO with extensive business experience who signs Sarbanes Oxley certifications for a company's financial statements— would appreciate the difference.

144.   As explained above, Blue Earth, Thomas, and Francis also clearly violated GAAP by attributing to the non-binding term sheets the full $44,035,000 market value of the stock Blue Earth issued to acquire the companies that

supposedly held those non-binding term sheets.  Because those term sheets were

not  binding at all, and because they were not even in existence at the time of the

acquisition, they were not separately "identifiable" assets.  As a result, none of the

$44,035,000 should have been attributed to the term sheets.  Virtually all of that

sum, less the value of the acquirees' meager tangible assets, should have been

classified as goodwill on Blue Earth's balance sheet. *See, e.g.*,  FASB ASC 805-

20-25-1, 805-20-25-10, 805-30-30-1.  If that $44,035,000 had been classified as

goodwill as required by GAAP, Jackson would have immediately recognized that

the sum did not represent assets with any value to support an investment, but rather

was merely the excess of the purchase price for IPS Power Engineering, Inc., and

Global Renewable Energy Group, Inc., over the value of their tangible assets.

## LOSS CAUSATION ALLEGATIONS

145.   Blue Earth's, Thomas's, and Francis's misrepresentations and

omissions concealed risks that materialized to destroy Jackson's investments.

146.   Blue Earth's Thomas's and Francis's misrepresentations (or omission

that led Jackson to believe incorrectly) that Blue Earth had tens of millions of

dollars in tangible "Property and Equipment" or "Net Fixed Assets" led investors

like Jackson to believe that Blue Earth had substantial assets that could be "used to

create and distribute [Blue Earth's] products and services" and thus generate

substantial revenue.  FASB ASC 360-10-05-2.  How substantial? Blue Earth itself projected in an October 2013 presentation that if the "Property and Equipment" had in fact been real property and equipment—i.e., seven actual cogeneration plants—the annualized EBITDA (earnings before interest, taxes, depreciation, and amortization) would have been over $13 million. (Blue Earth's total revenues for 2014 were about $12.5 million, according to Blue Earth's amended 10-K for that year.)  The misrepresentations and omissions thus concealed the fact that Blue Earth actually had very few assets capable of distributing products and services and thus very little capacity to generate revenue.  That risk materialized when, due to Blue Earth's inability to generate revenue, Blue Earth became unable to service its debt obligations and ultimately entered bankruptcy.  That bankruptcy destroyed almost all of Jackson's investments.  In the bankruptcy, all pre-bankruptcy equity interests were cancelled, including Jackson's Blue Earth common stock.  Under the bankruptcy plan, Jackson received no compensation for its pre-bankruptcy Blue Earth equity investments.  Moreover, in the bankruptcy Jackson received compensation for only a fraction of its pre-bankruptcy debt investments in Blue Earth.  After the bankruptcy, Jackson had an approximately $20 million deficiency with respect to its debt investments in Blue Earth.

147.   Blue Earth's, Thomas's, and Francis's misrepresentations (or omissions that led Jackson to believe incorrectly) that Blue Earth had tens of millions of dollars in tangible "Property and Equipment" led Jackson to believe that Blue Earth had tangible assets that would secure Jackson's investments if Blue Earth defaulted on the notes that Jackson acquired from Blue Earth. Those misrepresentations therefore concealed the fact that very few of the assets that served as collateral to Jackson's investments were assets that Jackson could realistically foreclose upon to recover those investments if Blue Earth defaulted. That risk materialized when Blue Earth in fact defaulted on the notes and entered bankruptcy, after which Jackson was unable to rely on Blue Earth's assets to recover Jackson's investments.

148.   Blue Earth's, Thomas's, and Francis's misrepresentations that Blue Earth had take-out financing lined up led Jackson to believe that other investors or lenders would step in to replace Jackson's debt investments and thus ensure a return on Jackson's debt investments.  Those misrepresentations thus concealed the risk that financing would not be available to take out Jackson's investment and that Jackson would not recoup its debt investments.  That risk materialized when in fact Blue Earth was unable to obtain financing to replace Jackson's investment and Jackson was unable to recover the vast majority of its debt investments.

149.   Blue Earth's, Thomas's, and Francis's misrepresentations (or omissions that led Jackson to believe incorrectly) that Blue Earth had tens of millions of dollars in tangible "Property and Equipment" led investors like Jackson to believe that Blue Earth was a fundamentally sound and valuable company.  For example, the representation on the 10-Q balance sheet Blue Earth filed on May 16, 2014, said to investors that Blue Earth's current assets and property and equipment alone exceeded Blue Earth's total liabilities by over $26 million. That representation also said to investors that Blue Earth's total assets exceeded total liabilities by over $81 million.  Those representations concealed the risk that Blue Earth in fact had few assets, especially few tangible assets, to satisfy Blue Earth's liabilities and that Blue Earth was thus a much less stable and valuable company than the balance sheet suggested.  That risk materialized when Blue Earth was in fact unable to meet its liabilities, defaulted on the notes to Jackson, and entered bankruptcy.  In the bankruptcy, all pre-bankruptcy equity interests were cancelled, including Jackson's Blue Earth common stock.  Under the bankruptcy plan, Jackson received no compensation for its pre-bankruptcy Blue Earth equity investments.  Moreover, in the bankruptcy Jackson received compensation for only a fraction of its pre-bankruptcy debt investments in Blue Earth.  After the

bankruptcy, Jackson had an approximately $20 million deficiency with respect to its debt investments in Blue Earth.

## CONTROL ALLEGATIONS

150.   Thomas had the power to control, and indeed actually controlled, Blue Earth's general affairs at least from September 1, 2010, to September 1, 2015, during which time he served as CEO.  Throughout that period, he played an integral role in Blue Earth's day-to-day operations.  Indeed, Blue Earth's Form 10-K for year-end 2013 said that the company "rel[ied] heavily" on his "expertise, experience and continued services."  In that report, Blue Earth added that "loss of" his "services" could "materially adversely affect" the company. Likewise in Blue Earth's Form 10-K for year-end 2014, Blue Earth again said that it "rel[ied] heavily" on his "expertise, experience and continued services."  The 10-K again added that "loss" of his "services" could "materially adversely affect" the company.

151.   Thomas also had the power to control, and actually controlled, how Blue Earth represented the nature and value of its assets to Jackson and other investors.  According to a senior Blue Earth executive who spoke to the undersigned based on personal knowledge, Thomas was directly involved in discussions and the decision about how to classify the term sheets on Blue Earth's

balance sheet.  Moreover, Thomas signed Form 10-Qs and the 10-K described above that contained the misrepresentations about the nature and value of Blue Earth's assets.  He also signed Sarbanes Oxley certifications detailing his responsibility for Blue Earth's financial statements and for internal controls supposedly designed to ensure the financial statements' accuracy and reliability.  Additionally, he signed many of the agreements described above that contained the misstatements and omissions about the nature and value of Blue Earth's assets.  And he personally met with and communicated with Jackson about Jackson's investments yet failed to disclose the true nature and value of Blue Earth's assets.  Quite the opposite, he and Francis told Jackson that Blue Earth's assets were real.

152.   Thomas also had the power to control, and indeed actually controlled, how Blue Earth represented to Jackson the availability of take-out financing.  Thomas, along with Francis, represented to Jackson that take-out financing was available.

153.   Francis likewise had the power to control, and indeed actually controlled, Blue Earth's general affairs as Blue Earth's Executive Vice President of Corporate Development and Investor Relations.  He played an integral role in Blue Earth's day-to-day operations. As Blue Earth stated in a proxy statement the company filed with the SEC on April 29, 2014, Francis "was a critical manager in

the development and implementation of the business model, the acquisitions,
investors relations and capital formation.  The Company has raised over $20
million in equity in 2013, which would not have been possible without the efforts
of Mr. Francis, the Chairman and Dr. Thomas."

154.   As Blue Earth's Vice President for "Investor Relations," Francis also
had the power to control, and did control, how Blue Earth disclosed to investors
the nature and value of its assets.  According to a senior Blue Earth executive who
spoke to the undersigned based on his personal knowledge, Francis was directly
involved in the discussion and decision about how to classify the term sheets on
Blue Earth's balance sheet.  He also repeatedly participated in emails, phone calls,
and a meeting with Jackson about Jackson's investments and also the cogeneration
project.  And he personally met with and communicated with Jackson about
Jackson's investments yet failed to disclose the true nature and value of Blue
Earth's assets.

155.   More specifically, Francis had the power to control, and did control,
the information Blue Earth made available to investors about the very assets at
issue here.  When Blue Earth released an August 24, 2014, press release regarding
the JBS USA Holdings., Inc. co-generation plant, the release listed John Francis as
an "Investor Relations Contact."

156.   Francis also had the power to control, and indeed actually controlled, how Blue Earth represented to Jackson the availability of take-out financing. Francis, along with Thomas, represented to Jackson that take-out financing was available.

## DAMAGES

157.   Jackson suffered significant economic damages due to Blue Earth's, Thomas's, and Francis's misrepresentations and omissions.

158.   In Blue Earth's bankruptcy, all pre-bankruptcy equity interests were cancelled, including Jackson's Blue Earth common stock.  Under the bankruptcy plan, Jackson received no compensation for its pre-bankruptcy Blue Earth equity investments.

159.   Moreover, in the bankruptcy Jackson received compensation for only a fraction of its pre-bankruptcy debt investments in Blue Earth.  After the bankruptcy, Jackson had an approximately $20 million deficiency with respect to its debt investments in Blue Earth.

160.   Based on the true facts about the nature and value of the assets that Thomas and Blue Earth mislabeled as "Property and Equipment" or "Net Fixed Assets," the securities Jackson invested in were worth substantially less than what Jackson paid for them.

## FIRST CAUSE OF ACTION
## Violation of Section 10(b) of the Exchange Act
## and Rule 10b-5 Promulgated Thereunder

161.   Plaintiff repeats and realleges each and every allegation contained above, as if set forth herein.

162.   Blue Earth, Thomas, and Francis, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails and wires, intentionally and/or with severe recklessness participated in a continuous course of conduct that operated to deceive Jackson; made untrue statements of material fact and/or omitted material facts that should have been disclosed to make the statements made not misleading, and had ultimate authority over the content of these statements and omissions; and employed devices, and artifices that operated to deceive Jackson in connection with the purchase and sale of securities, and caused Jackson to purchase the securities.

163.   Pursuant to the aforesaid plan and course of conduct, Blue Earth and Thomas prepared, issued, and had ultimate authority over the misleading statements and omissions described above about the nature and value of Blue Earth's assets and the accuracy and reliability of Blue Earth's financial statements, including, for example:

(a)      The Form 10-Q Blue Earth filed in May 2014, that Thomas signed, and for which Thomas signed Sarbanes Oxley certifications about the 10-Q's accuracy and reliability;

(b)      The emails between Thomas, Francis, and Jackson in September 2014;

(c)      The Form 10-Q that Blue Earth filed in November 2014, that Thomas signed, and for which Thomas signed Sarbanes Oxley certifications about the 10-Q's accuracy and reliability;

(d)      The statements and omissions Thomas and Francis made on Blue Earth's behalf during November 2014, May 2015, and August 2015 meetings with Jackson;

(e)      The Common Stock Purchase Agreement Thomas signed on behalf of Blue Earth in November 2014;

(f)      The statements and omissions Thomas and Francis made in February 2015 communications and in-person meeting with Jackson about a potential Jackson investment, including the January 2015 balance sheet that Thomas sent Jackson;

(g)     The Form 10-K that Blue Earth filed in March 2015, that

Thomas signed, and for which Thomas signed Sarbanes Oxley

certifications about the 10-K's accuracy and reliability;

(h)     The Form 10-Q that Blue Earth filed in August 2015, that

Thomas signed, and for which Thomas signed Sarbanes Oxley

certifications about the 10-Q's accuracy and reliability;

(i)     The balance sheet Thomas and Francis sent Jackson in October

2015;

(j)     The October 2015 Note Purchase Agreement that Blue Earth

entered with Jackson and that Thomas signed on behalf of Ensite

Power; and

(k)     The December 2015 Fourth Omnibus Amendment and

Reaffirmation Agreement that Jackson and Blue Earth entered and

that Thomas signed on behalf of Ensite Power.

Throughout, Thomas acted within the scope of his employment with Blue Earth or

Ensite, (where specified) a Blue Earth subsidiary.

164.   Pursuant to the aforesaid plan and course of conduct, Blue Earth and

Francis made and had ultimate authority over the misleading statements and

omissions described above about the nature and value of Blue Earth's assets,
including:

> (a)     The representations in Blue Earth's balance sheets about the
> nature and value of Blue Earth's assets; Francis and Thomas both
> participated directly in the decision about how to classify Blue Earth's
> non-binding term sheets on the balance sheet;
>
> (b)     The emails between Thomas, Francis, and Jackson in
> September 2014;
>
> (c)     The statements and omissions Thomas and Francis made at the
> November 2014, May 2015, and August 2015, meetings with Jackson;
> and
>
> (d)     The statements and omissions Thomas and Francis made in
> February and October 2015 communications and meeting with
> Jackson about a potential Jackson investment.

Throughout, Francis acted within the scope of his employment with Blue
Earth.

165.   In each of these various communications, Blue Earth, Thomas, and
Francis made statements and omissions that were false and misleading.  In each
communication, Blue Earth, Thomas, and/or Francis communicated to Jackson, or

allowed Jackson to continue to believe, that Blue Earth had tangible "Property and Equipment" of "Net Fixed Assets" that Blue Earth did not in fact have.  Also in each communication, Blue Earth, Thomas, and/or Francis communicated to Jackson, or allowed Jackson to continue to believe, that the underlying asset was worth at least $44 million, when in fact that figure was a gross overstatement.  It represented merely the market value of stock Blue Earth had supposedly issued to the shareholders of two companies in order to acquire those companies and their non-binding term sheets to discuss the possibility of entering a definitive agreement to build cogeneration plants—term sheets that did not even exist at the time of the acquisition.  The term sheets in fact had no value of their own under GAAP; virtually the entire $44,035,500 figure was mere goodwill.   And in each of these communications, Blue Earth, Thomas, and/or Francis communicated to Jackson, or allowed Jackson to continue to believe, that Blue Earth's SEC filings were accurate and reliable, when in fact those filings misrepresented the nature and value of Blue Earth's assets.

166.   Thomas and Blue Earth had a duty to disclose the true nature and value of the asset they labeled "Property and Equipment" or "Net Fixed Assets," because they knew the true facts about the asset and made or were otherwise aware of the prior misrepresentations about the asset's nature and value and knew that

Jackson had relied on the misrepresentations and omissions.  Thomas and Blue omitted to do so.

167.   Francis had a duty to disclose the true nature and value of the assets, because he knew the true facts about the asset and made or was otherwise aware of the prior misrepresentations about the asset's nature and value and also knew that Jackson had relied on the misrepresentations and omissions.  He also had such a duty because:

(a)   He personally participated in many of the misrepresentations above, including the in-person meetings with senior Jackson personnel and the email communications on which he was copied. He also directly participated in Blue Earth's decision about how to classify the non-binding term sheets on Blue Earth's public balance sheet.  He knew that it was necessary to disclose the true facts about the nature and value of the assets to remedy the misleading impression that the earlier misrepresentations had given Jackson.

(b)   Over the course of Jackson's investments, detailed above, Francis developed a relationship of trust with senior Jackson personnel.  He personally participated in direct communications with Jackson personnel that led to Jackson's investments.  Moreover, as

Executive Vice President of Corporate Development and Investor Relations, Francis assumed a duty to the public and to investors like Jackson of ensuring that the public and investors were not misled.

(c)     As explained above, Francis had superior access to the true facts given his senior position, Blue Earth's small size, the importance of the cogeneration work to Blue Earth, and his direct participation in the cogeneration project and in the decision how to classify the term sheets on Blue Earth's public balance sheet.

(d)     Francis personally benefitted from the stock-price inflation that his misrepresentations caused.  The stock appreciation allowed him or entities and persons affiliated with him to sell their stock at a premium if they chose to do so.

(e)     Based on his direct participation in Thomas's and Blue Earth's communications with Jackson, Francis was aware that Blue Earth was relying on an incorrect understanding of the nature and value of Blue Earth's assets.

(f)     As detailed above, Francis directly participated in Blue Earth's and Thomas's solicitations of Jackson to invest in Blue Earth.

(g)      As explained above, Francis knew, or with severe recklessness

disregard, the falsity of Blue Earth's and Thomas's statements and

omissions about the nature and value of Blue Earth's assets.

(h)      As detailed above, the misrepresentations about the nature and

value of Blue Earth's assets were flagrant GAAP violations that

dramatically inflated the value of Blue Earth's assets and badly

mischaracterized the nature of Blue Earth's assets.

168.   Francis failed to make those disclosures.

169.   Blue Earth's, Thomas's, and Francis's misrepresentations and

omissions were material.   To a reasonable investor, these misrepresentations and

omissions significantly altered the mix of information available about Blue Earth.

If these communications had (1) accurately represented that Blue Earth had tens of

millions of dollars' fewer tangible "Property and Equipment" than Defendants and

Blue Earth represented or allowed Jackson to continue to believe, or (2) that the

underlying asset was worth nothing at all under GAAP, much less $44,035,000 or

more, the statements and omissions would have presented a substantially different

risk profile to investors.  For example, investors would have known that Blue Earth

had much less property and equipment with which to "create and distribute [Blue

Earth's] products and services"—and that Blue Earth was thus substantially less

able to generate revenue than Blue Earth represented that it had been.  FASB ASC 360-10-05-2.   Likewise, investors would have known that few assets would be available to distribute to investors and creditors if Blue Earth were to enter bankruptcy (which it eventually did).

170.   As explained in Paragraphs 102-144, for example, Blue Earth, Thomas, and Francis had actual knowledge of, or with severe recklessness disregarded, the true nature and value of these assets.  Blue Earth, Thomas, and Francis made these material misrepresentations and/or omissions knowingly, or with severe recklessness, for the purpose and effect of inducing Jackson to purchase Blue Earth securities.

171.   Jackson reasonably and justifiably relied on these misrepresentations and omissions.  Jackson would not have purchased any of the Blue Earth securities described above if Jackson had known the true facts about the nature and value of Blue Earth's assets. Jackson at all times exercised reasonable diligence by, for example, reviewing Blue Earth's financial statements, discussing Blue Earth's business results, prospects, risks, and plans with Blue Earth's principals, and investigating Blue Earth's sources of funding for expansion.  Jackson did not know the truth about the nature and value of Blue Earth's assets, or about the inaccuracy

and unreliability of Blue Earth's SEC filings.  Nor could Jackson have learned the truth by exercising reasonable diligence.

172.   At the time of all of the investments described above, Jackson did not know and could not have known the true nature or value of the assets Blue Earth, Thomas, and Francis mislabeled "Property and Equipment" or "Net Fixed Assets" worth tens of millions of dollars.

173.   As explained in Paragraph 145-49, for example,  Blue Earth's, Thomas's, and Francis's misrepresentations proximately caused Jackson's investments to lose virtually all of their value.  Those misrepresentations concealed risks that materialized to destroy the investments' value.

174.   As a result of these misrepresentations and omissions, Jackson suffered damages in an amount to be determined at trial.

175.   As a result, Blue Earth, Thomas, and Francis violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## SECOND CAUSE OF ACTION
### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder

176.   Plaintiff repeats and realleges each and every allegation contained above, as if set forth herein.

177.   Blue Earth, Thomas, and Francis, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails and wires, intentionally and/or with severe recklessness participated in a continuous course of conduct that operated to deceive Jackson; made untrue statements of material fact and/or omitted material facts that should have been disclosed to make the statements made not misleading, and had ultimate authority over the content of these statements and omissions; and employed devices, and artifices that operated to deceive Jackson in connection with the purchase and sale of securities, and caused Jackson to purchase the securities.

178.   Pursuant to the aforesaid plan and course of conduct, Blue Earth, Thomas, and Francis made, and had ultimate authority over, statements to Jackson in February 2015 that Blue Earth had take-out financing lined up that would ensure that Jackson recouped debt investments.  That representation explains why the note had an unusually short six-month maturity date.  Thomas and Francis acted within the scope of their employment with Blue Earth in making these statements.

179.   This statement was false and misleading.  Blue Earth had no take-out financing lined up.  Nor did Blue Earth have take-out financing lined up at the time of Jackson's later debt investments.

180. Thomas, Francis, and Blue Earth had a duty to disclose the unavailability of take-out financing after the February 2015 statements. They knew the true facts about the unavailability of take-out financing and that Jackson had relied on the misrepresentation in making the debt investments. Thomas, Francis, and Blue Earth did not make that disclosure.

181. Blue Earth's, Thomas's, and Francis's misrepresentations and omissions were material. To a reasonable investor, these misrepresentations and omissions significantly altered the mix of information available about Blue Earth. If these communications had accurately represented that Blue Earth did not have take-out financing lined up, they would have presented a substantially different risk profile to a reasonable investor. For example, true statements would have made clear that Jackson was not certain to recover its debt investments in Blue Earth.

182. As explained in Paragraphs 102-44, for example, Blue Earth, Thomas, and Francis had actual knowledge of, or with severe recklessness disregarded, the truth about take-out financing's unavailability. Blue Earth, Thomas, and Francis made these material misrepresentations and/or omissions knowingly, or with severe recklessness, for the purpose and effect of inducing Jackson to purchase Blue Earth debt securities.

183.   Jackson reasonably and justifiably relied on these misrepresentations and omissions.  Jackson would not have purchased any of the Blue Earth debt securities described above if Jackson had known the true facts about the unavailability of take-out financing.  Jackson at all times exercised reasonable diligence by, for example, reviewing Blue Earth's financial statements, discussing Blue Earth's business results, prospects, risks, and plans with Blue Earth's principals, and investigating Blue Earth's sources of funding for expansion. Jackson did not know the truth about the unavailability of take-out financing.  Nor could Jackson have learned the truth by exercising reasonable diligence.

184.   At the time of all of the debt investments described above, Jackson did not know and could not have known that take-out financing was not lined up.

185.   As explained in Paragraph 148, for example, Blue Earth's, Thomas's, and Francis's misrepresentations and omissions proximately caused Jackson's debt investments to lose virtually all of their value.  Those misrepresentations concealed risks that materialized to destroy the investments' value.

186.   As a result of these misrepresentations and omissions, Jackson suffered damages in an amount to be determined at trial.

187.   As a result, Blue Earth, Thomas, and Francis violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## THIRD CAUSE OF ACTION
## Violation of Section 20(a) of the Exchange Act

188.   Plaintiff repeats and realleges each and every allegation stated above, as if fully set forth herein.

189.   As set forth above, Blue Earth is an individual liable under Section 10(b) of the Exchange Act.

190.   As explained in Paragraphs 150-56, Thomas and Francis each had the power to control Blue Earth's general affairs and in fact exercised that control during the relevant period.  Also as explained in those paragraphs, Thomas and Francis had the power to control, and in fact controlled, the specific corporate policy that resulted in the primary violation—i.e., how Blue Earth described the nature and value of its assets to investors like Jackson and also how Blue Earth represented the accuracy and reliability of its SEC filings.

191.   Neither Thomas nor Francis can make the requisite showing that they acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.  Indeed, both directly and knowingly, or with severe reckless, caused the violation.

192.   As a result, the Defendants have violated § 20(a) of the Exchange Act.

193.   Jackson has been damaged by the violations of Thomas and Francis as described in this Count and seek recovery of damages caused thereby in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### Violation of Section 20(a) of the Exchange Act

194.   Plaintiff repeats and realleges each and every allegation stated above, as if fully set forth herein.

195.   As set forth above, Blue Earth is an individual liable under Section 10(b) of the Exchange Act.

196.   As explained in Paragraphs 150 and 153, for example, Thomas and Francis each had the power to control Blue Earth's general affairs and in fact exercised that control during the relevant period.  And as explained in Paragraphs 152 and 156, for example, Thomas and Francis had the power to control, and in fact controlled, the specific corporate policy that resulted in the primary violation—i.e., how in February 2015 and thereafter Blue Earth represented to Jackson (or omitted to correct misrepresentations about) the availability of take-out financing.

197.   Neither Thomas nor Francis can make the requisite showing that they acted in good faith and did not directly or indirectly induce the act or acts

constituting the violation or cause of action.  Indeed, both directly and knowingly, or with severe recklessness, caused the violation.

198.   As a result, the Defendants have violated § 20(a) of the Exchange Act.

199.   Jackson has been damaged by the violations of Thomas and Francis as described in this Count and seek recovery of damages caused thereby in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
## Violation of O.C.G.A. § 10-5-58(g)

200.   Plaintiff repeats and realleges each and every allegation stated above, as if fully set forth herein.

201.   Blue Earth sold securities to Jackson by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which it was made, not misleading.  For example, Blue Earth sold securities to Jackson by misrepresenting the nature and value of its assets in its financial statements and the accuracy and reliability of Blue Earth's SEC filings. Blue Earth repeatedly purported to have tens of millions of dollars' worth of tangible "Property and Equipment" or "Net Fixed Assets" (and previously, in part "Construction in progress") that Blue Earth did not have.

202.   Jackson did not know the untruth of those statements or that Blue Earth made those omissions.

203.   Blue Earth could not sustain its burden of showing that it did not know or could not have known in the exercise of reasonable care that the statements were untrue or that Blue Earth made the omissions.

204.   Thomas and Francis each directly or indirectly controlled Blue Earth. As explained in Paragraphs 150-56, Thomas and Francis each had the power to control Blue Earth's general affairs and in fact exercised that control during the relevant period.  Also as explained in those paragraphs, Thomas and Francis had the power to control, and in fact controlled, the specific corporate policy that resulted in the primary violation—i.e., how Blue Earth described the nature and value of its assets to investors like Jackson and how Blue Earth described the accuracy and reliability of its SEC filings.

205.   Thomas was an executive officer and/or director of Blue Earth at all relevant times.

206.   At all relevant times, Francis was an executive officer or had a similar status or performed similar functions to an executive officer.  He was Executive Vice President of Corporate Development and Investor Relations.  And as Blue Earth stated in a proxy statement the company filed with the SEC on April 29,

2014, Francis "was a critical manager in the development and implementation of the business model, the acquisitions, investor relations and capital formation. The Company has raised over $20 million in equity in 2013, which would not have been possible without the efforts of Mr. Francis, the Chairman and Dr. Thomas."

207.   Until in or about December 2015, Thomas was an employee of Blue Earth or otherwise associated with Blue Earth. He materially aided the conduct giving rise to Blue Earth's liability under O.C.G.A. § 10-5-58(b). For example:

(a)   Concerning the Form 10-Q Blue Earth filed in May 2014, Thomas signed that document and also signed Sarbanes Oxley certifications about the 10-Q's accuracy and reliability;

(b)   Thomas participated directly in the emails between Thomas, Francis, and Jackson in September 2014;

(c)   Concerning the Form 10-Q that Blue Earth filed in November 2014, Thomas signed that 10-Q and also signed Sarbanes Oxley certifications about the 10-Q's accuracy and reliability;

(d)   Thomas directly participated in the November 2014, May 2015, and August 2015 meetings with Jackson;

(e)   Concerning the Common Stock Purchase Agreement in November 2014,  Thomas signed on behalf of Blue Earth;

(f)     Thomas directly participated in the February 2015 communications and in-person meeting with Jackson about a potential Jackson investment and sent the misleading January 2015 balance sheet to Jackson;

(g)     Concerning the Form 10-K that Blue Earth filed in March 2015, Thomas signed that 10-K and also signed Sarbanes Oxley certifications about the 10-K's accuracy and reliability;

(h)     Concerning the Form 10-Q that Blue Earth filed in August 2015, Thomas signed that 10-Q and also signed Sarbanes Oxley certifications about the 10-Q's accuracy and reliability;

(i)     Concerning the October 2015 balance sheet, Thomas sent the document to Jackson;

(j)     Concerning the October 2015 Note Purchase Agreement that Blue Earth entered with Jackson, Thomas signed on behalf of Ensite Power; and

(k)     Concerning the December 2015 Fourth Omnibus Amendment and Reaffirmation Agreement that Jackson and Blue Earth entered, Thomas signed on behalf of Ensite Power.

208.   Until in or about December 2015, Francis was an employee of Blue Earth or otherwise associated with Blue Earth. He materially aided conduct giving rise to Blue Earth's liability under O.C.G.A. § 10-5-58(b).  For example:

(a)      Francis participated directly in the decision how to characterize the non-binding term sheets on Blue Earth's balance sheet;

(b)      Francis participated in the emails between Thomas, Francis, and Jackson in September 2014;

(c)      Francis participated in the November 2014, May 2015, and August 2015 meetings with Jackson; and

(d)      Francis participated in February 2015 communications and meeting with Jackson about a potential Jackson investment.

209.   Jackson has been damaged by the violations of Thomas and Francis as described in this Count and seek recovery of damages caused thereby in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**Violation of O.C.G.A. § 10-5-58(g)**

210.   Plaintiff repeats and realleges each and every allegation stated above, as if fully set forth herein.

211.   Blue Earth sold securities to Jackson by means of untrue statements of material fact and omissions to state material facts necessary in order to make the

statements made, in light of the circumstances under which it was made, not misleading.  For example, starting in February 2015 Blue Earth sold securities to Jackson by misrepresenting, or omitting to correct misrepresentations, that Blue Earth had lined up take-out financing that would ensure that Jackson recovered its debt investments in Blue Earth.  Blue Earth had not lined up take-out financing.

212.   Jackson did not know the untruth of those statements or that Blue Earth made those omissions.

213.   Blue Earth could not sustain its burden of showing that it did not know or could not have known in the exercise of reasonable care that the statements were untrue or that Blue Earth made the omissions.

214.   Thomas and Francis each directly or indirectly controlled Blue Earth. As explained in Paragraphs 150 and 153, for example, Thomas and Francis each had the power to control Blue Earth's general affairs and in fact exercised that control during the relevant period.  And as explained in Paragraphs 152 and 156, for example, Thomas and Francis had the power to control, and in fact controlled, the specific corporate policy that resulted in the primary violation—i.e., how Blue Earth described the availability of take-out financing to Jackson.

215.   Thomas was an executive officer and/or director of Blue Earth at all relevant times.

216.   At all relevant times, Francis was an executive officer or had a similar status or performed similar functions to an executive officer.  He was Executive Vice President of Corporate Development and Investor Relations.  And as Blue Earth stated in a proxy statement the company filed with the SEC on April 29, 2014, Francis "was a critical manager in the development and implementation of the business model, the acquisitions, investor relations and capital formation.  The Company has raised over $20 million in equity in 2013, which would not have been possible without the efforts of Mr. Francis, the Chairman and Dr. Thomas."

217.   Until in or about December 2015, Thomas was an employee of Blue Earth or otherwise associated with Blue Earth.  He materially aided the conduct giving rise to Blue Earth's liability under O.C.G.A. § 10-5-58(b).  Indeed he and Francis misrepresented to Jackson in February 2015 that take-out financing was lined up.

218.   Until in or about December 2015, Francis was an employee of Blue Earth or otherwise associated with Blue Earth. He materially aided conduct giving rise to Blue Earth's liability under O.C.G.A. § 10-5-58(b).  Indeed he and Thomas misrepresented to Jackson in February 2015 that take-out financing was lined up.

219.   Jackson has been damaged by the violations of Thomas and Francis as described in this Count and seek recovery of damages caused thereby in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**Fraud or Negligent Misrepresentation**

220.   Plaintiff repeats and realleges each and every allegation stated above, as if fully set forth herein.

221.   Thomas made several material misrepresentations to Jackson about the nature and value of Blue Earth's assets and about the accuracy and reliability of Blue Earth's SEC filings.  In those communications, Thomas represented that Blue Earth had tens of millions of dollars in tangible property equipment when in fact the underlying assets were intangible, non-binding term sheets worth nothing at all under GAAP.   Thomas also made omissions in communications with Jackson, failing to correct Thomas's prior statements about the nature and value of Blue Earth's assets. Those misrepresentations and omissions occurred, for example, in the following communications described above:

> (a)    The Form 10-Q Blue Earth filed in May 2014, that Thomas signed, and for which Thomas signed Sarbanes Oxley certifications about the 10-Q's accuracy and reliability;

(b)     The emails between Thomas, Francis, and Jackson in September 2014;

(c)     The Form 10-Q that Blue Earth filed in November 2014, that Thomas signed, and for which Thomas signed Sarbanes Oxley certifications about the 10-Q's accuracy and reliability;

(d)     The statements and omissions Thomas and Francis made on Blue Earth's behalf during November 2014, May 2015, and August 2015 meetings with Jackson;

(e)     The Common Stock Purchase Agreement Thomas signed on behalf of Blue Earth in November 2014;

(f)     The statements and omissions Thomas and Francis made in February 2015 communications and a meeting with Jackson about a potential Jackson investment, including the January 2015 balance sheet Thomas sent Jackson;

(g)     The Form 10-K that Blue Earth filed in March 2015, that Thomas signed, and for which Thomas signed Sarbanes Oxley certifications about the 10-K's accuracy and reliability;

(h)     The Form 10-Q that Blue Earth filed in August 2015, that Thomas signed, and for which Thomas signed Sarbanes Oxley certifications about the 10-Q's accuracy and reliability;

(i)     The October 2015 email attaching a balance sheet;

(j)     The October 2015 Note Purchase Agreement that Blue Earth entered with Jackson and that Thomas signed on behalf of a Blue Earth subsidiary; and

(k)     The December 2015 Fourth Omnibus Amendment and Reaffirmation Agreement that Jackson and Blue Earth entered and that Thomas signed on behalf of a Blue Earth subsidiary.

222.   Those misrepresentations were material.  To a reasonable investor, these misrepresentations significantly altered the mix of information available about Blue Earth.  If these communications had accurately represented (1) that Blue Earth had tens of millions of dollars' fewer tangible "Property and Equipment" or "Net Fixed Assets" than Thomas represented or allowed Jackson to continue to believe, or (2) that the underlying asset was worth substantially less than represented, the statements and omissions would have presented a substantially different risk profile to investors.  For example, investors would have known that Blue Earth had much less property and equipment with which to

"create and distribute [Blue Earth's] products and services"—and that Blue Earth was thus substantially less able to generate revenue than Blue Earth represented that it had been.  FASB ASC 360-10-05-2.  Likewise, investors would have known that few assets would be available to distribute to investors and creditors if Blue Earth were to enter bankruptcy (which it eventually did).

223.   As explained in Paragraphs 102-44, for example, Thomas made these misrepresentations with knowledge of, or with severely reckless disregard for, the truth about the nature and value of Blue Earth's assets. Alternatively, Thomas made these misrepresentations with negligent disregard for the truth about the nature and value of those assets.

224.   In making those misrepresentations and omissions, Thomas intended to induce Jackson into making investments in Blue Earth.  Alternatively, it was foreseeable to Thomas that Jackson would receive and rely on the false information.

225.   Jackson justifiably relied on Thomas's misrepresentations and omissions.   Jackson did not know, and could not have known, the truth about the nature or value of the  assets Thomas had labeled as tangible "Property and Equipment" worth tens of millions of dollars. Jackson would not have purchased Blue Earth securities if Jackson had known the truth about the nature and value of

Blue Earth's assets.  At all times, Jackson exercised reasonable diligence when investing in Blue Earth.

226.   As explained in Paragraphs 145-49, for example, Thomas's misrepresentations and omissions proximately caused Jackson damages.  The risks that Thomas's misrepresentations and omissions concealed materialized to destroy the value of Jackson's investments.

227.   Likewise, Francis made misrepresentations and omitted to state the true nature and value of Blue Earth's assets, in several communications, including the following communications:

(a)    Francis participated directly in the decision about how to label the non-binding term sheets on Blue Earth's SEC filings;

(b)    Francis participated in the emails between Thomas, Francis, and Jackson in September 2014;

(c)    Francis participated in the November 2014 meeting with Jackson; and

(d)    Francis participated in February 2015 communications and a meeting with Jackson about a potential Jackson investment.

228.   In some of those communications the participants discussed Blue Earth's cogeneration project—which was the asset Blue Earth had mislabeled

"Property and Equipment" or "Net Fixed Assets" supposedly worth tens of millions of dollars.  Francis participated in those communications and nonetheless omitted to disclose that Blue Earth had mislabeled and overvalued those assets.  .

229.   These misrepresentations and omissions were material. To a reasonable investor, these omissions significantly altered the mix of information available about Blue Earth.  If Francis had divulged (1) that Blue Earth had tens of millions of dollars' fewer tangible "Property and Equipment" or "Net Fixed Assets" than Francis allowed Jackson to continue to believe, or (2) that the underlying asset was worth substantially less than represented, Francis would have presented a substantially different risk profile to investors.  For example, investors would have known that Blue Earth had much less property and equipment with which to "create and distribute [Blue Earth's] products and services"—and that Blue Earth was thus substantially less able to generate revenue than Blue Earth represented that it had been.  FASB ASC 360-10-05-2.  Likewise, investors would have known that few assets would be available to distribute to investors and creditors if Blue Earth were to enter bankruptcy (which it eventually did).

230.   As explained in Paragraphs 102-44, for example, Francis knew, or with severe recklessness disregarded, the true facts about the nature and value of

Blue Earth's assets. Alternatively, Francis negligently disregarded the true facts about the nature and value of Blue Earth's assets.

231.   In making those omissions, Francis intended to induce Jackson into making investments in Blue Earth.  Alternatively, it was foreseeable to Francis that Jackson would receive and rely on the false information.

232.   Jackson justifiably relied on Francis's omissions.   Jackson did not know, and could not have known, the truth about the nature or value of the  assets Blue Earth had labeled as tangible "Property and Equipment" worth tens of millions of dollars. Jackson would not have purchased Blue Earth securities if Jackson had known the truth about the nature and value of Blue Earth's assets.  At all times Jackson acted with reasonable diligence when investing in Blue Earth.

233.   As explained in Paragraphs 145-49, Francis's omissions proximately caused Jackson damages.  The risks that Francis's omissions concealed materialized to destroy the value of Jackson's investments.

## EIGHTH CAUSE OF ACTION
## Fraud or Negligent Misrepresentation

234.   Plaintiff repeats and realleges each and every allegation stated above, as if fully set forth herein.

235.   Thomas and Francis misrepresented to Jackson in February 2015 that Blue Earth had lined up take-out financing to ensure that Jackson would recover

Jackson's debt investments.  That representation explains why the note had an unusually short six-month maturity date.  Thomas and Francis thereafter failed to correct that misrepresentation, though they knew that Jackson continued to make investments in reliance on that misrepresentation.

236.   Those misrepresentations and omissions were material.  To a reasonable investor, these misrepresentations significantly altered the mix of information available about Blue Earth.  If these communications had accurately represented that Blue Earth had not lined up take-out financing, the statements and omissions would have presented a substantially different risk profile to a reasonable investor.  A reasonable investor would have known that Jackson was not in fact certain to recover its debt investments.

237.   As explained in Paragraphs 102-44, for example, Thomas and Francis made these misrepresentations and omissions with knowledge of, or with severely reckless disregard for, the truth about the unavailability of take-out financing. Alternatively, Thomas and Francis made these misrepresentations and omissions with negligent disregard for the truth about the unavailability of take-out financing.

238.   In making those misrepresentations and omissions, Thomas and Francis intended to induce Jackson into making investments in Blue Earth.

Alternatively, it was foreseeable to Thomas and Francis that Jackson would receive and rely on the false information or omissions.

239.   Jackson justifiably relied on Thomas's misrepresentations and omissions.   Jackson did not know, and could not have known, the truth about the unavailability of take-out financing.  Jackson would not have purchased Blue Earth securities if Jackson had known the truth about the unavailability of take-out financing.  At all times Jackson exercised reasonable diligence when making debt investments in Blue Earth.

240.   As explained in Paragraph 148, for example, Thomas's and Francis's misrepresentations and omissions proximately caused Jackson damages.  The risks that Thomas's and Francis's misrepresentations and omissions concealed materialized to destroy the value of Jackson's debt investments.

## NINTH CAUSE OF ACTION
### Conspiracy to Commit Common-Law Fraud and Violate O.C.G.A. § 10-5-58

241.   Plaintiff repeats and realleges each and every allegation stated above, as if fully set forth herein.

242.   Thomas and Francis combined, and acted with a common design, to commit common-law fraud and violate of § O.C.G.A. § 10-5-58, i.e., to mislead investors generally and Jackson specifically about the nature and value of Blue

Earth's assets and about the accuracy and reliability of Blue Earth's SEC filings and to thereby induce investors and Jackson to purchase Blue Earth securities.

243.   Indeed, Thomas and Francis jointly participated in many of the misrepresentations and communication alleged above.  For example:

> (a)   Thomas and Jackson both participated directly in the decision about how to classify the non-binding term sheets on Blue Earth's balance sheet;
>
> (b)   Thomas and Jackson both participated in the emails with Jackson in September 2014;
>
> (c)   Thomas and Francis both participated in the November 2014, , February 2015, May 2015, and August 2015, meetings with Jackson; and
>
> (d)   Thomas and Francis both participated in the February and October 2015 communications with Jackson about a potential Jackson investment.

244.   As a result of this conspiracy and the underlying torts, Jackson suffered damages in an amount to be proven at trial.

## TENTH CAUSE OF ACTION
## Conspiracy to Commit Common-Law Fraud and Violate O.C.G.A. § 10-5-58

245.   Plaintiff repeats and realleges each and every allegation stated above, as if fully set forth herein.

246.   Thomas and Francis combined, and acted with a common design, to commit common-law fraud and violate of § O.C.G.A. § 10-5-58, i.e., to mislead Jackson into believing that take-out financing was lined up to repay Jackson's debt investments and thereby to induce Jackson into making those debt investments in 2015.

247.   Indeed, Thomas and Francis jointly represented to Jackson that take-out financing was available in February 2015.  Thomas and Francis thereafter jointly met with and communicated with Jackson without correcting that misrepresentation.

248.   As a result of this conspiracy and the underlying torts, Jackson suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiff seeks a trial by jury on all matters and judgment against Defendants:

1.      For losses in an amount to be proven at trial;

2.      Plus prejudgment interest;

3.      Plus reasonable attorneys' fees;

4.      Plus such other and further relief as the Court deems equitable and just.


November 28, 2016

       /s/    Stephen Hudson

Stephen E. Hudson
Georgia Bar No. 374692
Josh C. Hess
Georgia Bar No. 371139
KILPATRICK TOWNSEND &
    STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4530
Telephone:  (404) 815-6500
Facsimile:  (404) 815-6555
shudson@kilpatricktownsend.com
jchess@kilpatricktownsend.com

*Attorneys for Plaintiff*