## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| JACKSON INVESTMENT GROUP, LLC | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 1:16-cv-04389-RWS |
| JOHNNY TOMAS AND JOHN C. FRANCIS, | ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFF JACKSON INVESTMENT GROUP'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Stephen E. Hudson
Georgia Bar No. 374692
Josh C. Hess
Georgia Bar No. 371139
KILPATRICK TOWNSEND &
    STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4530
Telephone:  (404) 815-6500
Facsimile:  (404) 815-6555
shudson@kilpatricktownsend.com
jchess@kilpatricktownsend.com

*Attorneys for Plaintiff*

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION .................................................................................1

II.  RELEVANT FACTUAL BACKGROUND ....................................................3

III. ARGUMENT AND CITATION OF AUTHORITY ...................................13

     A.   JIG Has Pled a Plausible Rule 10b-5 Claim Against
          Defendants. ...........................................................................14

          1.   Defendants Misrepresented Material Facts and Failed to
               Disclose Other Material Facts that Should Have Been
               Disclosed to JIG. .......................................................14

          2.   Francis Also Is Responsible for the Fraud. ..............................21

          3.   Defendants Acted with Scienter. .............................................22

          4.   Defendants' Fraud Proximately Caused JIG's Loss. ................29

          5.   The Notes Were Investments and thus Securities. ....................31

     B.   JIG Has Adequately Pled the Control Person and State Law
          Claims. ...................................................................................33

IV.  CONCLUSION..............................................................................35

US2008 12659604 13

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>

*100079 Canada Inc. v. Stiefel Labs., Inc.*, No. 11-22389, 2011 WL
13116079 (S.D. Fla. Nov. 30, 2011) ...................................................... 13, 21

*Alameda v. Nuveen Mun. High Income Opp. Fund.*, No. 08-4575,
2009 WL 1424529 (N.D. Cal. May 20, 2009) ...............................................20

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002).....................................17

*Alpha Cap. Anstalt v. New Gen. Biofuels, Inc.*, No. 13-5586, 2014 WL
6466994 (S.D.N.Y. Nov. 18, 2014)........................................................ 20, 31

*Asset Protection Plans, Inc. v. Oppenheimer & Co., Inc.*, No. 11-440,
2011 WL 2533839 (N.D. Ga. June 27, 2011) ................................................33

*Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653 (5th Cir. 2005) .................................21

*Batwin v. Occam Networks, Inc.*, No. 07-2750, 2008 WL 2676364
(C.D. Cal. July 1, 2008)................................................................................23

*Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008) ......................23

*Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239 (D. Mass. 2006)........... 27, 28

*Carlucci v. Han*, 886 F. Supp. 2d 497 (E.D. Va. 2012).................................... 29, 32

*Carpenters Health & Welfare Fund of Phil. v. Coca Cola Co.*, No. 00-
2838, 2002 WL 34089163 (N.D. Ga. Aug. 20, 2002)...................................25

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed  Martin Corp.*, 875
F. Supp. 2d 359 (S.D.N.Y. 2012) .................................................................21

*Espinoza v. Whiting*,  8 F. Supp. 3d 1142 (E.D. Mo. 2014) ............................ 25, 26

*First Va. Bankshares v. Benson*, 559 F.2d 1307 (5th Cir. 1977)............................16

*Fla. St. Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645 (8th
Cir. 2001) ................................................................................................. 18, 29

*Hall v. Coram Healthcare Corp.*, 157 F.3d 1286 (11th Cir. 1998)........................21

*Howard v. Everex Sys., Inc.*, 228 F.3d 1057 (9th Cir. 2000)....................................27

*In re Alstom SA*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) .................................. 19, 20

*In re Am. Bus. Fin. Servs., Inc. Noteholder Litig.*, No. 08-0784, 2008
    WL 3405580 (E.D. Pa. Aug. 11, 2008) ........................................................25

*In re Ambac Fin. Grp., Inc., Secs. Litig.*, 693 F. Supp. 2d 241
    (S.D.N.Y. 2010)................................................................................................17

*In re Atlas Air Worldwide Hldgs., Inc. Secs. Litig.*, 324 F. Supp. 2d
    474 (S.D.N.Y. 2004)................................................................................. 24, 25

*In re Carter's Inc. Secs. Litig.*, No. 08-02940, 2012 WL 3715241
    (N.D. Ga. Aug. 28, 2012) ...............................................................................22

*In re Ebix, Inc. Secs. Litig.*, 898 F. Supp. 2d 1325 (N.D. Ga. 2012)............... passim

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d
    549 (S.D. Tex. 2002) ......................................................................................26

*In re Friedman's, Inc. Secs. Litig.*, 385 F. Supp. 2d 1345 (N.D. Ga.
    2005) ......................................................................................... 15, 24, 34

*In re Hornyak*, No. 08-09048, 2010 WL 2044469 (N.D. Ga. Apr. 1,
    2010) ...............................................................................................................33

*In re JDN Realty Corp. Secs. Litig.*, 182 F. Supp. 2d 1230 (N.D. Ga.
    2002) ......................................................................................... 16, 21, 25

*In re Lehman Bros. Secs. & ERISA Litig.*, 799 F. Supp. 2d 258
    (S.D.N.Y. 2011)...............................................................................................30

*In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965 (N.D. Cal.
    2007) ................................................................................................. 17, 18

*In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620 (E.D. Va.
    2000) ................................................................................................. 25, 26

US2008 12659604 13

*In re New Oriental Educ. & Tech. Grp. Secs. Litig.*, 988 F. Supp. 2d 406 (S.D.N.Y. 2013)...................................................................................17

*In re Officemax, Inc. Secs. Litig.*, No. 00-2432, 2002 WL 33959993 (N.D. Ohio. Mar. 26, 2002) ...........................................................................18

*In re Omnicom Grp., Inc. Secs. Litig.*, No. 02-4483, 2005 WL 735937 (S.D.N.Y. Mar. 30, 2005) ................................................................... 27, 28

*In re Paincare Hldgs. Sec. Litig.*, 541 F. Supp. 2d 1283 (M.D. Fla. 2008) ......................................................................................................22

*In re Petrobras Secs. Litig.*, 116 F. Supp. 3d 368 (S.D.N.Y. 2015).......................15

*In re Scientific-Atlanta, Inc. Secs. Litig.*, 239 F. Supp. 2d 1351 (N.D. Ga. 2002) ................................................................................ 15, 24, 29

*Joffee v. Lehman Bros, Inc.*, No. 04-3507, 2005 WL 1492101 (S.D.N.Y. June 23, 2005) ...........................................................................26

*Kennedy v. Tallant*, 710 F.2d 711 (11th Cir. 1983) .................................................19

*King Cnty., Wash v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334 (S.D.N.Y. 2010)....................................................................................31

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940 (9th Cir. 2005) .................................................................................................30

*Longden v. Sunderman*, 737 F. Supp. 968 (N.D. Tex. 1990) .................................20

*Makor Issues & Rights Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008) ......................................................................................................23

*Marksman Partners, LP v. Chantal Pharm. Corp.*, 927 F. Supp. 1297 (C.D. Cal. 1996).................................................................................. 17, 19

*Nebo Ventures, LLC v. NovaPro Risk Solutions, LP*, 752 S.E.2d 18 (Ga. Ct. App. 2013) ...................................................................................35

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F. 3d 376 (6th Cir. 2016) ....................................................................................29

*Reves v. Ernst & Young*, 494 U.S. 56 (1990)....................................................... 31, 32

*Rivell v. Private Health Care Sys.*, 520 F.3d 1308 (11th Cir. 2008) .......................13

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) .......................................................27

*SEC v. Lauer*, No. 03-50612, 2008 WL 4372896 (S.D. Fla. Sept. 24, 2008) ....................................................................................................................26

*SEC v. Mozilo*, No. 09-3994, 2010 WL 3656068 (C.D. Cal. Sept. 16, 2010) .......................................................................................................... 15, 19, 29

*SEC v. Novus Tech, LLC*, No. 07-235, 2010 WL 4180550 (D. Utah Oct. 20, 2010), *aff'd*, 732 F.3d 1151 (10th Cir. 2013)....................................33

*SEC v. Reynolds*, No. 06-1801, 2010 WL 3943729 (N.D. Ga. Oct. 5, 2010) ....................................................................................................................33

*SEC v. Thompson*, 732 F.3d 1151 (10th Cir. 2013)..................................................32

*SEC v. True North Fin. Corp.*, 909 F. Supp. 2d 1073 (D. Minn. 2012).................29

*SEC v. Wallenbrock*, 313 F.3d 532 (9th Cir. 2002)..................................................32

*Teamsters Local 617 Pension & Welfare Fund v. Appollo Grp., Inc.*, 690 F. Supp. 2d 959 (D. Ariz. 2010) .............................................................34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).......................22

*Transit Rail LLC v. Marsala*, No. 05-0564, 2007 WL 2089273 (W.D.N.Y. July 20, 2007) ............................................................................21

*Turner v. MagicJack VocalTec, Ltd.*, No. 13-448, 2014 WL 406917 (S.D.N.Y. Feb. 3, 2014)................................................................................18

*WPP Lexembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039 (9th Cir. 2011) .................................................................................27

*Wright v. Downs*, No. 91-2050, 1992 WL 168104 (6th Cir. 1992)........................32

## <u>Statutes</u>

15 U.S.C. § 78j(b) ....................................................................................14

15 U.S.C. § 78t ................................................................................. 33, 34

15 U.S.C. § 78u-4 ....................................................................................13

O.C.G.A. § 10-5-58(b) ............................................................................35

O.C.G.A. § 10-5-58(g)(1)-(2) ..................................................................35

## <u>Other Authorities</u>

FASB ASC 360-10-05-3 ...................................................................... 7, 15

FASB ASC 805-10-20 .......................................................................... 5, 15

FASB ASC 805-20-25-1 .............................................................................5

FASB ASC 805-30-30-1 .............................................................................5

## <u>Rules</u>

17 C.F.R. § 210.4-01(a)(1) (2011) ................................................ 11, 15, 19

17 C.F.R. 240.10b-5 ...................................................................... passim

Fed. R. Civ. P. 12(b)(6) ...................................................................... 1, 13

Fed. R. Civ. P. 9(b) ..................................................................................13

US2008 12659604 13

## I.    <u>INTRODUCTION</u>

Defendants, Johnny Thomas and John Francis, were senior executives of Blue Earth, an energy startup that was running out of cash and spiraling towards insolvency.  Desperate to secure life-sustaining capital, Defendants made Blue Earth appear a safer investment than it was by disguising its paper "assets" as real ones:  Blue Earth had non-binding term sheets memorializing plans to discuss building seven power plants.  Defendants fraudulently included those non-binding term sheets on its balance sheet as "Property and Equipment," which is by definition a "tangible" asset like a factory that can produce revenue-generating products and secure debt.  They slapped a $44 million value on that "Property and Equipment"—making it *one-half* the assets on Blue Earth's balance sheet.

Plaintiff, Jackson Investment Group ("JIG"), reviewed and relied on Blue Earth's financial statements, and specifically the value of the assets listed therein, and met and communicated directly with Defendants.  It was fooled into believing that Blue Earth had substantial real, productive assets and therefore invested in Blue Earth.  When Blue Earth's paper assets generated too little revenue to pay its debts, it entered bankruptcy, wiping out JIG's investment.  JIG brings this lawsuit against Defendants, asserting securities-fraud claims under federal and Georgia law.  Defendants moved to dismiss under Rule 12(b)(6).

All of Defendants' arguments for dismissal fail, and their motion to dismiss should be denied.[1]  According to Defendants, they fully disclosed that Blue Earth's power-plant projects were mere term sheets.  But that argument misses the point. Defendants did not disclose that they had classified the term sheets as "Property and Equipment" or that the term sheets were all of that $44 million asset.

Defendants also argue that they neither knew nor recklessly disregarded that Blue Earth had misclassified and overvalued the term sheets.  That borders on the risible.  Defendants were sophisticated, hands-on senior officers who were intimately familiar with Blue Earth and directly solicited JIG's investments to fund the power-plant projects; the term sheets were the company's biggest and most important "assets" and thus within Defendants' purview; Defendants both helped decide how to classify the term sheets; common sense dictates that non-binding term sheets are not "Property and Equipment" worth $44 million; and the SEC warned Defendants that the accounting for the term sheets was deceptive.  At most, Defendants raise jury questions, not grounds for dismissal at the pleading stage.

---

[1] Defendants claim that JIG has reviewed Blue Earth's internal documents.  That is not true.  To date JIG has refrained from collecting those documents to avoid interfering with an ongoing Securities and Exchange Commission ("SEC") investigation of Blue Earth relating in part to the very accounting issues raised by JIG's Complaint.

US2008 12659604 13

## II.  <u>RELEVANT FACTUAL BACKGROUND</u>

Thomas and Francis were the Chief Executive Officer and the Executive Vice President of Corporate Development and Investor Relations, respectively, of a small energy startup named Blue Earth.  [¶¶ 6-7, 12, 116].[2]  Both were senior officers with integral roles in Blue Earth's day-to-day affairs.  [¶¶ 114-115].

By 2013, Blue Earth was foundering.  In the first quarter, it had a net loss of over $1.8 million and only $458,483 cash on hand.  [PEX A at 3].  It warned that it had "not yet established an ongoing source of revenues sufficient to cover its operating costs and allow it to continue as a going concern" and that its survival depended on obtaining "adequate capital."  *Id.* at 7 n.2.  By midyear, Blue Earth owed many vendors and risked insolvency without a capital infusion.  [¶ 126].

To attract capital, Defendants executed a transaction that they could use to make Blue Earth appear a more promising investment.  On July 15, 2013, Blue Earth announced that it had issued $44 million worth of Blue Earth stock to the stockholders of two small energy companies, IPS Power Engineering and Global Renewable Energy Group ("GREG").  [¶ 18(c); DEX 3 at 2].  In return, Blue Earth acquired the companies and their supposed "plans to build seven power plants and sell the thermal and electrical power generated to one large customer[.]"  [DEX 3

---

[2] Paragraph references are to the Complaint.  Defendants' and Plaintiff's exhibits are, respectively, "DEX" and "PEX."

at 2].  "Plans" was a generous description.  On the acquisition date, the two companies did not have even non-binding term sheets for those seven plants. [¶ 18(c)].  Blue Earth created those term sheets afterwards, and even then they provided a mere "framework to identify certain issues and matters that would have to be addressed in further discussions and definitive written agreements."  [¶ 2].

Defendants manipulated the accounting for the acquisition to make it appear that Blue Earth had acquired sizeable real assets that could spur growth.  They treated the aspirational plans as a discrete asset on Blue Earth's Form 10-Q balance sheet and called it "Construction in progress," implying that Blue Earth was building productive assets.  [DEX 7 at 3; ¶ 18].  On that balance sheet, Defendants valued the Construction "asset" at $44 million, and Defendants internally valued each potential plant at $6.2 million.  [¶ 18(a), (c)].  The $44 million figure was the full value of the stock Blue Earth had issued in the IPS/GREG acquisition—a fact Thomas (who sighed the 10-Q) buried in a footnote.  [DEX 7 ad 11 n.5].  That $44 million fictional "asset" was *over 56%* of Blue Earth's total assets.  *Id.* at 3.

Defendants' accounting for Blue Earth's acquisition of IPS and GREG and the construction "plans" violated Generally Accepted Accounting Principles, or "GAAP."  [¶ 18(d)].  Under GAAP, an acquirer records as "goodwill" the fair value of the consideration it pays for an acquiree, except that the acquirer may

record a separate value for any separately "identifiable assets" acquired.  FASB

ASC 805-30-30-1, 805-20-25-1.[3]  An asset is separately "identifiable" only if (1) it

is "separable" and thus "capable of being sold, transferred, licensed, rented or

exchanged," or (2) it "arises from a contractual or other legal rights."  FASB ASC

805-10-20 (definition of "Identifiable").  Under those GAAP rules, Blue Earth

should have accounted for nearly the entire $44 million purchase price as mere

"goodwill," not as the plans' value.  The plans were not separately "identifiable"

assets" with their own value, because they were not contracts that were transferable

or that created "legal rights":  On the acquisition date the plans were not even term

sheets, and the term sheets Defendants later created were non-binding.

Blue Earth repeated this GAAP violation on its 2013 Form 10-K [DEX 2 at

F-3], which caught the SEC's attention.  Starting in April 2014, the SEC wrote

Thomas several letters about that $44 million "Construction in progress" asset,

among other things.  [¶¶ 105-112].  On April 2, for example, the SEC asked

Thomas whether the Construction in Progress asset represented actual "physical

assets in construction" or instead "intangible asset[s] related to contract rights" and

also asked for further detail.  [¶ 106].  Thomas responded by admitting that the

---

[3] Excerpts of FASB ASC 805 and 360 are attached as PEX B and PEX C.  The
FASB Accounting Standards Codifications are the "authoritative generally
accepted accounting principles."  *FASB: About the Codification* at 4,
https://asc.fasb.org/imageRoot/71/58741171.pdf.

assets were simply "designs and plans," but he implied falsely that Blue Earth had "contract rights" to "build the plants." [¶ 108]. Thomas also stated falsely that the plant projects had "[a]ll begun preconstruction work" and that Blue Earth had ordered "equipment" for "5 projects." [¶ 109]. Weeks later, the SEC again wrote to Thomas about the assets, asking that Blue Earth's disclosures better describe the "nature of the assets," "[g]iven the significance of th[ose] assets." [¶ 111]. Soon after, the SEC again instructed Thomas to disclose more about the assets. [¶ 112].

Because of the SEC's questions, Defendants amended Blue Earth's 2013 Form 10-K. The final iteration was nearly 100 pages long, single spaced (excluding exhibits). [PEX D]. Despite the SEC's repeated admonitions, the amended 10-K's balance sheet still stated that Blue Earth had $44 million in "Construction in progress." *Id.* at F-3. And like the earlier Form 10-Q, the final amended Form 10-K still buried in a cursory footnote a misleading explanation that the $44 million represented the value of "Designs for co-generation projects" and "costs accumulated on 7" power plants. *Id.* at F-21 n.13.

Then Defendants grew more brazen. On May 16, 2014, Blue Earth filed a 10-Q with the SEC—a document that Thomas signed and certified as accurate. [¶¶ 16, 17; DEX 8]. Without explanation, the 10-Q reclassified some of the term sheets as $33,745,418 in "Property and equipment, net." [¶ 16]. Under GAAP,

"property and equipment" is a "tangible asset[] used to create and distribute an entity's" revenue-generating "products and services and include" buildings and machinery.  FASB ASC 360-10-05-3.  Blue Earth had virtually no tangible property and equipment and had not contracted to build any plants.  [¶ 18(b)].

The following month, an investment-management consultant approached JIG about investing in Blue Earth.  [¶ 16].  The consultant gave JIG a presentation with information directly from Blue Earth's balance sheet.  *Id.*  Like the May 10-Q, the presentation stated that Blue Earth had $33,745,418 in "Property and Equipment, net" and also that Blue Earth had $12,581,570 in "Construction in progress"—assets that together were over one-half of Blue Earth's total assets.  *Id.*  Due to those misrepresentations, which were based on Blue Earth's financial statements, JIG believed that Blue Earth had tens of millions of dollars in tangible, revenue generating assets—and over $12.5 million more actually under construction.  [¶ 22].  JIG believed that Blue Earth was a real company, with real assets.  On June 20, 2014, JIG thus bought $2.5 million in Blue Earth stock.  *Id.*

A month later, on August 22, 2014, Blue Earth signed its *first* contract to build a *single* power plant (a plant that is not complete today).  [¶ 18(b)].

Starting in early September 2014, JIG exchanged emails with Thomas and Francis directly.  [¶ 23]. Neither Thomas nor Francis disclosed that the "Property

and Equipment" asset on the balance sheet had consisted solely of the non-binding term sheets to discuss the possibility of building seven cogeneration plants.  *Id.* Nor did they explain how they and Blue Earth had calculated the valuation (*i.e.*, by disregarding GAAP rules for valuing acquisitions).  *Id.*  Thus, JIG continued to believe, incorrectly, that Blue Earth had tens of millions of dollars in tangible, revenue-generating property and equipment and had even more on the way.  JIG therefore invested another $4,017,095 through November 14, 2014.  [¶¶ 27-28].

On November 14, 2014, Blue Earth filed another 10-Q, which Thomas signed and certified.  [¶¶ 29, 30].  Although Blue Earth had not completed any plants or otherwise increased its tangible assets, the 10-Q stated falsely that Blue Earth had $52,248,308 in tangible, revenue generating "Property and Equipment" (an $18.5 million increase from May 2016).  [¶¶ 31, 31(b)].  At least $44,035,000 of the "asset" still consisted solely of the value that, in July 2013, Defendants had placed on the "plans" to build power plants.  [¶ 31(a)].

Days later, Thomas and Francis met with senior JIG representatives to solicit yet another investment.  [¶ 34].  Although they discussed the power-plant project, Defendants did not disclose that truth about the "Property and Equipment" classification.  *Id.* Quite the opposite:  During the meeting they stated that Blue

-8-

Earth had real, tangible assets.  *Id.*  So JIG still believed that Blue Earth had tens of millions of dollars of tangible, revenue-generating "Property and Equipment."

On November 25, 2014, JIG thus made another $10 million equity investment in Blue Earth.  [¶ 38].  JIG did so through a Common Stock Purchase agreement with Blue Earth that Thomas signed and that certified the accuracy of Blue Earth's November 2014 Form 10-Q and all of its other SEC filings.  *Id.*  That agreement also stated that JIG was "relying on the representations, acknowledgements and agreements made by" Thomas in the agreement. [¶ 39].

The following month, Blue Earth signed another agreement to build an additional power plant—the final time Blue Earth would sign such a contract. [¶ 42(b)].  Blue Earth had not completed the first plant (and has not today).  *Id.*

In February 2015, Blue Earth faced a crisis.  A key would-be investor suddenly changed the terms of the proposed investment.  [¶ 131].  Thomas felt that the terms were "very unacceptable" and that the investment's breakdown placed Blue Earth in a "vulnerable" and "precarious" position.  *Id.*  Confronted with that emergency, Thomas and Francis called senior JIG personnel to solicit an investment.  [¶ 40].  They also sent JIG a memorandum insisting that Blue Earth "urgent[ly]" needed money to pay key vendors so that Blue Earth could continue construction on a power plant, and concluding that Blue Earth needed to find a new

"investor" to replace the other one.  [¶ 131].  Thomas and Francis also met with JIG personnel, and emailed JIG personnel, to press the case.  [¶ 40].  Defendants never disclosed the truth about the "Property and Equipment."  [¶ 45].  To the contrary, in late February 2015, Thomas and Francis emailed Blue Earth's 2015-2017 budget to JIG—budgets that basically repeated the misclassification.  [¶ 42].

In addition to these misrepresentations and omissions, Thomas and Francis told JIG that they had lined up another source of "take-out financing" that would quickly repay any new JIG investment.  [¶ 49].  That, too, was false.  *Id.*

JIG then made a $10 million debt investment.  [¶ 50].  In return, JIG received a 12% senior secured convertible note, the principal and interest of which were convertible to Blue Earth common stock; 200,000 shares of Blue Earth stock; and additional warrants and options.  *Id.*  The note's maturity was only six months because JIG expected take-out financing to repay the investment.  *Id.*  Because JIG believed that Blue Earth had substantial real assets, JIG structured the deal (and later debt investments) so that Blue Earth's assets would serve as collateral. [¶¶ 54, 70, 78, 82].  In a press release, Thomas described the deal as an "investment" to fund plant construction and to provide working capital.  [¶ 53].

JIG and Blue Earth completed this transaction through a Note and Warrant Purchase Agreement that Thomas signed.  [¶ 50].  That agreement incorporated

Blue Earth's November 2014 10-Q (*i.e.*, the one stating that Blue Earth had $52 million in Property and Equipment) and contained false representations that the 10-Q was prepared in compliance with GAAP and was accurate. [¶ 51]. JIG made the investment based on this and the prior misrepresentations. [¶ 55].

Thereafter, Blue Earth filed Forms 10-K and 10-Q that continued to misrepresent that it had tens of millions of dollars in tangible "Property and Equipment." [¶¶ 56, 58, 65, 67]. Thomas again signed the filings and certified their accuracy. [¶¶ 56, 57, 65, 66]. Defendants hid information about that "asset" in a labyrinth of footnotes—even though SEC regulations say specifically that GAAP violations in financial statements are misleading notwithstanding "footnote or other disclosures." 17 C.F.R. § 210.4-01(a)(1) (2011). For example:

- In Footnote 2, the 10-K suggested that the "Property and Equipment" asset included a variety of tangible assets, including "Leasehold improvements," "Equipment and tools," and "Vehicles." [PEX H at F-9].

- Another footnote in the 10-K—Footnote 6—stated that nearly all of the asset was "Construction in progress – internal." *Id.* at F-14. To learn more about "Construction in progress – internal," however, the 10-K required a reader to find yet another footnote, Footnote 12. The footnote stated that the asset was "Designs for co-generation projects," but stated falsely that Blue Earth had "commenced construction of the projects." *Id.* at F-25.

- If a reader wanted information about how Blue Earth had calculated this "asset's" value, the 10-K required a reader to find yet another footnote— Footnote 16. *Id.* at F-27 to F-28.

Afterward, Blue Earth failed to repay JIG's March debt investment.  [¶ 133].  In September 2015, Blue Earth and JIG therefore agreed to refinance that investment through a 15% senior secured note for $10.6 million.  [¶ 70].  In the refinancing agreement, Blue Earth represented that the earlier 10-K and 10-Q were accurate and GAAP compliant.  [¶ 71].  JIG made the investment in reliance on this and the prior misrepresentations.  [¶ 73]

On October 13, 2015, Defendants again emailed JIG a copy of a proforma balance sheet that repeated the misrepresentation that Blue Earth had millions of dollars in tangible "Property and Equipment."  [¶ 75].  Later that month, JIG invested $4.94 million in return for a 9% senior secured note, relying on the "Property and Equipment" and take-out-financing misrepresentations.  [¶¶ 78, 80].

Once more, Blue Earth was unable to repay the investment.  [¶ 133].  So in December 2015, JIG and Blue Earth completed another note purchase that refinanced the October note and included an additional $2 million investment from JIG that would provide "working capital."  [¶¶ 81, 83].  JIG also received 704,842 shares of Blue Earth stock and a warrant to purchase additional shares.  *Id.*  The agreement that governed the December transaction—which Thomas signed— stated that all prior representations in the September agreement were accurate.

US2008 12659604 13

[¶ 84]. JIG invested in reliance on this and the prior misrepresentations and omissions. [¶ 85].

Blue Earth failed to make any of the scheduled principal payments to JIG on the notes.  [¶ 88].  For that reason, JIG declared Blue Earth in default on March 1, 2016.  *Id.*  Soon thereafter, Blue Earth entered bankruptcy.  [¶ 90].  Because Blue Earth did not in fact have $44 million in tangible "Property and Equipment," Blue Earth had few assets JIG could foreclose upon to recover its investments in the bankruptcy.  JIG recovered only a fraction of its debt investments, resulting in a $20 million deficiency.  [¶ 93].  JIG's equity investments were wiped out.  [¶ 92].

## III.   ARGUMENT AND CITATION OF AUTHORITY

Rule 12(b)(6) requires a plaintiff to plead claims that are "plausible," assuming all factual allegations are true.  *Rivell v. Private Health Care Sys.*, 520 F.3d 1308, 1310 (11th Cir. 2008) (per curiam).  The Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, and Rule 9(b) also require a plaintiff to plead certain facts with particularity, but they do not require "sheer perfection or set the bar so high as to make it near impossible to get beyond the dismissal stage." *100079 Canada Inc. v. Stiefel Labs., Inc.*, No. 11-22389, 2011 WL 13116079, at *14 & n.3 (S.D. Fla. Nov. 30, 2011).  Here, JIG's Complaint alleges plausible securities fraud claims against Defendants under federal and Georgia law.

-13-

**A.      JIG Has Pled a Plausible Rule 10b-5 Claim Against Defendants.**

Under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),

and SEC Rule 10b-5 promulgated thereunder (collectively, "Rule 10b-5"), a

defendant is liable for (1) making a material misrepresentation or omission in

connection with the purchase or sale of securities; (2) while acting with scienter (or

severe recklessness); (3) and thereby causing the purchaser or seller to suffer a

loss.  *In re Ebix, Inc. Secs. Litig.*, 898 F. Supp. 2d 1325, 1339 (N.D. Ga. 2012)

(Story, J.).  Defendants are liable under Rule 10b-5.  They repeatedly and

intentionally misrepresented that Blue Earth had at least $44 million in real,

revenue-generating "Property and Equipment," when in fact it had virtually none.

That led JIG to invest $34 million in Blue Earth, an investment that evaporated

when Blue Earth's assets failed to generate revenues sufficient to sustain the

company and also proved to be inadequate collateral for JIG's debt investments.

**1.      Defendants Misrepresented Material Facts and Failed to Disclose Other Material Facts that Should Have Been Disclosed to JIG.**

Defendants made material misrepresentations and omissions about Blue

Earth's largest "asset" and about the availability of take-out financing.

*First,* in several documents, Defendants repeatedly stated that *one-half* of

Blue Earth's assets were "Property and Equipment."  *E.g.*, [¶¶ 29, 42].  Those

statements egregiously violated GAAP—as well as common sense—and thus

misrepresented Blue Earth's financial condition.  *See generally In re Scientific-Atlanta, Inc. Secs. Litig.,* 239 F. Supp. 2d 1351, 1363 (N.D. Ga. 2002) (Story, J.); *In re Friedman's, Inc. Secs. Litig.*, 385 F. Supp. 2d 1345, 1360 (N.D. Ga. 2005); 17 C.F.R. § 210.4-01(a)(1).  Under GAAP (and ordinary usage) "Property and Equipment" means a tangible, physical asset companies use to distribute revenue-generating products and services. FASB ASC 360-10-05-3.  But as Blue Earth's own internal accounting confirms, virtually all of the "Property and Equipment" consisted *solely* of "intangible," non-binding term sheets in which the parties had done nothing more than agree to discuss the possibility that Blue Earth would build power plants.  *E.g.*, [¶ 31(a)]; *see generally* FASB ASC 805-10-20 (definition of "Intangible Asset").  This misrepresentation made Blue Earth appear a safer investment than it was – *i.e.*, a company with sizeable, real assets that could generate revenues and that could secure a debt investment.  *E.g.*, [¶¶ 20, 59]; *see SEC v. Mozilo*, No. 09-3994, 2010 WL 3656068, at *14 (C.D. Cal. Sept. 16, 2010) (understating the riskiness of corporate assets is materially misleading).

*Second*, Defendants overvalued the non-binding term sheets egregiously.  *In re Petrobras Secs. Litig.*, 116 F. Supp. 3d 368, 380 (S.D.N.Y. 2015) (overvaluing property and equipment was a material misrepresentation).  Defendants valued the term sheets at $44 million, *i.e.*, the price Blue Earth had paid to acquire IPS and

GREG.  [¶ 31(c)].  But, as explained above, under GAAP rules for acquisition accounting, the term sheets were not "identifiable assets" with their own values: They did not even exist on the acquisition date and were non-binding once Blue Earth created them.  So they had *zero* value under GAAP.

*Third*, Defendants obtained debt investments from JIG partly by stating that Defendants had lined up financing to repay JIG's investment.  [¶ 49].  That was false, which is why Blue Earth never repaid any of the principal.  [¶¶ 49, 88].

*Finally*, Thomas and Francis failed to correct the above misrepresentations, whether in SEC filings or during their many communications and meetings directly with JIG.  Quite the opposite, they represented in at least one meeting that Blue Earth's assets were real.  [¶ 36].  By failing to correct the SEC filings, Defendants violated their disclosure duties as senior executive officers and thus made actionable omissions under Rule 10b-5.  *In re JDN Realty Corp. Secs. Litig.*, 182 F. Supp. 2d 1230, 1243, 1247, 1252 (N.D. Ga. 2002) (Story, J.); *see generally First Va. Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir. 1977).

Defendants apparently concede the materiality of these representations and omissions but contend, incorrectly, that they were not misleading.

Defendants first contend that GAAP violations are "misrepresentations" only if the company has restated its financial statements or if an auditor otherwise

objected to them.  That is wrong.  GAAP violations are actionable without restatements or auditor objections.  *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002); *In re New Oriental Educ. & Tech. Grp. Secs. Litig.*, 988 F. Supp. 2d 406, 426-27 (S.D.N.Y. 2013);  *In re Ambac Fin. Grp., Inc., Secs. Litig.*, 693 F. Supp. 2d 241, 273 (S.D.N.Y. 2010); *Marksman Partners, LP v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1314 n.13 (C.D. Cal. 1996).  In *New Oriental*, for example, the court held that the plaintiffs had stated a viable Rule 10b-5 claim based on a "plausible" GAAP violation, even though auditors had certified the company's financials, the company never restated them, and an SEC division had accepted the accounting.  988 F. Supp. 2d at 417, 421, 426-27.  Moreover, the blessing of Blue Earth's auditor would be a weak defense here: An accounting regulator has revoked the auditor's registration precisely because of its shoddy Blue Earth audits—including how the auditor reviewed Blue Earth's decision to "assign[] the entire excess purchase price . . . to intangible assets" in the IPS/GREG acquisition. [PEX I, ¶ 42, § IV(B)].

Defendants' cases are not to the contrary.  One acknowledges that a GAAP violation may be a misrepresentation even without a restatement.  *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 987 (N.D. Cal. 2007).  And all hold

merely that a restatement or auditor objection might be necessary to make a GAAP violation actionable if the violation is minor or dubious.[4]  That is not the case here.

Defendants argue that they complied with GAAP because ASC 360-10-30-1 justifies the "Property and Equipment" classification.  Not so.  The provision does not say how to *classify* an asset; the provision merely explains how to apply the rule in § 835-20-05-1 for capitalizing interest when determining an asset's historical cost.  *See* [PEX C at 3; PEX F].  And setting aside the "Property and Equipment" classification, Defendants do not argue that they complied with GAAP when they treated the non-existent, non-binding term sheets as "identifiable" assets with their own $44 million value.  In all events, a jury should decide whether GAAP has been violated, after hearing expert testimony.  *E.g.*, *Fla. St. Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001).

Defendants also argue that they adequately disclosed that the power-plant projects were mere term sheets.  Defendants miss the point.  Even if Defendants disclosed that the projects were mere term sheets, investors had no reasonable way to know either (1) that Defendants had placed those term sheets under "Property

---

[4] *Strauss*, 527 F. Supp. 2d at 987 (GAAP violation insufficient if dependent merely on "two former employees[']" "views"); *In re Officemax, Inc. Secs. Litig.*, No. 00-2432, 2002 WL 33959993, at *17-18 (N.D. Ohio. Mar. 26, 2002) (GAAP violation was too unclear to show scienter); *Turner v. MagicJack VocalTec, Ltd.*, No. 13-448, 2014 WL 406917, at * 9 & n.1 (S.D.N.Y. Feb. 3, 2014) (GAAP violation did not suffice where the violation was unclear and also of insubstantial "magnitude").

-18-

and Equipment" or (2) that the term sheets constituted nearly *all* of that $44 million asset and thus one-half of Blue Earth's assets.

To the contrary, Defendants splintered and buried such facts in a number of footnotes across many lengthy SEC filings.  For example, the 10-Q for March 31, 2014 explained the "Property and Equipment" entry in a footnote.  [PEX E at 11 n.7].  Even then, the disclosure said merely that the asset consisted mostly of "Cogeneration plants (under construction)."  The footnote did not explain that 100% of those "plants" were non-binding term sheets or how Blue Earth had valued them after the acquisition.  Likewise, as explained above, the 89-page 2014 10-K required investors to skip from footnote to footnote for more information.

Such disclosures are legally insufficient.  SEC regulations say specifically that "footnote or other disclosures" do not cure GAAP violations in financial statements.  17 C.F.R. § 210.4-01(a)(1); *see also In re Alstom SA*, 406 F. Supp. 2d 433, 453 & n.14 (S.D.N.Y. 2005).  Courts also hold that piecemeal disclosures do not remedy fraud.  *E.g. Kennedy v. Tallant*, 710 F.2d 711, 720 (11th Cir. 1983) ("Full and fair disclosure cannot be achieved through piecemeal release of subsidiary facts[.]"); *Marksman*, 927 F. Supp. at 1306-07 (disclosure in a 10-K addendum did not defeat fraud claim); *Mozilo*, 2010 WL 3656068, at *9.  For, investors "should not be called upon to piece together buried information from

distinct parts of financial statements" or "footnotes" "to understand basic aspects of a company's finances."  *Alstom*, 406 F. Supp. 2d at 453 n.11.  This reasoning squarely applies here.

That JIG is supposedly "sophisticated" does not mean that it was obligated to ferret out Defendants' misrepresentations; it just demonstrates the effectiveness of Defendants' fraud in inducing JIG's investments.  Assuming sophisticated investors must investigate more than others, that duty is "limited" to conducting a "basic inquir[y]" or to uncovering facts that "practically faced" the investors. *Alpha Cap. Anstalt v. New Gen. Biofuels, Inc.*, No. 13-5586, 2014 WL 6466994, at *11 (S.D.N.Y. Nov. 18, 2014).  Such investors are not "charged with a complete understanding of every nuance" in available documents, like the buried footnotes here.  *Longden v. Sunderman,* 737 F. Supp. 968, 975 (N.D. Tex. 1990).  In any event, whether Defendants' disclosures sufficed for an investor of JIG's "sophistication" is a jury question.  *Id.*; *Alameda v. Nuveen Mun. High Income Opp. Fund.*, No. 08-4575, 2009 WL 1424529, at *7 (N.D. Cal. May 20, 2009).

Finally, Defendants argue that JIG must plead more detail to show that their "take-out financing" statement was fraudulent.  But JIG has pled what the

US2008 12659604 13

statement was, who made it, when they did so, and why it was false. [¶¶ 40, 49,

88].  That is sufficient.  *100079 Canada*, 2011 WL 13116079, at *14 & n.3.[5]

### 2.    Francis Also Is Responsible for the Fraud.

The group-pleading doctrine allows the Court to presume that Francis is

responsible for the fraud, because he was a senior officer with day-to-day

responsibility for the company—including classifying the asset at issue and

communicating with investors. [¶¶ 7, 115, 121, 153-56]; *City of Pontiac Gen.*

*Emps.' Ret. Sys. v. Lockheed  Martin Corp.*, 875 F. Supp. 2d 359, 373-75

(S.D.N.Y. 2012); *see JDN Realty*, 182 F. Supp. 2d at 1251.  Moreover, he had a

duty to disclose the truth to JIG and made fraudulent omissions by not doing so:

He had such a duty as a senior officer who helped decide how to classify the asset

at issue and who was responsible for investor relations.  *JDN Realty*, 182 F. Supp.

2d at 1247.  Likewise, he had such a duty because he participated in

communications where Thomas defrauded JIG.  *Barrie v. Intervoice-Brite, Inc.*,

409 F.3d 653, 656 (5th Cir. 2005); [¶¶ 34, 42, 75].

---

[5] Defendants argue that contractual merger clauses in the note purchase agreements
mean that JIG could not have relied on this misrepresentation, because it was not
written in the contract.  State law governs such clauses' effect.  *Hall v. Coram
Healthcare Corp.*, 157 F.3d 1286, 1289 (11th Cir. 1998).  Under the governing
New York law [DEX 23 at 73; DEX 24 at 69], those general, boilerplate clauses
are ineffective as a matter of law.  *E.g.*, *Transit Rail LLC v. Marsala*, No. 05-0564,
2007 WL 2089273, at *9-10 (W.D.N.Y. July 20, 2007).

US2008 12659604 13

### 3.      Defendants Acted with Scienter.

To plead scienter, a Rule 10b-5 plaintiff need not plead a "smoking-gun."

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007); *In re*

*Paincare Hldgs. Sec. Litig.*, 541 F. Supp. 2d 1283, 1293 (M.D. Fla. 2008); *In re*

*Carter's Inc. Secs. Litig.*, No. 08-02940, 2012 WL 3715241, at *1 n.5 (N.D. Ga.

Aug. 28, 2012).  Rather, a plaintiff must allege facts that, if assumed true and

considered "collectively," could lead a reasonable person to "infer" "a fifty-fifty

chance" that the defendant made a misrepresentation or omission at least

recklessly.  *Ebix*, 898 F. Supp. 2d at 1344;  *Tellabs*, 551 U.S. at 326.

Collectively, the facts alleged here require that conclusion.  This is not a

case where corporate officers might not have known of a fraud perpetrated inside a

large, far-flung enterprise.  To the contrary, Defendants, as hands-on officers of a

small company, must have known that the company's biggest asset was mere term

sheets.  And as sophisticated officers who helped classify those term sheets and

directly solicited JIG's investments, they surely knew about the "Property and

Equipment" classification—and that the classification violated GAAP and

common sense.  Moreover, Defendants had acute motives to make Blue Earth

appear a safe investment through such a misclassification, *i.e.*, to raise capital that

would stem Blue Earth's collapse and to save their own jobs and investments.

-22-

***Core Operations & Glaring GAAP Violations***:  A senior officer likely knows about corporate fraud if (1) he has day-to-day management responsibility and (2) the fraud relates to the company's core operations.  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987-89 (9th Cir. 2008); *Makor Issues & Rights Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709-11 (7th Cir. 2008).  All the more so if (3) those core operations are directly within the officer's purview or if the company is small.  *Ebix*, 898 F. Supp. 2d at 1346-47 (officers are likely aware of fraud in their "purview"); *Batwin v. Occam Networks, Inc.*, No. 07-2750, 2008 WL 2676364, at *12 (C.D. Cal. July 1, 2008) (small-company officers are likely to detect fraud).

Those are the facts here.  First, Thomas and Francis were key executives with day-to-day responsibilities for running Blue Earth.  [¶¶ 114-115].  Second, the power-plant projects were one of Blue Earth's areas of "primary focus," projects from which the company expected over a billion dollars in revenue and that were half the company's balance sheet.  [¶¶ 117-119].  Third, Blue Earth was a "small company" [¶ 116], and the power-plant projects were in both Defendants' purview: Thomas signed the agreement to acquire IPS and GREG and their plans to build seven plants [PEX G at 66]; both Thomas and Francis solicited investments for the plant projects and described those projects to JIG [¶¶ 119, 120, 122, 135, 139]; Thomas admitted to the SEC that the projects were not real plants [¶ 108]; Thomas

-23-

commented on the projects publicly [¶ 140]; and Francis was the public's point of contact about the projects [¶ 155].[6]  Assuming all those facts as true, a reasonable person would find at least a "50-50 chance" that Defendants knew about, or recklessly disregarded, the fraud related to the plant projects.

Defendants argue that even if the power-plant projects were critical enough for them to have known about them, that fact does not suggest they also knew about fraudulent accounting for the projects.  But the projects' importance at least means Defendants knew that the projects were mere term sheets with no current value—the facts necessary to evaluate the projects' accounting treatment.  *See In re Atlas Air Worldwide Hldgs., Inc. Secs. Litig.*, 324 F. Supp. 2d 474, 490-91 (S.D.N.Y. 2004).  And other facts show that Defendants also knew, or recklessly disregarded, how Blue Earth had accounted for the projects in SEC filings and that this accounting violated GAAP (and the company's internal analysis, [¶ 18(a)]):

- Defendants' senior positions mean that the company's finances were in their purview.  *Ebix*, 898 F. Supp. 2d at 1346-47; *Friedman's*, 385 F. Supp. 2d at 1362.

- Both Defendants helped decide how to classify the power-plant projects on the company's financial statements, and Thomas signed and certified those statements.  *E.g.*, [¶¶ 17, 121]; *Scientific-Atlanta*, 239 F. Supp. 2d at 1366 (that defendants played a "role in calculating and disseminating

---

[6] Blue Earth's prospective investments were a major part of Blue Earth's strategy and in both Defendants' purview.  [¶¶ 14, 40, 115, 120, 122, 131]. So they surely knew that another investor was not available to "take out" JIG's debt investment.

the financial statement" is evidence of scienter); *JDN*, 182 F. Supp. 2d at
1242 (that defendant signed financial statement was evidence of
scienter); *Atlas*, 324 F. Supp. 2d at 491 (same).

- The decision to label the non-binding term sheets as tangible "Property
  and Equipment" is such an "obvious," "common-sense" violation of a
  "simple" GAAP rule that "it is more likely that the Defendants were
  aware of the violation[.]"  *In re MicroStrategy, Inc. Sec. Litig.*, 115 F.
  Supp. 2d 620, 638 (E.D. Va. 2000).

- The GAAP violations fundamentally mischaracterized one-half of the
  company's assets *and* overvalued them by $44 million.  Such a major
  GAAP violation is "extremely probative of scienter"—*i.e.*, a violation
  senior executives likely knew about.  *Carpenters Health & Welfare Fund
  of Phil. v. Coca Cola Co.*, No. 00-2838, 2002 WL 34089163, at *15
  (N.D. Ga. Aug. 20, 2002); *see also Ebix*, 898 F. Supp. 2d at 1345 n.10
  (GAAP violation's "magnitude" helps determine scienter).

- Defendants received red flags about the GAAP violation.  *See Ebix*, 898
  F. Supp. 2d at 1345 n.10.  Specifically, they received SEC warning letters
  about Defendants' deceptive accounting for the very asset at issue.  *In re
  Am. Bus. Fin. Servs., Inc. Noteholder Litig.*, No. 08-0784, 2008 WL
  3405580, at *3, 8 (E.D. Pa. Aug. 11, 2008).

- Both Defendants were sophisticated businessmen with finance
  experience.  Thomas had served as CEO multiple times and had been a
  financial consultant, and Francis had twice been a CFO.  [¶¶ 103-104].

In short, Defendants surely knew the truth about the nature and value of the term

sheets and also that Blue Earth had fraudulently accounted for them.

Defendants argue that they could not have known about the GAAP

violations here for the same reasons the defendants did not in *Espinoza v. Whiting*,

8 F. Supp. 3d 1142 (E.D. Mo. 2014).  But in that case unique facts, absent here,

demonstrated the defendants' lack of scienter, such as that the defendants had a

-25-

"cogent explanation" for their accounting decisions; that the accounting violation did not include "inaccurate" "*values*"; and that the defendants demonstrated good faith by "repeatedly and accurately" disclosing the truth. *Id.* at 1151-52.

Defendants also argue that GAAP is open to interpretation and thus something one cannot violate intentionally or recklessly. That is not always the case, and it is not here. *MicroStrategy,* 115 F. Supp. 2d at 638.

***Deceptive Pattern***: A defendant is more likely to have committed fraud intentionally if that fraud is part of a pattern of deception. *E.g.*, *Joffee v. Lehman Bros, Inc.*, No. 04-3507, 2005 WL 1492101, at *12 (S.D.N.Y. June 23, 2005); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 693-94 (S.D. Tex. 2002); *SEC v. Lauer*, No. 03-50612, 2008 WL 4372896, at *23 (S.D. Fla. Sept. 24, 2008). Defendants engaged in such a pattern here. For example, in October 2013, Thomas represented to investors that Blue Earth had "signed" "agreements" and "contracts" to build the seven power plants. [¶¶ 135-137]. At the time, Blue Earth did not have a *single* contract to build a plant. [¶ 18(b)]. Defendants argue that they disclosed this fact and thus acted in good faith—but Defendants point to disclosures *months later* that the SEC had to coax from them. Next, in September 2014, Thomas represented that Blue Earth would complete three to four power plants by year-end, yet at that late date Blue Earth still had at

-26-

most two plants under construction.  [¶¶ 138-140].  Thomas elsewhere admitted at
the time that Blue Earth's first plant would not open until early 2015.  *Id.*
Additionally, in February 2015 Defendants told JIG that their "worst case" 2017
revenue projection was $153 million—an eight-fold increase from 2014 that was
impossible given the power plants' status. [¶ 141; PEX H at F-4].  Similarly, in
May 2011 Thomas projected that Blue Earth's 2012 revenue would exceed $100
million.  [PEX J].  Actual 2012 revenues were under $8.5 million.  [DEX 2 at F-4].

   ***Economic Incentives*:**  That a corporate officer had acute economic
incentives to mislead investors or inflate stock prices is evidence that he did so
with scienter.  Such is the case, for example, if he had an incentive to defraud
investors of their capital to stem the company's losses or collapse.  *WPP
Lexembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1052 (9th
Cir. 2011); *Howard v. Everex Sys.*, *Inc.*, 228 F.3d 1057, 1064 & n.8 (9th Cir.
2000); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 253-54 (D. Mass.
2006).  So too if an officer has an incentive to inflate stock prices so that the stock
serves as valuable currency in transactions like acquisitions.  *In re Omnicom Grp.,
Inc. Secs. Litig.*, No. 02-4483, 2005 WL 735937, at *12-13 (S.D.N.Y. Mar. 30,
2005); *Rothman v. Gregor*, 220 F.3d 81, 93-94 (2d Cir. 2000).

US2008 12659604 13

Defendants had both these incentives when they misled JIG and inflated Blue Earth's value.  First, they had an incentive to mislead investors into making capital infusions in 2014, *i.e.*, to avert Blue Earth's insolvency.  [¶ 126].  They had the same incentive in early 2015 (when they extracted JIG's first debt investment), *i.e.*, to replace a key investor that suddenly withdrew and imperiled Blue Earth. [¶ 131].  Second, Defendants also had an incentive to inflate the stock price, because Blue Earth used its stock as currency in an ongoing, "multi-year program of growth through acquisition" and in other transactions.  *Omnicom*, 2005 WL 735937, at *12; [¶ 129(a)-(z)(iv)].  Defendants argue that any corporate executive has these incentives, so they are not evidence of scienter here.  But incentives to avoid a company's collapse or to finance an ongoing acquisition strategy are unusually acute and thus were unusually strong motives to mislead.  *Brumbaugh*, 416 F. Supp. 2d at 253; *Omnicom*, 2005 WL 735937, at *13.

Defendants' remaining two arguments also fail.  To begin, they contend that Blue Earth's begrudging disclosures (made at the SEC's insistence) about the "letters of intent and the status of the cogeneration plants" demonstrate Defendants' "good faith."  As explained above, however, those disclosures did not divulge that the non-binding term sheets were virtually all of the "Property and Equipment" or that the term sheets were overvalued by at least $44 million.  So

those disclosures do not show that Defendants made the misrepresentations at issue in "good faith."  And the buried disclosures were too obscure to suggest good faith. *Mozilo*, 2010 WL 3656068, at \*19.  In fact, their obscurity suggests the opposite. *SEC v. True North Fin. Corp.*, 909 F. Supp. 2d 1073, 1113-14 (D. Minn. 2012).

Defendants also argue that because they kept their personal Blue Earth stock, they could not have had scienter.  That is incorrect, *Green Tree*, 270 F.3d at 663, and shows that they had an incentive to commit fraud that would inflate their investments and save their jobs.  *See Scientific-Atlanta*, 239 F. Supp. 2d at 1366. Considering the facts collectively, a reasonable person could find a "50-50 chance" that Defendants acted with intent or at least severe recklessness.

### 4.    Defendants' Fraud Proximately Caused JIG's Loss.

JIG must plead that Defendants' fraud caused its loss,[7] albeit only with enough detail to "satisfy Rule 8 standards."  *Ebix*, 898 F. Supp. 2d at 1347.  As a "decisive majority" of circuits have held, JIG may do so by alleging that the fraud concealed a risk that materialized and caused the loss.  *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F. 3d 376, 384-85 (6th Cir. 2016); *see also*

---

[7] In a footnote, Defendants argued that the September and December notes "paid in full" the March and October notes, so JIG cannot show any damages at all related to the latter notes.  That is incorrect; the September/December notes merely refinanced the March/October notes, rather than repay them, which is why JIG never recouped the principal on any notes.  [¶ 88].  Thus, JIG suffered damages as to all notes.  *Carlucci v. Han*, 886 F. Supp. 2d 497, 511-12 (E.D. Va. 2012).

US2008 12659604 13

*In re Lehman Bros. Secs. & ERISA Litig.*, 799 F. Supp. 2d 258, 307 n.323 (S.D.N.Y. 2011) (corrective disclosure and price decline are unnecessary).

Defendants' fraud concealed two such risks.  [¶¶ 145-149].  First, Defendants concealed the risk that Blue Earth did not have enough earnings-generating assets to sustain its business.  They did so by misrepresenting Blue Earth's "financial strength"—*i.e.*, stating that Blue Earth had at least $44 million in tangible assets that could deliver goods and services and thus generate revenues. *Lehman Bros.*, 799 F. Supp. 2d at 306; *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 949 (9th Cir. 2005).  How much revenue?  If those assets had been actual property and equipment, *i.e.*, power plants, Blue Earth's own estimates predicted over $13 million in additional pre-tax earnings per year (doubling 2014 revenue).  [¶ 146].  Second, Defendants concealed the risk that they lacked tangible assets that, in bankruptcy, a secured investor could liquidate to recover his investment.  They did so by misrepresenting that Blue Earth's term sheets were in fact at least $44 million in "Property and Equipment."

Both risks materialized to destroy JIG's investments.  First, Blue Earth's assets did not generate enough revenues to repay its debts, so the company entered bankruptcy.  [¶¶ 146, 149]; *Livid*, 416 F.3d at 949 (plaintiff pled loss causation where fraud concealed "dire financial situation, [and the company] eventually went

-30-

bankrupt, which caused [plaintiff] to lose the entire value of its investment"); *King Cnty., Wash v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 340 (S.D.N.Y. 2010) (noteholder plaintiff pled loss causation where company's assets proved "worthless" and company therefore entered receivership).  Second, in bankruptcy, Blue Earth's lack of tangible assets kept JIG from foreclosing on anything to recover JIG's investments.  [¶ 147]; *Alpha Cap.*, 2014 WL 6466994, at *12.  As a result, JIG lost nearly all of its investment.  [¶¶ 158-159].[8]

Defendants argue that JIG itself caused the loss by defaulting Blue Earth. But the only reason JIG did so is that Blue Earth's assets did not generate revenue sufficient to repay JIG's debt investments—*i.e.*, the first risk's materialization. [¶ 88].  At the very least, the risks above were substantial contributors to JIG's loss, which is all JIG must plead.  *Ebix*, 898 F. Supp. 2d at 1340.

### 5.    The Notes Were Investments and thus Securities.

JIG's notes were securities.  The Exchange Act says that the "term 'security' means any note," so all notes are presumptively securities.  *Reves v. Ernst & Young*, 494 U.S. 56, 60 (1990) (quoting 15 U.S.C. § 78c(a)(10)); *id.* at 65.  To confirm that a particular note is a security, courts consider several factors, and

---

[8] Additionally, Defendants' misrepresentation that take-out financing was available concealed the risk that such financing was not available.  That risk materialized when no other source repaid JIG's debt investments and Blue Earth therefore defaulted and went bankrupt.  [¶ 148].

those factors support JIG here.  *Reves*, 494 U.S. at 66.  First, the notes raised

capital for the power-plant projects and Blue Earth's general operations and also

generated interest for JIG—indicia of a security.  *Id.* at 66, 68; [¶¶ 83, 95, 96].

Second, the public would see the notes as investments, and thus securities, because

that is how the parties described them.  *Reves*, 494 U.S. at 68-69; [¶ 97].  Third,

riskier notes are securities, and no regulatory regime made the notes safer here.

*Reves*, 494 U.S. at 67; [¶ 99].  Nor did the notes' collateral, because much of that

collateral (the "Property and Equipment") was a mirage.  *SEC v. Wallenbrock*, 313

F.3d 532, 539-40 (9th Cir. 2002).  Fourth, the March note was convertible to stock,

which also indicates that the note was a security.  *Carlucci*, 886 F. Supp. 2d at 513.

Although JIG was the notes' only distributee, that is not controlling.  *Id*.  Thus,

Defendants cannot rebut the *Reves* presumption that the notes are securities.

Defendants argue that the notes are short-term, collateralized notes from a

small business and thus resemble notes *Reves* said might not be securities.  But that

merely begins the multi-factor analysis above, *see Wallenbrock*, 313 F.3d at 537-

38, which is why courts have deemed similar notes to be securities.  *SEC v.*

*Thompson*, 732 F.3d 1151, 1155, 1162-69 (10th Cir. 2013) (deeming a security a

six-month note possibly secured by corporate assets); *Wright v. Downs*, No. 91-

2050, 1992 WL 168104, at *3 (6th Cir. 1992) (deeming a security a church-issued

note secured by church property).  The decisions Defendants cite agree and hold

only that notes are not securities if (unlike here) they were "highly similar" to

consumer-financing notes or merely resolve cash-flow issues.[9]

    In any event, the notes here are "investment contracts," and thus another

security varietal, because Blue Earth used JIG's money to invest in the power-plant

projects and other operations; because JIG derived profits (*i.e.*, interest) solely

through Blue Earth's efforts; and because JIG depended on Blue Earth to pay that

interest.  [¶¶ 95, 96].  *SEC v. Novus Tech, LLC*, No. 07-235, 2010 WL 4180550, at

*8-9 (D. Utah Oct. 20, 2010), *aff'd*, 732 F.3d 1151 (10th Cir. 2013); *see generally*

*SEC v. Reynolds*, No. 06-1801, 2010 WL 3943729, at *2-3 (N.D. Ga. Oct. 5,

2010).  In sum, JIG has pled a plausible Rule 10b-5 claim.[10]

## B.    JIG Has Adequately Pled the Control Person and State Law Claims.

    Defendants' attacks on JIG's Section 20(a) and state-law claims also fail.

    Exchange Act § 20(a) makes defendants liable if they have the "power to

control the general business affairs of a primary violator" (*i.e.*, Blue Earth) and

---

[9] *Asset Protection Plans, Inc. v. Oppenheimer & Co., Inc.*, No. 11-440, 2011 WL 2533839, at *3-4 (N.D. Ga. June 27, 2011); *In re Hornyak*, No. 08-09048, 2010 WL 2044469, at *3 (N.D. Ga. Apr. 1, 2010).

[10] In a footnote, Defendants argue that they left Blue Earth before September 2015 and thus could not have "made" misrepresentations in connection with the September and December notes.  But the agreements for those notes incorporated Defendants' earlier misrepresentations.  [¶¶ 71, 84].

also had the power to "indirectly control or influence" the "specific corporate policy which resulted in the primary liability" (*i.e.* Blue Earth's financial statements). *Ebix*, 898 F. Supp. 2d at 1340-41. Both requirements are met here.

Defendants move to dismiss the § 20(a) claim because the Complaint supposedly does not plead that they had the power to "indirectly control or influence" how the company's financials reported the term sheets. To the contrary, the Complaint satisfies the applicable Rule 8 pleading standard. *Teamsters Local 617 Pension & Welfare Fund v. Appollo Grp., Inc.*, 690 F. Supp. 2d 959, 965-70 (D. Ariz. 2010). The accounting was within both Defendants' "purview," and thus something they had the "power" to "influence," because they both were "directly involved in the decision how to classify" those assets. [¶¶ 121, 154-156]; *see Local 617*, 690 F. Supp. 2d 976-77 (defendant controlled financial-statement fraud in his "purview"). And Thomas signed the financials, which underscores his influence over them. *Friedman's*, 385 F. Supp. 2d at 1373. Defendants also argue that after May 2013 Francis lacked control over Blue Earth, but he was still a "critical manager" afterward. [¶¶ 115, 153-154]. This is sufficient.

Defendants argue that the state-law claims rise or fall with the Rule 10b-5 claims. That is wrong, because the state-law claims have less demanding elements

that Defendants overlook.  For example, O.C.G.A. § 10-5-58(b), (g)(1)-(2) makes

scienter an affirmative defense, not a claim element.

Finally, Defendants attack the negligent-misrepresentation and fraud claims,

arguing that JIG does not plead that it exercised due diligence.  But JIG does so

plead [¶¶ 171, 183], which makes this a jury question.  *Nebo Ventures, LLC v.*

*NovaPro Risk Solutions, LP*, 752 S.E.2d 18, 23 (Ga. Ct. App. 2013).  "Due

diligence" did not require JIG to root out Defendants' buried disclosures.  JIG need

not "exhaust all means at [its] command to ascertain the truth."  *Id.* at 23, 24.

## IV.   **CONCLUSION**

The Court should thus deny the motion to dismiss.  Alternatively, JIG

respectfully requests leave to amend its Complaint.

Respectfully submitted on April 7, 2017,

KILPATRICK TOWNSEND &
   STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4530
Telephone:  (404) 815-6500
Facsimile:  (404) 815-6555
shudson@kilpatricktownsend.com
jchess@kilpatricktownsend.com

/s/    Stephen Hudson
Stephen E. Hudson
Georgia Bar No. 374692
Josh C. Hess
Georgia Bar No. 371139


*Attorneys for Plaintiff*

-35-

## **CERTIFICATE OF COMPLIANCE**

I certify that the foregoing brief complies with the font and point

requirements of LR 5.1.

April 7, 2017,

KILPATRICK TOWNSEND                s/      Stephen Hudson
     & STOCKTON LLP                Stephen E. Hudson
1100 Peachtree Street, Suite 2800   Georgia Bar No. 374692
Atlanta, Georgia 30309
(404) 815-6500
(404) 815-6555 (fax)
shudson@kilpatricktownsend.com     *Counsel for Plaintiff*

US2008 12659604 13

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 7, 2017, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will automatically send

email documentation of such filing to all attorneys of record.


|  |  |
|---|---|
|  | s/   Stephen Hudson |
| KILPATRICK TOWNSEND | Stephen E. Hudson |
|    & STOCKTON LLP | Georgia Bar No. 374692 |
| 1100 Peachtree Street, Suite 2800 | |
| Atlanta, Georgia 30309 | |
| (404) 815-6500 | |
| (404) 815-6555 (fax) | |
| shudson@kilpatricktownsend.com | *Counsel for Plaintiff* |